# ORAL ARGUMENT NOT YET SCHEDULED

## No. 26-1062

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA – BROADBAND ASSOCIATION OF VIRGINIA; and NEWSMAX MEDIA INC.,

*Appellants/Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent*.

On Notice of Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

## EMERGENCY MOTION FOR STAY AND
## INJUNCTION PENDING APPEAL

JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellants/Petitioners Broadband Communications Association of Pennsylvania; Broadband Communications Association of Washington; Indiana Cable and Broadband Association; Mississippi Internet and Television; Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia*

*(Additional Counsel Listed on Inside Cover)*

March 21, 2026

MARK I. BAILEN P.C.
BAILEN LAW
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 656-0422
mb@bailenlaw.com

*Counsel for Appellant/Petitioner Newsmax Media Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit 26.1:

- The Broadband Communications Association of Pennsylvania certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The Broadband Communications Association of Washington certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The Indiana Cable and Broadband Association certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- Mississippi Internet and Television certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The Tennessee Cable & Broadband Association certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- VCTA – Broadband Association of Virginia certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- Newsmax Media Inc.'s parent company is Newsmax Inc.  No publicly held company holds 10% or greater ownership interest in Newsmax Media Inc.

Newsmax Media Inc. is an American cable news and digital media company.  The remaining Appellants/Petitioners are state-wide trade associations representing cable and broadband operators, equipment suppliers, programmers, and other allied companies in their respective states.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici.

Appellants/Petitioners (hereinafter "Appellants") are the Broadband Communications Association of Pennsylvania; the Broadband Communications Association of Washington; the Indiana Cable and Broadband Association; Mississippi Internet and Television; the Tennessee Cable & Broadband Association; VCTA – Broadband Association of Virginia; and Newsmax Media Inc. Appellee/Respondent is the Federal Communications Commission (FCC). The following persons or entities also participated in proceedings before the Commission:

- American Federation of Teachers

- American Economic Liberties Project

- American Television Alliance

- Asian Americans Advancing Justice

- Asian and Pacific Islander American Vote

- Business Forward

- CCB License, LLC

- Center for American Rights

- Center for Journalism & Liberty at Open Markets Institute

- Christopher Rollins

- Cincinnati Bell Extended Territories LLC d/b/a AltaFiber

- Committee for the First Amendment

- Common Cause

- Consumer Action

- Digital First Project

- DIRECTV, LLC

- EchoStar Corporation

- Empowering Pacific Islander Communities

- Eric Williams

- Fourth Branch Action

- Free Press

- Get Free

- Hawaiian Telecom Services Company, Inc.

- Hispanic Federation

- Hispanic Tech and Telecommunications Partnerships

- Indivisible

- Japanese American Citizens League

- Jim Petzel

- LGBT Tech

- Local Independent Online News Publishers

- Mafia Monthly

- Maher Akremi

- MANA, A National Latina Organization

- Media and Democracy Project

- Multicultural Media & Correspondents Association

- Multicultural Media, Telecom and Internet Council

- NAACP

- National Action Network

- National Association of Black Owned Broadcasters

- National Association of Broadcast Employees and Technicians - Communications Workers of America

- National Black Justice Collective

- National Coalition on Black Civic Participation

- National Content & Technology Cooperative

- National Council of Asian Pacific Americans

- National Council of Negro Women

- National Hispanic Media Coalition

- National LGBTQ Taskforce Action Fund

- National Newspaper Publishers Association

- National Urban League

- Nexstar Media Group, Inc.

- NTCA-The Rural Broadband Association

- OCA-Asian Pacific American Advocates

- One Ministries, Inc.

- Optimum Communications

- Public Citizen

- Public Knowledge

- Representative Robin L. Kelly

- Representative Steven Horsford

- Representative Troy A. Carter, Sr.

- Representative Wesley Bell

- SAG-AFTRA

- Sean Patrick Patterson

- Sikh American Legal Defense and Education Fund

- Sinclair Inc.

- TEGNA Inc.

- Terry B

- The Leadership Conference on Civil and Human Rights

- The NewsGuild - Communications Workers of America

- TIG Advisors LLC

- United Church of Christ Media Justice Ministry, Inc.

- Writers Guild of America East

- Writers Guild of America West

**B.     Ruling Under Review.**

The ruling under review is the March 19, 2026 Media Bureau order granting the applications to transfer control of broadcast licenses held by TEGNA Inc. to Nexstar Media Group, Inc.  The order, which was released a few minutes before 7:00 PM ET, is reproduced at NOA.App.1-40.  Roughly 15 minutes after the order was publicly released, Nexstar issued a press release announcing "that it has closed its acquisition of TEGNA Inc."  Press Release, (Mar. 19, 2026), https://perma.cc/E9WE-4E72.  On March 20, 2026, Appellants filed an application for review with the full Commission.  As of this filing, the Commission has not acted on Appellants' application.  Appellants simultaneously filed a motion asking the Commission to stay the Media Bureau's order pending resolution of the application for review.  Due to the urgent need to stop the parties from taking further steps to consummate the merger, Appellants requested a ruling by March 21 at 3:00 PM. Appellants noted that, absent a ruling by that time, they would deem the motion for an injunction to be denied.  As of this filing, the Commission has not acted on Appellants' motion for a stay.

