**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-1062**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

BROADBAND COMMUNICATIONS ASSOCIATION
OF PENNSYLVANIA, et al.
*Appellants/Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION,
*Appellee/Respondent.*

On Appeal of an Order of the Federal Communications Commission
MB Docket No. 25-331

**RESPONSE OF INTERVENOR DIRECTV, LLC TO EMERGENCY
MOTION FOR STAY AND INJUNCTION PENDING APPEAL**

Michael Nilsson
Timothy J. Simeone
E. Austin Bonner
Jason Neal
HWG LLP
1919 M St., NW, 8th Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

*Counsel for DIRECTV, LLC*

March 21, 2026

**TABLE OF CONTENTS**

INTRODUCTION AND BACKGROUND ..............................................................1

ARGUMENT ......................................................................................................6

I.  APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS....................6

   A.  The Commission Lacks Authority to Waive the National Ownership
       Cap, and the Media Bureau Lacks Authority to Address the Issue................6

       1.  The Commission has no authority to waive the national cap. ....................7

       2.  Waiving the national ownership cap at a minimum involves novel
           questions of law and policy. ...............................................................12

   B.  The Bureau's Failure to Address Extensive Evidence on the Record of
       Public Interest Harms Resulting from the Transaction Violated the
       Statute and Was Arbitrary and Capricious. ....................................................13

II. DIRECTV, LIKE APPELLANTS, WILL SUFFER IRREPARABLE
    HARM IN THE ABSENCE OF A STAY...........................................................19

CONCLUSION .....................................................................................................24

APPENDIX A – DECLARATION OF ROBERT THUN

## TABLE OF AUTHORITIES

**CASES**

*ACLU v. FCC*,
  823 F.2d 1554 (D.C. Cir. 1987)......................................................11

*Air All. Hou. v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018)......................................................10

*All. for the Wild Rockies v. Salazar*,
  672 F.3d 1170 (9th Cir. 2012) ..........................................................9

*Am. Fin. Servs. Ass'n v. FTC*,
  767 F.2d 957 (D.C. Cir. 1985)........................................................11

*Brady v. Nat'l Football League*,
  640 F.3d 785 (8th Cir. 2011) ..........................................................21

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).......................................................22

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ............................................................9

*Fox Television Stations, Inc. v. FCC*,
  293 F.3d 537 (D.C. Cir. 2002)........................................................10

*FTC v. Dean Foods*,
  384 U.S. 597 (1966)........................................................................23

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015)....................................................19

*Grayscale Invs., LLC v. SEC*,
  82 F.4th 1239 (D.C. Cir. 2023).......................................................18

*Hampton v. Wong*,
  426 U.S. 88 (1976)..........................................................................10

*In re Al-Nashiri*,
  791 F.3d 71 (D.C. Cir. 2015)..........................................................19

ii

*In re Baluchi*,
   952 F.3d 363 (D.C. Cir. 2020)................................................................19

*In re Los Angeles Dodgers LLC*,
   465 B.R. 18 (D. Del. 2011).................................................................21

*In re NTE Conn., LLC*,
   26 F.4th 980 (D.C. Cir. 2022)..............................................................23

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369, 401 (2024)..............................................................11, 12

*Moctezuma-Reyes v. Garland*,
   124 F.4th 416 (6th Cir. 2024) ............................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..........................................................................15

*Nat'l Ass'n of Broads. v. FCC*,
   39 F.4th 817 (D.C. Cir. 2022)..............................................................10

*Prometheus Radio Project v. FCC*,
   2003 U.S. App. LEXIS 18390 (3d Cir. Sept. 3, 2003)............................7, 20, 22

*United States v. Osorto*,
   995 F.3d 801 (11th Cir. 2021) ............................................................10

**STATUTES**

15 U.S.C. § 18................................................................................14

28 U.S.C. § 1651(a) .........................................................................23

47 U.S.C. § 303...............................................................................5

47 U.S.C. § 309(d) ..........................................................................14

47 U.S.C. § 309(e) ..........................................................................14

47 U.S.C. § 310(d) ....................................................................4, 14, 17

47 U.S.C. § 325(b) ...........................................................................2

47 U.S.C. § 339(a)(2).........................................................................2

Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3

§ 629.................................................................................................5, 8

§ 629(1).................................................................................................8

§ 629(2).................................................................................................8

§ 629(3).................................................................................................8

Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56

§ 202(c) ...........................................................................................5, 7, 8

§ 202(h).....................................................................................7, 8, 10, 11

**REGULATIONS**

47 C.F.R. § 0.283(c)........................................................................5, 6, 12

47 C.F.R. § 0.5(c)....................................................................................12

47 C.F.R. § 1.3 .....................................................................................5, 12

**ADMINISTRATIVE DECISIONS**

*2002 Biennial Regul. Rev.- Rev. of the Comm'n's Broad. Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecomms. Act of 1996*, 18 FCC Rcd. 13620 (2003)........................................7

*AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, 30 FCC Rcd. 9131 (2015)......................14, 18

*Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, 38 FCC Rcd. 1282 (2023)........................................17

*Consent to Transfer Control of License Subsidiaries of Media Gen., Inc., from S'holders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, 32 FCC Rcd. 183 (2017)........................................................................18

*Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Ann. Rep. and Analysis of Competitive Mkt. Conditions with Respect to Mobile Wireless, Including Commercial Mobile Servs.*, 28 FCC Rcd. 3700 (2013)....................................15

iv

*Little Dixie Radio, Inc.*,
  25 FCC Rcd. 4375 (2010)......................................................................................13

*Media Bureau Seeks to Refresh the Record in the Nat'l Television
  Multiple Ownership Rule Proceeding*, 40 FCC Rcd. 4159 (2025).....................6

*Tully-Warwick Corp.*,
  95 F.C.C.2d 1427 (1983) ....................................................................................13

## OTHER AUTHORITIES

*Nexstar Media Group, Inc. Closes Acquisition of TEGNA Inc.*,
  Nexstar Media Group, Inc. (Mar. 19, 2026)......................................................2

Nexstar Media Group, Inc., Annual Report (Form 10-K)
  (Feb. 27, 2026)...............................................................................................4, 6

Press Release, Brendan Carr, Commissioner, FCC, Carr Statement on
  FCC's Denial of WADL TV's Application (Apr. 23, 2024)..............................12

*Statement of Commissioner Michael O'Rielly, attached to Amend. of
  Section 73.3555(e) of the Comm'n's Rules, Nat'l Television
  Multiple Ownership Rule*, 32 FCC Rcd. 10785 (2017) ....................................8

TEGNA Inc., Annual Report (Form 10-K) (Mar. 2, 2026) ....................................4

*We Interrupt This Program: Media Ownership in the Digital Age:
  Hearing Before the S. Comm. on Com., Sci., and Transp.*,
  119th Cong. (2026) ..............................................................................................9

## INTRODUCTION AND BACKGROUND

America's largest broadcaster, Nexstar Media Group, Inc. ("Nexstar") seeks to acquire another of America's largest broadcasters, TEGNA Inc. ("TEGNA"). Before the Federal Communications Commission, DIRECTV opposed the transaction for a simple reason: It would harm consumers by enabling the resulting broadcast behemoth to demand higher fees from DIRECTV and other distributors for the right to carry local signals—raising prices for millions of DIRECTV subscribers and tens of millions of Americans. Any decision on this industry-transforming transaction should have been made by the FCC's Senate-confirmed Commissioners, after due consideration of the novel issues involved.

Instead, the FCC, Nexstar, and TEGNA circumvented action by the full Commission to rush the merger through—and try to prevent effective judicial review. By pushing approval down to the Bureau level, Nexstar and the Commission sought to conjure a "Goldilocks" scenario where the approval is "final" enough to close the deal but not final enough for this Court to review. On March 19, the FCC's Media Bureau staff approved the transaction. *Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, DA 26-267, MB Docket No. 25-331 (rel. Mar. 19, 2026) ("Order"). The Order relied extensively on *ex parte* communications from Nexstar to the FCC *made that same day*—and not posted on the FCC's public docket until after the transaction closed—describing

1

divestitures and other commitments Nexstar would make to secure approval. *E.g.*, Order ¶5 n.5, ¶24 n.72, ¶55 n.188, ¶75 n.227, NOA.App.2, 12, 24, 30.  Just minutes after the Order was released, Nexstar and TEGNA closed the deal.  *See Nexstar Media Group, Inc. Closes Acquisition of TEGNA Inc.*, NEXSTAR MEDIA GROUP, INC. (Mar. 19, 2026), https://tinyurl.com/2hf3favs.

The Order is unlawful for multiple reasons—but most clearly so because the Bureau purports to override *Congress's* 39 percent cap on national audience reach, which the combined entity vastly exceeds.  And the combination of a Bureau-level decision on a massive transaction and the parties' rush to close immediately raise serious concerns.  If this Court declines to intervene to preserve the status quo, future Commissions will have a roadmap to push through controversial deals for favored parties without effective judicial review.  The Court should issue a stay.

***

Distributors like DIRECTV must secure "retransmission consent" from a local broadcast station to carry its programming.  *See generally* 47 U.S.C. § 325(b).  DIRECTV subscribers in Knoxville, Tennessee, for example, cannot receive ABC programming unless DIRECTV successfully negotiates with Nexstar (the owner of the local ABC affiliate) for the right to carry that local station's signal.  *See generally id.* § 339(a)(2).  Failure to reach an agreement means that Nexstar "blacks out" the channel on DIRECTV's service.

2

DIRECTV therefore must choose between paying exorbitant fees and accepting unfavorable terms to avoid blackouts or enduring blackouts—and angry subscribers—to seek lower fees and better terms.  Either way, when broadcasters demand higher fees, DIRECTV loses subscribers, whether from rising subscriber prices due to higher fees or from subscriber frustrations over blackouts, which station owners often target to include must-view events like the Super Bowl.  When subscribers leave DIRECTV, they generally do not return.  In recent years, *per-subscriber* retransmission-consent fees have increased nearly 15 percent annually, even as broadcast viewership declines overall.  *See* Petition to Deny of DIRECTV, LLC at app. B, B-39, MB Docket No. 25-331 (filed Dec. 31, 2025), https://tinyurl.com/3t8khh57 ("DIRECTV Petition"); *id.* at app. B, B-16 (figure).