**C.  Related Cases.**

This case has not previously come before this Court or any other, and counsel for Appellants is not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. iii

TABLE OF AUTHORITIES ............................................................................... x

GLOSSARY OF ABBREVIATIONS .................................................................. xv

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 4

      A.     Statutory Background ................................................................ 4

      B.     Regulatory Background ............................................................ 7

      C.     Factual and Procedural Background ...................................... 9

ARGUMENT ................................................................................................ 14

I.      Appellants' Challenge To The Media Bureau's Order Is Likely To Succeed ................................................................................................. 15

      A.     Waiving the Statutory 39% National Cap Was Both *Ultra Vires* and Arbitrary .............................................................. 15

            1.     The Commission lacks authority to waive the statutory cap ................................................................................ 15

            2.     The Media Bureau lacks authority over novel questions of law and policy .................................................... 19

      B.     Waiving the Duopoly Rule Was Arbitrary and Capricious Several Times Over ............................................................... 21

      C.     Granting the Applications Without Designating Them for a Hearing Was *Ultra Vires* and Arbitrary ............................. 22

II.     The Remaining Factors Support A Stay ....................................... 24

CONCLUSION ............................................................................................. 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) .......................................................................16

*Am. Mail Line v. FMC*,
503 F.2d 157 (D.C. Cir. 1974) ...................................................................24

*Astroline Comm'ns v. FCC*,
857 F.2d 1556 (D.C. Cir. 1988) .................................................................22

*Encino Motorcars v. Navarro*,
579 U.S. 211 (2016).......................................................................... 18, 20

*Fox Television Stations v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) .................................................................17

*Fox Television Stations v. FCC*,
293 F.3d 537 (D.C. Cir. 2002) ......................................................... 6, 7, 17

*FTC v. Dean Foods*,
384 U.S. 597 (1966)....................................................................................24

*FTC v. HJ Heinz*,
246 F.3d 708 (D.C. Cir. 2001) ............................................................ 24, 25

*Gresham v. Azar*,
950 F.3d 93 (2020).....................................................................................20

*In re Al Baluchi*,
952 F.3d 363 (D.C. Cir. 2020) ...................................................................24

*Johnston Broad. v. FCC*,
175 F.2d 351 (D.C. Cir. 1949) ...................................................................15

*Judge Rotenberg Educ. Ctr. v. FDA*,
3 F.4th 390 (D.C. Cir. 2021) ......................................................................15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).....................................................................................18

*Monongahela Power v. Marsh*,
809 F.2d 41 (D.C. Cir. 1987) ....................................................16

*Nat'l Env't Dev. Ass'n v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ..................................................20

*NetworkIP v. FCC*,
548 F.3d 116 (D.C. Cir. 2008).............................................. 7, 21

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................25

*NLRB v. Wyman-Gordon*,
394 U.S. 759 (1969)..................................................................19

*Prometheus Radio Project v. FCC*,
2003 WL 22052896 (3d Cir. Sep. 3, 2003)...............................25

*Public Citizen v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ..................................................17

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006)....................................................................16

*Russello v. U.S.*,
464 U.S. 16 (1983)....................................................................17

*Sekhar v. United States*,
570 U.S. 729 (2013)..................................................................23

*Stone v. INS*,
514 U.S. 386 (1995)..................................................................17

*Tribune v. FCC*,
133 F.3d 61 (D.C. Cir. 1998) ...................................................22

*U.S. v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)..................................................................24

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).............................................................. 16, 18

*WAIT Radio v. FCC*,
418 F.2d 1153 (D.C. Cir. 1969)........................................................21

*WMATA v. Holiday Tours*,
559 F.2d 841 (D.C. Cir. 1977) ....................................... 3, 14, 19

*Zimmer Radio v. FCC*,
145 F.4th 828 (8th Cir. 2025)........................................................7

**Statutes**

47 U.S.C. §154(*i*) ........................................................................7

47 U.S.C. §301 ............................................................................4

47 U.S.C. §303(r) .............................................................. 7, 18

47 U.S.C. §309(d)(2)......................................................... 4, 22, 23

47 U.S.C. §310(d)-(e) ..................................................................4

47 U.S.C. §402(b) .................................................................. 4, 24

47 U.S.C. §402(c) ........................................................................5

Pub.L.104-104, 110 Stat. 56 (1996)...............................................5, 6

Pub.L.108-199, 118 Stat. 3 (2004)........................................... *passim*

**Regulations**

47 C.F.R. §0.283 ......................................................................20

47 C.F.R. §0.283(c)......................................................... 2, 4, 19

47 C.F.R. §0.5(c) ............................................................... 19, 20

47 C.F.R. §0.61(a) ......................................................................4

47 C.F.R. §0.61(k) ......................................................................4

50 Fed.Reg. 4666 (Feb. 1, 1985) ..................................................5

68 Fed.Reg. 46,286 (Aug. 5, 2003)................................................6

72 Fed.Reg. 16283 (Apr. 4, 2007) ..................................................18

78 Fed.Reg. 68,384 (Nov. 14, 2013) ...............................................8

81 Fed.Reg. 73,035 (Oct. 24, 2016) ................................................8

82 Fed.Reg. 21,124 (May 5, 2017) .................................................8

83 Fed.Reg. 3661 (Jan. 26, 2018) ..............................................5, 8

90 Fed.Reg. 30,032 (July 8, 2025) ................................................8

 **Other Authorities**

@BrendanCarrFCC, X (Feb. 7, 2026), https://perma.cc/9RXP-ZJU6 ...................13

@realDonaldTrump, Truth Social (Feb. 7, 2026),
 https://perma.cc/63H6-8XUG.........................................................12

Agreement & Plan of Merger (Aug. 18, 2025),
 https://perma.cc/GWJ9-38T6.........................................................25