The Nexstar-TEGNA transaction will exacerbate this challenging retransmission-consent landscape. Pre-transaction, Nexstar owned 164 full-power television stations in 114 markets. Nexstar Media Group, Inc., Annual Report (Form 10-K) at 7-11 (Feb. 27, 2026) ("Nexstar 10-K"). TEGNA owned 64 stations in 51 markets, many of which overlap with Nexstar's markets. TEGNA Inc., Annual Report (Form 10-K) at 3 (Mar. 2, 2026). Post-transaction, Nexstar will reach 80 percent of U.S. households—again, in clear contravention of the national cap—including nine of the ten biggest markets. Nexstar 10-K at 7. Nexstar will also have far greater leverage in the 27 *local* markets where, after it makes its promised divestitures, Nexstar will own new Big-Four duopolies (*i.e.*, two stations affiliated with the "Big Four" networks: ABC, CBS, FOX, and NBC).[1] Order ¶55, NOA.App.24; DIRECTV Petition at 13. DIRECTV submitted economic evidence and analysis to the FCC demonstrating that Nexstar's ability to black out multiple stations in these markets would lead to even greater retransmission-consent rate hikes.

DIRECTV argued to the Commission that it *must* address these transaction-specific economic harms in its statutorily required public interest analysis. *See* 47 U.S.C. § 310(d). And, of course, DIRECTV highlighted that the combined entity

---

[1] In a 28th market, Nexstar will add another affiliate to an already-existing duopoly.

4

would unlawfully exceed Congress's 39 percent national cap.  *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (amending Telecommunications Act of 1996, Pub L. No. 104-104, § 202(c), 110 Stat. 56, 111 , by adding § 202(c)(3)) (current version at 47 U.S.C. § 303 note). DIRECTV urged that these issues must be addressed by the full FCC, not lower-level employees prohibited from deciding novel questions of law, fact, or policy. *See* 47 C.F.R. § 0.283(c).

The Media Bureau's Order rejects any need to weigh public harms from Nexstar's increased ability post-transaction to extract supra-competitive retransmission-consent fees.  The Order also purports to waive Congress's cap on national audience reach even though the FCC's waiver authority extends only to its own rules, and not to decisions of Congress.  *See id*. § 1.3.  And, again, the Order allows the transaction to proceed without a full Commission vote.

A stay is necessary to prevent irreparable injury to DIRECTV, Appellants, and the public.  As noted above, Nexstar and TEGNA closed their transaction immediately after the Order's public release.  But this Court and others have recognized the impracticability of unwinding such far-reaching transactions long after consummation.  Moreover, upon Nexstar's and TEGNA's merger, contractual clauses immediately began to run that increase the retransmission-consent fees DIRECTV must pay Nexstar.  DIRECTV will lose subscribers that will not return.

This Court's intervention is thus essential to maintain the status quo pending review.

**ARGUMENT**

**I.      APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS.**

**A.      The Commission Lacks Authority to Waive the National Ownership Cap, and the Media Bureau Lacks Authority to Address the Issue.**

The transaction would allow Nexstar to reach 80 percent of U.S. households, greatly exceeding the 39 percent national cap.[2]  *See* Nexstar 10-K at 7.  The FCC has an open proceeding to consider the novel question whether it has authority to change that cap.[3]  The Applicants, however, proposed circumventing the cap with a waiver—"to permit closing of the Transaction," Comprehensive Exhibit, NOA.App.156 (citation omitted)—which the Bureau granted.  But the Commission cannot "waive" *Congress's* decision as to maximum permissible audience reach. And even if the Commission could, the *Bureau*'s delegated authority does not extend to such "novel questions of law, fact or policy."  47 C.F.R. § 0.283(c).

---

[2]  Nexstar and TEGNA's application to the FCC admitted that the transaction would expand the combined companies' reach far beyond the cap. *See* Comprehensive Exhibit, NOA.App.156 (placing the percentage at 54.5 percent based on a loophole in the FCC's rules, but still far above 39 percent).

[3]  *Media Bureau Seeks to Refresh the Record in the Nat'l Television Multiple Ownership Rule Proceeding*, 40 FCC Rcd. 4159 (2025).

### 1.    The Commission has no authority to waive the national cap.

In 2004, Congress adopted a specific 39 percent national cap *and* expressly insulated it from Commission review—in clear contrast with the previous time that Congress established a cap in 1996.  The language that Congress chose in adopting the 39 percent cap and the surrounding context confirm that Congress intended its decision to be final.

The first time that Congress set a national cap, in the Telecommunications Act of 1996 ("1996 Act"), it (1) directed the Commission to amend its rules to increase the cap from 25 percent to 35 percent (in Section 202(c)(1)(B) ); and also (2) required the Commission to periodically review *all* of ownership issues, including the cap, to determine whether they continue to serve the public interest (in Section 202(h)).  *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1)(B) , (h), 110 Stat. 56, 111-12.