*Amendment of Section 73.3555(E)*,
 31 FCC.Rcd. 10213 (2016)............................................... *passim*

*Applications of Tribune Media Company*,
 34 FCC.Rcd. 8436 (2019)...........................................................8

*Benedek License Corp.*,
 13 FCC.Rcd. 18913 (1998)...................................................... 7, 21

*Blanca Tel.*,
 32 FCC.Rcd. 10594 (2017)...................................................... 4, 20

Complaint, *U.S. v. Gray Television*,
 No. 1:18-cv-2951 (D.D.C. 2018) (Dkt.1) .........................................10

FCC, *Informal Timeline for Consideration of Applications for Transfers
 or Assignments of Licenses or Authorizations Relating to Complex
 Mergers*, https://perma.cc/H446-Y6FP..............................................14

*Maurice Rosenfield*,
 22 FCC.2d 934 (1970) ..............................................................7

Nexstar, *Acquisition of Tegna Inc.* 8 (Aug. 2025),
   https://perma.cc/2CXE-DNAF ..............................................................10

Press Release (Aug. 19, 2025), https://perma.cc/9K5V-FMLB ..............................10

Press Release (Mar. 20, 2026), https://tinyurl.com/33cm6mwc..............................14

Press Release, (Mar. 19, 2026), https://perma.cc/E9WE-4E72 ..............................14

S.Rep.104-230 (1996) ...........................................................................6

*TEGNA*,
   38 FCC.Rcd. 1282 (2023).....................................................................22

*Tribune Media*,
   33 FCC.Rcd. 6830 (2018).....................................................................22

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| NOA.App. | Notice of Appeal Appendix |
| CAA | Consolidated Appropriations Act of 2004, Public Law No. 108-199 |
| DOJ | Department of Justice |
| FCC | Federal Communications Commission |
| MVPD | Multichannel video programming distributor |

**INTRODUCTION**

The FCC order under review allows Nexstar (the nation's largest television-station conglomerate) to acquire broadcast licenses currently held by TEGNA (the third largest) in a $6.2 billion merger. The resulting entity will control 259 full-power stations, reaching every corner of the country and over 80% of U.S. households. The merger "adversely affect[s]" Appellants and consumers: By lifting regulatory restrictions on the first and third biggest broadcasters, the new company will upend the market for cable news and digital media and exert its newfound leverage to demand higher and higher fees from cable providers and other multichannel video programming distributors (MVPDs) wishing to carry Nexstar/TEGNA stations (which in turn means higher monthly TV bills for American consumers). Yet while Congress guaranteed adversely affected entities the right to judicial review, it will be exceedingly difficult as a practical matter to unwind the acquisition once TEGNA fully dissolves into Nexstar. That fact is not lost on Nexstar and TEGNA—rather than slowing things down to facilitate review, they apparently worked hand-in-glove with the FCC to frustrate judicial review: The order approving the transaction was publicly released around 6:50 PM; by 7:05 PM, Nexstar publicly announced that the transaction had already closed.

Without intervention to prevent further combination, Appellants' right to judicial review will be meaningless. And such intervention is warranted, as the

Bureau's order is flawed from stem to stern. In the Consolidated Appropriations Act of 2004 (CAA), Congress prescribed a "39 percent national audience reach limitation," so a company with 80% national reach should be a nonstarter. FCC regulations also prohibit one company from owning more than two stations in a single market—so a company owning 3 stations in scores of markets should also be a nonstarter. And even if the Commission somehow retained authority to suspend either requirement wholesale, the Commission has never done so—so allowing the subordinate Bureau to do so should be yet another nonstarter, because the Bureau expressly *lacks* authority over "novel questions of law, fact or policy." 47 C.F.R. §0.283(c). Under binding precedent from both this Court and the FCC, the least the Commission had to do was hold a hearing and put this transaction to a vote of the Commissioners. But that precedent went out the window after a social-media directive from President Trump to "GET THIS DEAL DONE!" The Media Bureau then dashed out an order approving the transaction in three-and-a-half months—roughly half the usual timeline—whistling past the Commission's prior position that it lacked the authority to "decline to enforce" the 39% cap "against any person or entity." 31 FCC.Rcd. 10213, 10222 (2016), *vacated on other grounds*, 82 Fed.Reg. 21,124 (Apr. 21, 2017). That is just as *ultra vires*, arbitrary, and capricious as it sounds.

The remaining factors confirm the need for a stay. Notwithstanding the "serious, substantial" legal questions that the Bureau purported to resolve, Nexstar and TEGNA spirited their transaction across the finish-line in an attempt to avoid defending the Bureau's "difficult and doubtful" conclusions in court. *WMATA v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977). Notwithstanding this gambit, substantial steps remain before full integration, and this Court should act promptly to enjoin them. Failing to do so would eviscerate Appellants' right to review while hearkening the problems that Congress' "39 percent national audience reach limitation" sought to prevent, concentrating control over high-value news, sports, and emergency programming in a single company and empowering that company to inflate prices while dictating what gets reported to 80% of households. And it would give future Commissioners (and Presidents) a roadmap to follow: Shunt politically-favored-but-legally-dubious mergers to the Bureau and give the parties a head-start to close before adversely affected entities can get into court.

To protect its jurisdiction, to preserve Appellants' statutory right to review, and to safeguard consumers, the Court should immediately stay the Bureau's order and direct Nexstar and TEGNA to hold separate and take no further steps to combine.