When the FCC voted as part of its Section 202(h) review in 2002 to increase the cap from 35 to 45 percent,[4] Congress intervened with the Consolidated Appropriations Act of 2004 ("2004 Act").  In "bitterly heated Member meetings

---

[4]    *2002 Biennial Regul. Rev.- Rev. of the Comm'n's Broad. Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecomms. Act of 1996*, 18 FCC Rcd. 13620, ¶499 (2003).  The FCC's proposed increase was stayed by the Third Circuit, so the cap remained at 35 percent until Congress stepped in to fix it at 39 percent.  *See Prometheus Radio Project v. FCC*, 2003 U.S. App. LEXIS 18390, at *3-4 (3d Cir. Sept. 3, 2003) (granting stay and requiring that "the prior ownership rules remain in effect").

and huddles," a "deal … was struck" whereby Congress acceded to broadcaster demands for a higher cap—at a level sufficient to "prevent[] any station group from being forced to sell off any stations"—in exchange for setting a "hard cap" of 39 percent that the Commission could *not* raise further.[5]

The 2004 Act effectuated that congressional compromise—a higher, but *fixed*, cap—through multiple related provisions. First, Section 629 increased the cap by amending Section 202(c)(1)(B) of the 1996 Act to "strik[e] '35 percent' and insert[] '39 percent,'" thereby also directly amending the Commission's rule. 2004 Act § 629(1). Second, Congress provided that Section 202(h) would no longer "apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B)," thus expressly carving the cap out of the Commission's periodic review of its ownership rules. *Id.* § 629(3). Third, Congress instructed the FCC that its delegated authority to forbear from enforcing certain statutory requirements "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations." *Id.* § 629(2). And finally, the 2004 Act also required any "entity that exceeds the 39 percent" cap through the acquisition of licenses to come into compliance within two years. *Id.*

---

[5]  *See Statement of Commissioner Michael O'Rielly* at 1, *attached to Amend. of Section 73.3555(e) of the Comm'n's Rules, Nat'l Television Multiple Ownership Rule*, 32 FCC Rcd. 10785, 10808 (2017).

These statutory directives are accretive and, taken together, could not be plainer: Congress set the cap to 39 percent and told the FCC to neither revisit nor opt out of enforcing it.  The Bureau's Order adopts a contrary, legalistic construction urged by Nexstar and TEGNA—that Congress set the cap only temporarily to 39 percent and barred its modification only during the Commission's periodic review of its ownership rules.  *See* Order ¶¶32-37, NOA.App.15-17.  But this idea that, *even on the very next day after Congress adopted the 39 percent cap*, the FCC could simply have changed it again to 100 percent makes nonsense of Congress's compromise and the carefully negotiated provisions effectuating it.  *Cf. We Interrupt This Program: Media Ownership in the Digital Age: Hearing Before the S. Comm. on Com., Sci., and Transp.*, 119th Cong., 02:30:55-02:32:32 (2026) (discussion of this hypothetical between Senator Ted Cruz and Curtis LeGeyt of the National Association of Broadcasters).  The Order fails to offer *any* reason, plausible or otherwise, for Congress to do this.

The Bureau's construction also contravenes settled law.  "When Congress enacts legislation that directs an agency to issue a particular rule, 'Congress has amended the law.'"  *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019) (quoting *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)).  And when an agency issues a rule "in response to a statute or executive order that, by its language, 'expressly' directs the agency" to adopt the

9

rule, "the agency is not free to scrap the rule in the absence of congressional or executive direction." *United States v. Osorto*, 995 F.3d 801, 815 (11th Cir. 2021) (citing *Hampton v. Wong*, 426 U.S. 88, 112 (1976)).

The Bureau's Order suggests that because the FCC had general rulemaking authority in this area before the 1996 Act, and the 2004 Act did not expressly *remove* that authority, the agency can revisit and revise Congress's careful compromise (by changing or simply waiving it). *See* Order ¶34, NOA.App.16. That is incorrect. As this Court concluded in rejecting a similar FCC assertion, "[a] generic grant of rulemaking authority to fill gaps … does not allow the FCC to alter the specific choices Congress made." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022) (citation omitted); *see also Air All. Hou. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]n agency may not circumvent specific statutory limits … by relying on separate, general rulemaking authority.").

The Order says *Fox Television Stations, Inc. v. FCC*, 293 F.3d 537 (D.C. Cir. 2002), which found that the Commission was *required*, at that time, to reconsider the cap as part of its Section 202(h) review, "reinforce[s]" its conclusion. Order ¶39, NOA.App.18. *Fox*, however, preceded the passage of the 2004 Act. As discussed above, Congress in 2004 set a specific cap and expressly *removed* the cap from Section 202(h) review. Congress thereby placed its 39 percent cap firmly back within the rule cited above that an agency cannot invoke

10

its general rulemaking authority to circumvent specific statutory limits set by Congress.

The Commission today retains *no* delegated authority over the national cap. In 2004, Congress spoke to the issue clearly and specifically, leaving the agency no gap-filling authority—not to raise the cap, not to lower it, and not to forbear from or waive it. The heart of administrative law is that "the extent of [an agency's] powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 965 (D.C. Cir. 1985) (quotation omitted); *see also Moctezuma-Reyes v. Garland*, 124 F.4th 416, 421 (6th Cir. 2024) ("The actual delegation of authority to the agency must be clear: imprecise wording alone won't cut it. *Chevron* is no more."). And when "the issue is one of *whether* a delegation of authority by Congress has indeed taken place … Congress can reasonably be expected both to have and to express a clear intent." *ACLU v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) (emphasis added); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024) ("abdication in favor of the agency is *least* appropriate" when the "ambiguity is about the scope of an agency's own power"). Far from delegating authority to the Commission in the 2004 Act, Congress expressly took away—it literally *un*delegated—the Commission's prior authority under Section 202(h) to alter the 39 percent cap.