**A.     Statutory Background**

1. Congress requires any entity wishing to operate a television station to obtain a license from the FCC.  47 U.S.C. §301.  Licenses can only be transferred "upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."  *Id.* §310(d)-(e).  "If a substantial and material question of fact is presented," "it shall formally designate the application for hearing."  *Id.* §309(d)(2).  The Commission has in turn delegated its authority to "[p]rocess applications for … transfer" to its Media Bureau, subject to certain "reserv[ations]," 47 C.F.R. §0.61(a), (k)—among other things, the Commission reserved for itself the authority to decide "[m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines," *id.* §0.283(c).  The upshot is the Media Bureau cannot "decide issues of first impression."  *Blanca Tel.*, 32 FCC.Rcd. 10594, 10610 (2017).

Congress gave "any … person" "aggrieved or" "adversely affected" a "[r]ight to appeal" any order of the Commission or Media Bureau "granting or denying" "any application" to this Court.  47 U.S.C. §402(b).  Congress further prescribed that this Court "shall have jurisdiction of the proceedings and of the questions determined therein" and "shall have power … to grant such temporary relief as it may deem just and proper" "by order[] directed to the Commission or any other party to the appeal."

*Id.* §402(c). "Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo … or the restoration of a position or status terminated or adversely affected by the order appealed from." *Id.*

2. As a substantive matter, Congress has legislated multiple times on how big a television station owner can get. In "the earliest days of broadcast television," Congress took a hands-off approach, leaving the subject to the Commission, which promulgated a national ownership rule "limiting the number of stations that could be commonly owned, operated, or controlled to three." 83 Fed.Reg. 3661, 3661-62 (Jan. 26, 2018). Over the ensuing decades, the Commission gradually increased that number and, under pressure from Congress, eventually added the additional limit of capping a station owner's national audience reach at 25%. 50 Fed.Reg. 4666, 4672 (Feb. 1, 1985). But in the Telecommunications Act of 1996, Congress formally directed the Commission to "modify its rules" in three ways: eliminating the numerical restriction on national station ownership; "increasing the national audience reach limitation for television stations to 35 percent"; and "conduct[ing] a rulemaking proceeding" to assess the need for numerical limits on the number of stations an entity could own "within the same television market." Pub.L.104-104, §202(c), 110 Stat. 111.

For the next several years, Congress shared control over the national-audience-reach limitation, directing the Commission to include the 35% cap in the list of "ownership rules" that the Commission had to review every 2 years and "repeal or modify" if "no longer in the public interest."  *Id.* §202(h), 110 Stat. 111-12; *Fox Television Stations v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002); S.Rep.104-230 p.164 (1996) (underscoring periodic review as exclusive mechanism for revising ownership rules).  But that shared control broke down once the Commission made clear that it had a different vision:  In 2003, the Commission proposed hiking the cap by ten percentage points.  68 Fed.Reg. 46,286, 46,339 (Aug. 5, 2003).  That proposal drew a swift rebuke from Congress in the CAA, which reset the national cap to 39% and codified a slew of new provisions making express reference to that "39 percent national audience reach limitation."  Pub.L.108-199, §629, 118 Stat. 99-100.  For one, Congress specified that "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations … through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance."  *Id.*  Congress also made clear that the Commission's forbearance authority—which allows it to waive some statutory rules —"shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations."  *Id.*  And Congress also specified that the Commission's

requirement to periodically review and repeal ownership rules "does not apply to any rules relating to the 39 percent national audience reach limitation." *Id.* In short, Congress followed this Court's directions for wresting back exclusive control: It "enshrined the … cap in the statute itself." *Fox*, 293 F.3d at 540.

## B. Regulatory Background

In addition to setting its own restrictions on station owners' national reach, Congress also gave the Commission authority to set additional restrictions "as public convenience, interest, or necessity requires." 47 U.S.C. §§154(*i*), 303(r). Among other things, the Commission used that authority to promulgate the duopoly rule, which "prohibits an entity from owning more than two full-power television stations in the same geographic market." *Zimmer Radio v. FCC*, 145 F.4th 828, 841 (8th Cir. 2025).

Commission precedent governs when to waive the duopoly rule's application. The applicant must "plead with particularity" specific "facts," *Maurice Rosenfield*, 22 FCC.2d 934, 938 (1970), "demonstrat[ing] why its case is significantly different from the many other station combinations across the county that are similarly situated," *Benedek License Corp.*, 13 FCC.Rcd. 18913 (1998), and why "deviation better serves the public interest," *NetworkIP v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008).

By contrast, given the 39% national-audience-reach limitation's statutory provenance, the Commission has disclaimed authority to waive that limit "against any person or entity." 31 FCC.Rcd. at 10222. Rather, whenever a previous license transfer would result in a violation of the cap—including when Nexstar acquired Tribune Media Company in 2019—the FCC conditioned approval on mandatory divestitures to bring the new entity into compliance. *E.g.*, *Applications of Tribune Media Company*, 34 FCC.Rcd. 8436 ¶8 (2019).

That said, the FCC never fully gave up on its competing vision for the national-audience-reach limit. Roughly ten years after the CAA, the FCC "tentatively" suggested that it might retain "authority to modify the national television ownership rule" through its general rulemaking powers, 78 Fed.Reg. 68,384, 68,386 (Nov. 14, 2013), and concluded that, despite lacking authority to "decline to enforce" the 39% cap "against any person or entity," 31 FCC.Rcd. at 10222, it did have authority to promulgate rules *tightening* the cap, 81 Fed.Reg. 73,035, 73,036 (Oct. 24, 2016). But the Commission later vacated that conclusion, 82 Fed.Reg. 21,124 (May 5, 2017), and restarted a rulemaking in 2017 on its power to modify the national cap, 83 Fed.Reg. at 3661. The Commission sought another round of comments in July 2025. 90 Fed.Reg. 30,032, 30,033 (July 8, 2025). As of this filing, the rulemaking remains ongoing.