11

In sum, the "best reading," *Loper Bright*, 603 U.S. at 395, of the 2004 Act does not provide the delegation that the Commission would require to change Congress's cap. *Congress* mandated a cap of 39 percent. *Congress* told the FCC not to review that congressionally mandated rule during its periodic review of all other ownership rules. And just as *Congress* told the FCC that it cannot "forbear" from the cap, the agency cannot achieve the same result via waiver—not least because the FCC's waiver authority is limited to *regulations*, rather than statutory requirements. *See* 47 C.F.R. § 1.3.

> **2.      Waiving the national ownership cap at a minimum involves novel questions of law and policy.**

The Media Bureau lacks authority to waive the national cap under FCC rules. The Bureau must "refer[] to the Commission … [m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." 47 C.F.R. § 0.283(c); *see also, e.g.*, *id.* § 0.5(c) (FCC staff has authority to act "on matters which are minor or routine or settled in nature").[6]

---

[6]   *See also* Press Release, Brendan Carr, Commissioner, FCC, Carr Statement on FCC's Denial of WADL TV's Application (Apr. 23, 2024), https://docs.fcc.gov/public/attachments/DOC-402042A1.pdf (Media Bureau "does not have the authority" to make "new and novel decisions").

Accordingly, the Bureau "erred and exceeded its delegated authority" where there was no "analogous Commission-level precedent to the facts presented."[7]

The Order here improperly decides novel questions of fact, law, *and* policy—including questions pending in a Commission-level rulemaking. *See* n.3, *supra*. Factually, a transaction envisioning a merged entity that would serve a majority of the national audience, even after accounting for the Commission's discount for "ultra-high-frequency" stations, has never been presented to the Commission. And whether the Commission still has authority to modify the national cap after the 2004 Act's reticulated pronouncements is a novel legal question—albeit one whose answer is clearly "no." Finally, there is a novel policy question whether the kind of broadcasting giant that the transaction creates should ever be allowed. The Media Bureau's Order addressing these issues was unlawful.

B. **The Bureau's Failure to Address Extensive Evidence on the Record of Public Interest Harms Resulting from the Transaction Violated the Statute and Was Arbitrary and Capricious.**

DIRECTV and other parties opposing the transaction identified significant public interest harms from the increased market power that the combined entity gains from the transaction. The Bureau's refusal to even consider those harms ignored its statutory responsibility and is arbitrary and capricious.

---

[7] *Little Dixie Radio, Inc.*, 25 FCC Rcd. 4375, ¶5 (2010); *see also Tully-Warwick Corp.*, 95 F.C.C.2d 1427, ¶5 (1983).

The FCC must weigh *all* the public interest benefits and harms of a proposed transaction and conclude that the former outweigh the latter.  47 U.S.C. § 310(d). If a party files a petition to deny that identifies a "substantial and material question of fact" regarding whether the transaction serves the public interest, the Commission "shall formally designate the application for hearing."  47 U.S.C. § 309(d)-(e).

It is well-established that the Commission's public-interest analysis under Section 310(d) is "informed by" merger review under the Clayton Act— "competitive analysis … forms an important part of the … evaluation."[8]  This evaluation "necessarily encompasses the 'broad aims of the Communications Act,' which include, among other things, a deeply rooted preference for preserving and enhancing competition."[9]  The Commission therefore considers how "a transaction would affect competition by defining a relevant market, looking at the market power of incumbent competitors, and analyzing barriers to entry, potential competition, and the efficiencies, if any, that may result from the transaction."[10] The Commission cannot depart from this established analysis without a reasoned

---

[8]    *AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, 30 FCC Rcd. 9131, ¶¶20-21 (2015) ("*AT&T-DIRECTV*") (citing 15 U.S.C. § 18).

[9]    *Id*. ¶19 (citation omitted).

[10]    *Id*. ¶20 (citation omitted).

14

explanation, which the Bureau Order fails to provide. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 47-56 (1983) (requiring reasoned decision-making).

DIRECTV's petition to deny also explained that, post-transaction, Nexstar would own either two or three broadcast stations affiliated with the "Big Four" networks in 30 DMAs (the relevant geographic area for assessing these issues). *See* DIRECTV Petition at 9-11. For each DMA, DIRECTV submitted economic analysis using what the FCC calls "the most widely-accepted measure of concentration in competition analysis,"[11] the Herfindahl-Hirschman Index ("HHI" in record materials). *Id.* at 12. Herfindahl-Hirschman calculations measure pre- and post-transaction levels of concentration in a particular market—and here, they showed that in the market for retransmission consent for Big Four stations in each DMA, the Herfindahl-Hirschman levels would increase significantly and result in highly concentrated markets. *See id.* at 12-16.

DIRECTV also submitted extensive evidence—from DIRECTV's own declarants, from economists, and from the FCC's and DOJ's prior analyses— confirming that Nexstar's ownership of Big Four duopolies and triopolies in the

---

[11] *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Ann. Rep. and Analysis of Competitive Mkt. Conditions with Respect to Mobile Wireless, Including Commercial Mobile Servs.*, 28 FCC Rcd. 3700, ¶54 (2013).

various markets would enable hikes in retransmission-consent rates. *See id.* at 20-31. When DIRECTV must negotiate with a party that controls not just one, but two or three, of the Big Four stations in a particular market, as DIRECTV's declarant explained, that is "[a]mong the most important set of data" the company considers in estimating "the higher bound of prices" it might pay—making this a "significant factor in [driving the amount of fees that] DIRECTV pays for retransmission consent." *Id.* at app. D ¶¶5-6.