### C.    Factual and Procedural Background

1. Nexstar and TEGNA own broadcast stations in media markets across the country. Those stations are generally affiliated with one of the four major networks (ABC, CBS, NBC, Fox) and broadcast that network's sports, news, and entertainment throughout the designated market. For example, in the DC market, TEGNA owns WUSA, a CBS affiliate. When DC-area pay-TV subscribers want to watch the CBS Evening News or the Baltimore Ravens, they turn on WUSA. NOA.App.40. MVPDs like Comcast and DirecTV must pay TEGNA fees—commonly known as retransmission consent fees—for the privilege of delivering that CBS content to their DC-area subscribers. In recent years, Nexstar- and TEGNA-owned stations have demanded higher retransmission consent fees from MVPDs, on pain of blackouts severing that provider's subscribers from accessing the stations. NOA.App.363-75. In practical terms, if a DC-area subscriber gets cable from Comcast, and Comcast and TEGNA do not come to terms on retransmission consent fees, then the subscriber will be unable to watch CBS sports, news, or emergency programming on WUSA until Comcast and TEGNA reach agreement.

Nexstar is the nation's largest television-station owner conglomerate; in many markets, it already owns multiple stations. In Ohio's Youngstown market, for example, Nexstar currently owns WKBN (a CBS affiliate) and WYFX-LD (a FOX

affiliate)—which gives Nexstar even more leverage when it comes to negotiating retransmission consent fees: If an MVPD with subscribers in Youngstown does not meet Nexstar's demands, Nexstar can deny those subscribers access to multiple networks' content. *See also* NOA.App.469-70, 472. Unsurprisingly, as the federal government has repeatedly explained, the ability "to black out more … stations simultaneously … lead[s] to increased retransmission consent fees," an increase that MVPDs pass on to their "subscribers in the form of higher subscription fees." *E.g.*, Compl.8, *U.S. v. Gray Television*, No. 1:18-cv-2951 (D.D.C. 2018) (Dkt.1).

2. A few weeks after the FCC requested another round of comments on its authority to modify the 39% national-audience-reach limit, Nexstar and TEGNA announced plans for Nexstar to acquire TEGNA in a $6.2 billion transaction. *See* Press Release (Aug. 19, 2025), https://perma.cc/9K5V-FMLB. Advocates of local news and other independent programming reacted with concern. MVPDs operating in markets where Nexstar and TEGNA currently operate were especially alarmed by the touted "contractual revenue synergies"—i.e., the new company's increased leverage over retransmission consent fees. Nexstar, *Acquisition of Tegna Inc.* 8 (Aug. 2025), https://perma.cc/2CXE-DNAF; NOA.App.464-65, 470-71, 477.

3. Nexstar and TEGNA jointly filed applications to transfer TEGNA's broadcast licenses to Nexstar, which the FCC accepted for filing on December 1, 2025. The applications acknowledged that the combined entity would run afoul of

"the FCC's outdated broadcast ownership rules"—in particular, the entity would reach roughly 80% of American households and own 3+ full power stations in twenty-three media markets not subject to existing duopoly-rule waivers—but argued that "[t]hose rules are in a state of flux and, to the extent not finally resolved during the pendency of the Applications, the applicants seek waiver of those rules that are pertinent." NOA.App.45.

In accordance with the FCC pleading cycle, Appellants—several trade associations with members providing cable in markets where Nexstar and TEGNA currently operate separate stations, joined by a leading digital media company that competes with Nexstar- and TEGNA-owned stations—filed petitions asking the FCC to designate the transaction for a hearing and to deny the applications, arguing that Nexstar and TEGNA were effectively asking the FCC to nullify Congress' 39% national-audience-reach limitation by fiat.

Twelve days after the briefing cycle closed, President Trump posted on social media in support of the transaction:



**Donald J. Trump** ✓ ➕
@realDonaldTrump

We need more competition against THE ENEMY, the Fake News National TV Networks. Letting Good Deals get done like Nexstar - Tegna will help knock out the Fake News because there will be more competition, and at a higher and more sophisticated level. Those that are opposed don't fully understand how good the concept of this Deal is for them, but they will in the future. GET THAT DEAL DONE! PRESIDENT DJT

**8.05k** ReTruths **32.5k** Likes                    Feb 07, 2026, 10:25 AM



@realDonaldTrump, Truth Social (Feb. 7, 2026), https://perma.cc/63H6-8XUG.

FCC Chairman Brendan Carr followed up a few hours later:



**Brendan Carr** ✔
@BrendanCarrFCC

President Trump is exactly right.

The national networks like Comcast & Disney have amassed too much power. For years, they've been pushing this Hollywood & New York programming all over the country with no real checks.

Let's get it done and bring real competition to them.

>
>
> **Donald J. Trump** ✔ ⊕
> @realDonaldTrump
>
> We need more competition against THE ENEMY, the Fake News National TV Networks. Letting Good Deals get done like Nexstar - Tegna will help knock out the Fake News because there will be more competition, and at a higher and more sophisticated level. Those that are opposed don't fully understand how good the concept of this Deal is for them, but they will in the future. GET THAT DEAL DONE! PRESIDENT DJT

2:20 PM · Feb 7, 2026 · **286.4K** Views

@BrendanCarrFCC, X (Feb. 7, 2026), https://perma.cc/9RXP-ZJU6.