The Bureau does not disagree with DIRECTV's showing of harm; it simply ignores it. More specifically, the Order entirely disregards questions of market definition and market concentration—questions standard to any competition analysis—as reflected in the Herfindahl-Hirschman data provided by DIRECTV and others. It merely states that *viewers* can now obtain programming from different technologies. While true, this does not even purport to address the harm alleged—that this merger will permit Nexstar to raise prices *to distributors like DIRECTV*. That is, the Bureau abandoned standard market concentration and competition analysis based solely on the unsupported view that they no longer matter. This was, of course, yet another decision exceeding the Bureau's delegated authority. And the Bureau disregarded undisputed record evidence—including the Commission's own data—that these other technologies *do not* constrain retransmission-consent prices. *E.g.*, *id.* at 36-37. It also ignored Nexstar's own

16

statements that it intends to increase retransmission consent prices as a result of this transaction.  *Id.* at i.

The Bureau also ignored evidence in the record when it questioned whether retransmission-consent-rate increases "would reach consumers."  Order ¶74, NOA.App.30.  DIRECTV provided both economist analysis and declarations explaining why and how those input-price increases are passed through to subscribers.  DIRECTV Petition at 35-37, app. C-D (B-47-B-51, D-1-D-2) (declarations).  It is arbitrary and capricious to conclude DIRECTV did not "provide[] transparency" (Order ¶74, NOA.App.30) given this unrefuted evidence. *See also Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, 38 FCC Rcd. 1282, ¶20 (2023) ("Retransmission consent fees paid by the MVPD to the broadcast stations are essentially passed on to consumers as part of the service fees paid by subscribers for the MVPD service.").

The Bureau also erroneously concluded that it could exclude retransmission-consent issues from public-interest analysis under Section 310(d) because "general concerns about the retransmission consent marketplace" are best addressed "in rulemaking proceedings."  Order ¶80, NOA.App.32.  Section 310(d) does not permit the Commission to choose to ignore issues affecting the public interest. The Commission itself claims to "employ[] a balancing process, weighing any potential public interest benefits of the proposed transaction against *any* potential

17

public interest harms,"[12] with applicants "bear[ing] the burden" of demonstrating that the standard is satisfied.[13]  Moreover, the Bureau's rationale that these concerns are properly addressed in a rulemaking is nonsensical given that the Order itself purports to grant Nexstar and TEGNA a waiver of the Commission's current rules—that waiver "addresses" these concerns *here* by opting to ignore them.

The "commitments" Nexstar made in its letter filed—but not provided to the public—on the day the Order was issued change nothing.  Order ¶75, NOA.App.30.  Nexstar's ability to charge supra-competitive retransmission-consent rates based on its market power will long outlast its offer to extend any soon-to-expire retransmission-consent agreements until November 2026.  *See id.*

The Administrative Procedure Act requires the Commission to consider *all* relevant issues presented to it.  *See, e.g.*, *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023).  Here, the Bureau created new law, and did so by ignoring important issues before it.  This was doubly unlawful.

---

[12]  *Consent to Transfer Control of License Subsidiaries of Media Gen., Inc., from S'holders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, 32 FCC Rcd. 183, ¶19 (2017) (emphasis added) (citation omitted).

[13]  *AT&T-DIRECTV* ¶18.

## II.    DIRECTV, LIKE APPELLANTS, WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A STAY.

DIRECTV agrees with Appellants that all the equitable factors support a stay here.  DIRECTV writes separately to describe the irreparable harm that it faces.

As Appellants explain, "an irreversible" event "that frustrates later appellate review" "is a quintessential type of 'irreparable' injury" under this Court's precedent.  *In re Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020) (quoting *In re Al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015)).  Both this Court and the Supreme Court have recognized that corporate mergers fit this standard.  *See* Mot. 24 (discussing precedents).

Here, the immediacy of that threat is clear.  Absent a stay, TEGNA will be fully subsumed into Nexstar long before this Court has any opportunity to hear the case on the merits, undermining the Court's ability to order meaningful relief.  Nexstar and TEGNA closed their transaction immediately after the Order was publicly released, knowing that it would be challenged, and likely with the purpose of hindering such a challenge.  Courts routinely issue stays in analogous circumstances because once an acquisition is finalized and the parties fully merge their operations, "'unscrambling' the eggs (*i.e.*, returning the merging companies to their pre-merger state)" would become an "especially daunting and potentially impossible task."  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 87 (D.D.C. 2015).  The

19

Third Circuit granted a stay for precisely this reason in the context of an earlier FCC attempt to relax its ownership restrictions, finding that impending and "irreversible" consolidation in the broadcast industry would otherwise have resulted in "the likely loss of an adequate remedy should the new ownership rules be declared invalid in whole or in part." *Prometheus*, 2003 U.S. App. LEXIS 18390, at *2.