4. A few weeks after those social-media posts—and less than four months into what is usually *at minimum* a six-month process—the Media Bureau granted the applications and denied Appellants' petitions to deny in an order dated March 19, 2026. NOA.App.1-40. *But cf.* FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to*

*Complex Mergers*, https://perma.cc/H446-Y6FP (explaining that the Commission "normally need[s]" 180 days to decide applications for transfers).  And just *15 minutes* after the Bureau's order became publicly available, Nexstar announced that the transaction had already closed.  Press Release, (Mar. 19, 2026), https://perma.cc/E9WE-4E72.  The next day, Commissioner Gomez issued a lengthy dissent:  "Late on March 19, 2026, the FCC's Media Bureau chose bureaucratic cover rather than an open and transparent process, approving behind closed doors the transfer of control … The order is wrong on the law, wrong on the policy, and the process by which it was issued is indefensible."  *See* https://tinyurl.com/33cm6mwc.

5.  Appellants promptly filed an application under 47 U.S.C. §155 for full Commission review, as well as a motion to stay the Media Bureau's order.  NOA.App.406, 439.  Given Nexstar and TEGNA's ongoing efforts to combine their operations, Appellants requested a stay ruling by March 21 at 3:00 PM.  Appellants further noted that, absent a ruling by that time, Appellants would seek emergency relief from this Court.  NOA.App.433.

## ARGUMENT

Whenever "substantial equity, and need for judicial protection" exists, and "a serious legal question is presented," "an order maintaining the status quo is appropriate."  *WMATA*, 559 F.2d at 844.

## I.   Appellants Are Likely To Succeed.

### A.   Waiving the 39% National Cap Was *Ultra Vires*, Arbitrary, and Capricious.

#### 1.   The Commission lacks authority to waive the cap.

"[A]gencies are creatures of statute"; "[t]hey possess only those powers that Congress confers upon them." *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). The FCC thus "has no authority to waive" statutory requirements unless Congress expressly confers that authority. *Johnston Broad. v. FCC*, 175 F.2d 351, 354-55 (D.C. Cir. 1949). That makes this a straightforward case. The 39% language comes directly from a statute that Congress passed and the President signed, and that was a direct response to the FCC's attempt to aggressively raise the cap to 45%. CAA §629, 118 Stat. 99-100. *Contra* NOA.App.17-18. Indeed, the statute singles out the most prominent instance of Congress giving the FCC authority to set-aside statutory requirements (47 U.S.C. §160's forbearance authority) and made crystal clear that it "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation." CAA §629, 118 Stat. 99-100; 31 FCC.Rcd. at 10222 (acknowledging that "provision is most reasonably interpreted as a congressional directive that the Commission not decline to enforce against any person or entity the stricter national cap that Congress required the Commission to adopt").

Statutory interpretation cases "start with the … text"—and "when, as here, the statute speaks clearly," the inquiry "end[s] there." *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18 (D.C. Cir. 2020). It is "hard to" get "less ambiguous than … precise numerical thresholds." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014). A statute saying "39 percent" in five places and expressly ruling out FCC forbearance does not empower the Commission to carve exceptions "to suit its own sense of how the statute should operate." *Id.* at 328. *Contra* NOA.App.14 (purporting to "find that strict application of the" National Cap "is not warranted").

Other parts of the text reinforce that conclusion. For one, Congress saw fit to craft an exception to the 39% rule for "persons or entities that exceed the 39 percent national audience reach limitation through population growth." CAA §629(8), 118 Stat. 99. Besides making clear that the 39% limit is a hard cap applying prospectively, "Congress would not design an Act which on its face is all-inclusive, but for specifically enumerated exceptions, and yet intend to establish an unmentioned exception" giving the Commission discretion to waive the cap. *Monongahela Power v. Marsh*, 809 F.2d 41, 47 (D.C. Cir. 1987). That is especially because doing so "would render" Congress' rejection of the FCC's attempt to raise the national cap ten points to 45% "a largely meaningless exercise." *Rumsfeld v. FAIR*, 547 U.S. 47, 57-58 (2006). When Congress intends for an agency to create exceptions to a statutory rule, it knows how to say so—including in neighboring

provisions of the CAA, *e.g.*, §§534(e), 613(h), 118 Stat. 182, 353, and in neighboring portions of Title 47, *e.g.*, §310(b)(4). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely." *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

Statutory history removes any remaining doubt. When the 1996 Act directed the FCC to "modify its rules" by "increasing the national audience reach limitation for television stations to 35 percent" and revisiting that limit every two years, this Court concluded that Congress left "for the Commission to decide" any "further change." *Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002). But rather than leaving the cap to the Commission's discretion, Congress amended the statute to "enshrine[]" a 39% "cap in the statute" and to take the 39% cap out of the periodic-review process—*the exact recipe that this Court articulated for Congress to reassert control*. *Fox*, 293 F.3d at 540. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," and just as it "adopt[s] that interpretation when it re-enacts a statute without change," *Public Citizen v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993), it equally intends any "amendment to have real and substantial effect," *Stone v. INS*, 514 U.S. 386, 397 (1995).