DIRECTV also faces specific irreparable injuries involving retransmission consent. As DIRECTV described at length to the Commission, Nexstar expressly plans to use this transaction to secure higher retransmission-consent fees. On an earnings call for the third quarter of 2025, for example, Nexstar touted $300 million in "synergies" from the deal, $135 million of which would come from "net retrans"—*i.e.*, increased retransmission-consent rates. DIRECTV Petition at 17-18. Nexstar's Chief Financial Officer separately described the transaction's synergies as breaking out "'very similarly to … the Tribune deal,' a transaction that also led to an increase in net retransmission rates, by 'applying [higher] Nexstar rates to Tribune subscriber counts.'" *Id.* at 18 n.45 (quoting Nexstar third-quarter earnings call).

Nexstar's greater market power as a result of the transaction will enable it to achieve these higher retransmission-consent rates in two ways. First, the extent to which a station group possesses multiple Big Four stations in the same market is

"[a]mong the most important set of data" that DIRECTV weighs in estimating the upper bound of prices it will agree to pay—the more stations an owner can black out, the more damage it can inflict by doing so, and thus the more it can demand to avoid a blackout.  Declaration of Robert Thun ¶¶6-7 ("Thun Decl.") (attached as Appendix A).  Without immediate relief, DIRECTV will—before this Court can decide the case—find itself negotiating with a station owner able to threaten blackouts of double, the scope that it currently can.  Nexstar will use that increased market power to raise already-inflated retransmission-consent rates even higher.  This kind of drastic change in bargaining leverage has led courts across the country to recognize that "negotiating with respect to a unique asset with decreased leverage constitutes irreparable harm."  *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011); *see also, e.g.*, *Brady v. Nat'l Football League*, 640 F.3d 785, 793-94 (8th Cir. 2011) (finding that the NFL "met its burden to demonstrate … irreparable harm" as a result of lost "leverage" in negotiations with its players, because the status quo "negotiating environment" could not be recreated post hoc).

Quite apart from Nexstar's increased leverage, DIRECTV's rates for TEGNA's current stations will *also* increase post-transaction based on "after acquired" clauses in DIRECTV's retransmission-consent agreements.[14]  As

---

[14]  Notably, DIRECTV negotiated those "after acquired" clauses in reliance on the Commission's rules—without the Order's unlawful approval, TEGNA's

relevant here, these clauses specify that if another broadcaster acquires TEGNA's stations, the acquiring station's rates (which in Nexstar's case are higher than TEGNA's) will apply relatively soon thereafter, and very likely before this Court could complete its review. Thun Decl. ¶13. As a result, absent a stay, DIRECTV's costs to retransmit TEGNA stations will go up *automatically* well before a decision on the merits in this case. There is therefore an "imminen[t] … need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up). This harm is, moreover, both "certain and great" and "beyond remediation," *id.*—once gone, subscribers lost due to rising prices cannot be returned even by unwinding the transaction. *See* Thun Decl. ¶14.

Just as in *Prometheus*, the irreparable harms that will result here absent a stay would "outweigh the effect of a stay on" the FCC, Nexstar, and TEGNA. *Prometheus*, 2003 U.S. App. LEXIS 18390, at *3. As Appellants describe, the Bureau Order granted this novel transaction on a much faster timeframe than is typical for even much less significant transactions. Mot. 13-14. And the public interest is undoubtedly served by pausing temporarily a transaction that will

---

licenses could not have been purchased by an entity as large as Nexstar or in a manner that created the duopolies created here. Thun Decl. ¶12.

certainly raise prices for consumers as a result of Nexstar's ability to impose higher prices on DIRECTV and other distributors.

*** 

Appellants thus satisfy the requirements for a stay pending this Court's review. If this Court finds that a stay pending judicial review is otherwise procedurally unavailable here, DIRECTV respectfully requests that the Court stay the Commission's decision pursuant to its mandamus authority or its authority to issue a stay under the All Writs Act. *See* 28 U.S.C. § 1651(a); *FTC v. Dean Foods*, 384 U.S. 597, 603-05 (1966). As Appellants explain in their Notice of Appeal or, in the Alternative, Emergency Petition for Writ of Mandamus, this Court has granted such relief in directly analogous circumstances. *See In re NTE Conn., LLC*, 26 F.4th 980, 988, 998-90 & n.2 (D.C. Cir. 2022) (staying a FERC decision under 28 U.S.C. § 1651 where appellate review would otherwise have been inadequate and the "well established requirements that we routinely apply to motions for stay pending appeal" were satisfied); Appellants' Notice of Appeal at 27-28 (citing *Dean Foods*, *In re NTE*, and other authorities).

23

# CONCLUSION

The Court should grant Appellants' emergency motion for a stay pending judicial review and administrative stay.  It should also grant any other appropriate relief necessary to preserve its ability to review this case on the merits and grant meaningful relief.

Dated: March 21, 2026

Respectfully submitted,

/s/ Timothy J. Simeone

Michael Nilsson
Timothy J. Simeone
E. Austin Bonner
Jason Neal
HWG LLP
1919 M St., NW, 8th Floor
Washington, DC 20036
(202) 730-1300
tsimeone@hwglaw.com

*Counsel for DIRECTV, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing document complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman font.  I further certify that the foregoing document complies with the requirements of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,118 words according to the word-count feature of Microsoft Word.