Finally, attempting to waive the 39% cap runs headlong into the regulatory history. Shortly after the CAA swapped in 39% for 35%, the FCC called

implementing a 39% cap a "nondiscretionary ministerial action" "mandated by" Congress. 72 Fed.Reg. 16283, 16284 (Apr. 4, 2007); 31 FCC.Rcd. 10213 at 10222 (acknowledging that the CAA "is most reasonably interpreted as a congressional directive that the Commission not decline to enforce against any person or entity the [39%] national cap"). That "interpretation[] issued contemporaneously with the statute at issue, and which ha[s] remained consistent over time," is "especially" telling. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Indeed, in the years since, every time a merger caused an entity to violate the 39% cap, the FCC has ordered divestitures to restore compliance. At the very least, the current FCC would need to provide a good explanation for "discover[ing]" "an unheralded power" to bless an entity able to reach (and control what gets reported to) 80% of American households. *Util. Air Regul. Grp.*, 573 U.S. at 324. Because the Media Bureau has not come close to doing so, its order is not just *ultra vires*, but arbitrary and capricious too. *Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016).

*   *   *

A final point bears emphasis. The Commission is currently engaged in a rulemaking about whether its general authority to promulgate "necessary" regulations "not inconsistent with law" gives it the authority to modify the 39% cap by rule. 47 U.S.C. §303(r); *supra* p.8. It would be strange to conclude that, by taking the national-audience-reach rule out of the specific periodic-review process

18

and repeatedly codifying a "39 percent national audience reach limitation," Congress somehow gave the Commission *more* flexibility to alter the limit. But if the FCC really believes that Congress did not intend to statutorily fix a "39 percent national audience reach limitation," then the Commission should say so in a final rule and defend that in the ordinary course.

What this Court should not countenance is the Commission "avoid[ing]" the hard work of defending that position—and insuring against any judicial review—by simultaneously announcing a waiver "rule[] in the course of" a rushed "adjudicatory proceeding[]" at the staff-level that effectively overrules Commission precedent without a full Commission vote. *NLRB v. Wyman-Gordon*, 394 U.S. 759, 764 (1969). If nothing else, this Court should grant the relief necessary to permit "plenary review" of that adjudicatory proceeding. *WMATA*, 559 F.2d at 845.

### 2. The Media Bureau lacks authority over novel questions.

Even if the full *Commission* could modify the national cap, *contra supra*, the *Media Bureau* still could not, because FCC regulations deny the subordinate Bureau authority over "novel questions of law, fact or policy that cannot be resolved under existing precedents." 47 C.F.R. §0.283(c); *id.* §0.5(c). Here, the Media Bureau purported to resolve two questions, each as novel as it gets: the legal question of whether the Commission can waive the 39% limit, NOA.App.15-18, and the policy question of when a waiver is appropriate, NOA.App.18-20. Even setting aside the

debate about whether the Commission can modify the limit by rule, *supra* p.8, the Commission has never claimed the authority to waive the 39% limit for particular entities (let alone articulated a standard for doing so); in fact, it expressly disclaimed that authority as recently as 2016. *Compare* 31 FCC.Rcd. 10213 at 10222, *with* NOA.App.17. Reversing that position and announcing a standard for when a waiver is in the public interest is plainly an "issue[] of first impression." *Blanca Tel. Co.*, 32 FCC.Rcd. at 10610, and an impermissible unacknowledged change in position regardless. *See Encino*, 579 U.S. at 221-22. Making matters worse, Appellants flagged this precise absence of Bureau authority in their petition to deny, *e.g.*, NOA.App.351, but the Bureau's order ignored the issue entirely—a failure landing the order even farther outside the bounds of "reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (2020).

The Media Bureau's failure to "refer[]" the applications "to the Commission en banc for disposition" thus supplies independent grounds to set aside its order. 47 C.F.R. §0.283; *accord id.* §0.5(c). "[A]n agency is bound by its own regulations," and because the Media Bureau had none of the precedent to guide its waiver of the 39% limit that §0.283(c) would require, doing so was arbitrary and capricious. *Nat'l Env't Dev. Ass'n v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

**B.      Waiving the Duopoly Rule Was Arbitrary and Capricious.**

Waiving the 39% limit was not the only novel thing about the Media Bureau's order.  Indeed, it was equally novel—and equally arbitrary and capricious—for the Media Bureau to grant a wholesale exemption of the duopoly rule.  *See* NOA.App.23-24.

Until now, the FCC has never waived its rules absent specific, market-by-market facts showing that "deviation better serves the public interest" in the particular markets at issue.  *NetworkIP*, 548 F.3d at 127.  Yet here Nexstar and TEGNA requested—and the Media Bureau countenanced—waiving the duopoly rule "as a general matter," NOA.App.21, without any explanation of why these markets are "significantly different from the many other station combinations across the country that are similarly situated," *contra Benedek*, 13 FCC.Rcd. 18913.  That is no exaggeration:  The Bureau "f[ou]nd that … strict application of the" duopoly rule is unnecessary "where at least one of the stations in the proposed combination is weak relative to the stronger stations in the market." NOA.App.23.  But of course, that will always be true when a company that already owns two stations wants to acquire a third.  If that truism justifies waiving the duopoly rule, then the Commission is granting waivers "out of unbridled discretion or whim." *WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969).

These unprecedented waivers-by-boilerplate not only exceeded the Bureau's delegated authority, *see supra* pp.19-20, but also violated "hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding," *Tribune v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998). The Bureau's order recognized this hornbook principle in other contexts, *cf.* NOA.App.6, but ignored it here—even though Appellants raised this very issue below, NOA.App.335.