/s/ Timothy J. Simeone
Timothy J. Simeone

# APPENDIX A

# <u>DECLARATION</u>

I, Robert Thun, do hereby declare and state under penalty of perjury as follows:

1. I am the Chief Content Officer of DIRECTV.  As such, I am principally responsible for all strategy, investments, negotiations, and acquisitions for programming on DIRECTV's satellite, streaming, and U-verse platforms.  My business address is 2260 E. Imperial Highway, El Segundo, CA 90245.

2. DIRECTV generally will pay more in retransmission consent fees to station groups that own more stations affiliated with the Big Four networks (ABC, CBS, FOX, and NBC) than to station groups that own fewer Big Four stations, everything else being equal.  Additionally, DIRECTV will pay more for the related non-Big Four stations to these larger station groups than the rates paid for non-Big Four stations of the smaller station groups.

3. The greater the national reach of a station group's Big Four stations, the greater the number of DIRECTV subscribers affected if DIRECTV fails to reach agreement with that station group.  Thus, as a station group expands its national footprint of Big Four stations, it obtains greater bargaining leverage against DIRECTV.

4. DIRECTV also generally will pay more to a station group in retransmission consent fees to the extent the station group controls two or more affiliates of the Big Four networks in one or more local markets, all other factors being equal.  For purposes of this declaration, I refer to such combinations as "Big Four Duopolies," "Big Four Triopolies," and "Big Four Quadropolies," using the term "Big Four Duopolies" to refer to all such combinations for clarity.

5. In addition to paying more in retransmission consent fees, DIRECTV also is forced to accept non-economic terms and conditions that are also generally less favorable than stations with less extensive Big Four national reach and stations without Big Four duopolies.  Further, it stands to reason that the more Big Four Duopolies a station group controls, the more leverage that group has in negotiations with DIRECTV.

6. When DIRECTV prepares for negotiations with a broadcast station group, it collects a wide variety of data to help it set the higher bound of prices it will agree to pay the station group for its portfolio of stations.  Among the most

1

important set of data DIRECTV considers in estimating the higher bound of prices, are the number of subscribers covered by that station group's Big Four stations, the extent to which the station group possesses Big Four Duopolies, and the amount of subscribers that such station group covers with such Big Four Duopolies.

7.  It can be difficult to quantify the extent of this leverage because each negotiation and each counterparty is different.  That said, I am confident that national Big Four subscriber reach and the number of Big Four Duopolies are significant factors in driving the amount of fees that DIRECTV pays for retransmission consent for those station groups that contain Big Four Duopolies in their respective portfolio of stations.

8.  DIRECTV's agreements with station groups nearly always cover all of the station group's portfolio of stations.  Those agreements also almost always provide for a single annual price for all of the group's stations that fall within a particular category.  Thus, for example, DIRECTV might pay $X per month per subscriber for stations (or multicast feeds) affiliated with the Big Four networks and pay $Y per month per subscriber for independent stations.

9.  DIRECTV negotiates these single fees, however, as a reflection of the parties' relative bargaining leverage *across the Designated Market Areas in which the station group operates*.

10. DIRECTV views the price it is willing to pay for all of a station group's stations as a "weighted average" rate it is willing to pay for each of the group's individual stations and is not a reflection or acknowledgement that stations do not have different values across markets.  Such practice was adopted for ease in applying and reconciling monthly payments between the parties.

11. A station group's acquisition of another station group can increase its bargaining leverage from an expanded national footprint of Big Four stations and/or from obtaining additional Big Four duopolies.  That is, if a station group enters a transaction that *both* expands its national footprint of Big Four stations *and* gives it additional Big Four duopolies, it obtains additional bargaining leverage in two ways.

12. In addition, price increases from "after acquired" station clauses impact future retransmission consent negotiations by setting a price floor in such negotiations. These self-executing uplifts during the contract term, negotiated in reliance on the Commission's existing rules, shift the starting point in the next renewal and are rarely reduced, delivering a timing benefit to the buyer of a smaller station group (in the form of higher rates sooner) without any discernable corresponding consumer benefit (such as competitive efficiencies arising from lower costs). *Existing* retransmission consent rates are among the most important variables in setting *subsequent* retransmission consent rates.

13. For the purposes of this transaction, if Nexstar acquires TEGNA's stations, Nexstar's rates (which are higher than those charged by TEGNA) will apply relatively soon thereafter and would preempt any future arm's length negotiations between DIRECTV and TEGNA for the license of its stations.

14. When broadcast station groups demand higher retransmission consent fees, whether through negotiation or "after acquired" station clauses, DIRECTV loses subscribers. Consumers often cancel their subscriptions over rising prices due to higher fees or frustration over targeted blackouts imposed by station owners. Upon cancellation, these subscribers are nearly always permanently lost, which underscores the long-term implications of higher retransmission consent prices and/or blackouts to DIRECTV's business.

March 12, 2026
Date

Robert D. Thun

## CERTIFICATE OF SERVICE

I hereby certify that, on March 21, 2026, the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit.  Service was accomplished on all parties or their counsel of record via CM/ECF.  I also caused a true copy of the foregoing to be served upon the Commission's general counsel by email to LitigationNotice@fcc.gov.

/s/ Timothy J. Simeone
Timothy J. Simeone