**C. Granting the Applications Without Designating Them for a Hearing Was *Ultra Vires*, Arbitrary, and Capricious.**

In other instances when the FCC has granted applications to transfer without holding a hearing, this Court has not hesitated to vacate and remand. *E.g.*, *Astroline Comm'ns v. FCC*, 857 F.2d 1556, 1558 (D.C. Cir. 1988). It should not hesitate to do so again. Before granting an application to transfer, Congress requires that the Commission "shall" hold a hearing anytime "a substantial and material question of fact is presented." 47 U.S.C. §309(d)(2); *Astroline*, 857 F.2d at 1561 ("[I]n evaluating a request for an evidentiary hearing … the Commission must … assum[e]" facts alleged in petition to deny are true). Here, "[t]he Commission … ignored" both that "statutory mandate and the decisions of this Court establishing an analytic procedure for evaluating petitions for evidentiary hearings," 857 F.2d at 1573, as well as its own precedent granting hearings in similar transactions, *see, e.g.*, *Tribune Media*, 33 FCC.Rcd. 6830 (2018); *TEGNA*, 38 FCC.Rcd. 1282 (2023).

22

Appellants' petitions to deny flagged several reasons why transferring TEGNA's licenses to Nexstar presented "substantial and material questions of fact," 47 U.S.C. §309(d)(2), and why granting the applications would be *prima facie* inconsistent with the public interest. NOA.App.363-65, 375-81. To take just one example: In 2024, the Commission unanimously found that Nexstar's de facto control over stations it does not formally own put it in "willful" violation of the 39% cap. The Commission did not contemplate waiving the cap; it forced Nexstar to choose between renouncing control over the other stations or undertaking divestitures. NOA.App.360-62.

The Media Bureau's order is a stark reversal from that 2024 position: Where the full Commission thought divestitures were necessary to avoid increased retransmission consent fees from being passed on to consumers, the Bureau now concludes that there is no reason to think "that any such increases" in retransmission consent fees will ultimately "reach consumers." NOA.App.30. *But see, e.g.*, NOA.App.363-71 (providing exactly this evidence). That "sounds absurd, because it is," *Sekhar v. United States*, 570 U.S. 729, 738 (2013): The Media Bureau eschewed the statutory requirement to probe that important issue, electing instead to rush the applications through in record time after the President and Chairman ordered it to "GET THAT DEAL DONE!" Because that was arbitrary and

23

capricious, and because approving this transaction without a hearing was thus *ultra vires*, the Court can vacate the order on that basis alone.

## II. The Remaining Factors Support A Stay.

1. "[A]n irreversible" event "frustrat[ing] later appellate review" "is a quintessential type of 'irreparable' injury," *In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020), and as both this Court and the Supreme Court have noted, corporate mergers amply fit that bill. *E.g.*, *FTC v. Dean Foods*, 384 U.S. 597, 604, 606 (1966) (endorsing "injunction pending review" when merger of "substantial competitors" "raise[d] serious questions": "where businesses have been merged or purchased and closed out it is commonly impossible to turn back the clock"); *Am. Mail Line v. FMC*, 503 F.2d 157, 170 (D.C. Cir. 1974) (recognizing "problems inherent in unscrambling a merger"); *FTC v. HJ Heinz*, 246 F.3d 708, 726-27 (D.C. Cir. 2001) (similar). That holds especially true here, where Congress gave Appellants a "[r]ight to appeal" the Media Bureau's order, 47 U.S.C. §402(b)—a right that will be at least frustrated if it does not happen in the vanishing time before TEGNA "complete[ly] disappear[s]" into Nexstar, leaving Appellants with potentially no effective relief. *U.S. v. Phila. Nat'l Bank*, 374 U.S. 321, 336 (1963). Especially since Nexstar and TEGNA appear bound-and-determined to complete the remaining steps to integrate in record time, Appellants need this Court to preserve the status quo.

2. Not only do the equities and public interest "merge" against the government, but here the balance is one-sided. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see* NOA.App.483-85, 489-91. *See generally Prometheus Radio Project v. FCC*, 2003 WL 22052896, at *1 (3d Cir. 2003).

Appellants seek no more than the modicum of process that 47 U.S.C. §402 guarantees. The normally-best-case 180-day timeline would not have run until June 2026, *supra* pp.13-14, and the parties' own agreement provided for closure as late as August 2026 (with an ability to extend to November 2026), *see* Agreement & Plan of Merger §8.1(b), https://perma.cc/GWJ9-38T6; *cf. HJ Heinz*, 246 F.3d 708 at 726-27 ("If the merger makes economic sense now, the appellees have offered no reason why it would not do so later."). Appellants stand ready to brief this case on any schedule this Court requires—but Appellants insist that this Court take a meaningful look at this unprecedented transaction and its multiple disputed legal and procedural questions before it becomes exceedingly difficult to grant relief.

**CONCLUSION**

The Court should stay the Media Bureau's order and direct Nexstar and TEGNA to hold separate and take no further steps to combine. The Court should also grant an administrative stay.

Respectfully submitted,

s/Paul D. Clement

JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellants/Petitioners Broadband Communications Association of Pennsylvania; Broadband Communications Association of Washington; Indiana Cable and Broadband Association; Mississippi Internet and Television; Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia*

MARK I. BAILEN P.C.
BAILEN LAW
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 656-0422
mb@bailenlaw.com

*Counsel for Appellant/Petitioner Newsmax Media Inc.*

March 21, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32(e) because it contains 5200 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(a)(1).

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

March 21, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I certify that, on March 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I further certify that I served a true copy of the foregoing upon the Commission's general counsel by email to LitigationNotice@fcc.gov.

s/Paul D. Clement
Paul D. Clement
