**ORAL ARGUMENT NOT YET SCHEDULED**

No. 26-1062

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA – BROADBAND ASSOCIATION OF VIRGINIA; and NEWSMAX MEDIA INC.,

*Appellants/Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent.*

---

On Notice of Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

---

## BRIEF OF THE CONSERVATIVE POLITICAL ACTION COALITION FOUNDATION CENTER FOR REGULATORY FREEDOM AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS/PETITIONERS

---

Arthur J. Burke
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4352
arthur.burke@davispolk.com

March 21, 2026

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

*Amicus curiae* has moved, pursuant to Rule 29(a)(3) of the Federal Rules of Appellate Procedure, for leave to file this amicus brief in support of Appellants.

Pursuant to Circuit Rule 29(d), *amicus curiae* states that it is unaware of any other amicus brief addressing the issues identified herein.  Among the issues addressed, *amicus curiae* believes that its brief is useful in providing the Court with additional detail regarding an analysis conducted by the American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation) Center for Regulatory Freedom regarding the Federal Communications Commission's lack of authority to waive the National Television Multiple Ownership Rule and its failure to engage in a proper public interest analysis in connection with its waiver of broadcast ownership rules relating to Nexstar Media Inc.'s acquisition of TEGNA Inc.

Given the significance of the case before the Court and the issues raised by the parties, other organizations and individuals are likely to file separate briefs as *amicus curiae* in support of Appellants.  Because of the unique perspectives and expertise of various amici, it is impractical to collaborate in a single brief.  Moreover, just as the Court will benefit from the presentation of additional arguments by amici in support of Appellee, so too will it benefit

from the presentation of a diverse set of additional arguments in support of

Appellants.

## CERTIFICATE AS TO PARTIES, RULINGS, AND OTHER CASES

**A.    Parties.**

Except for the American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation) Center for Regulatory Freedom, and any other amici who have not yet entered an appearance in this Court, all parties, intervenors and amici appearing in this Court are listed in the Brief for Appellants.

**B.    Rulings Under Review.**

References to the ruling at issue appear in the Brief for Appellants.

**C.    Related Cases.**

*Amicus curiae* adopts the statement of related cases presented in the Brief for Appellants.

/s/ Arthur J. Burke

Arthur J. Burke
*Counsel for Amicus Curiae*

March 21, 2026

iii

## CORPORATE DISCLOSURE, AUTHORSHIP, AND
## FINANCIAL CONTRIBUTION STATEMENTS

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, and consistent with D.C. Circuit Rule 26.1, *amicus curiae* states that the Center for Regulatory Freedom is a project of the American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation), an independent 501(c)(3) nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *amicus curiae* states that no counsel to a party in the matter before the Court authored this brief in whole or in part; that no party or party's counsel contributed money intended to fund preparing or submitting this brief; and that no person contributed money to *amicus curiae* that was intended to fund preparing or submitting this brief.

iv

# **TABLE OF CONTENTS**

STATEMENT REGARDING CONSENT TO FILE AND
SEPARATE BRIEFING ........................................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND OTHER CASES ...... iii

CORPORATE DISCLOSURE, AUTHORSHIP, AND FINANCIAL
CONTRIBUTION STATEMENTS ........................................... iv

TABLE OF CONTENTS ..................................................................... v

TABLE OF AUTHORITIES ............................................................ vi

GLOSSARY .................................................................................. viii

INTEREST OF *AMICUS CURIAE* .................................................. 1

SUMMARY OF ARGUMENT ........................................................ 3

ARGUMENT .................................................................................. 5

    I.     The FCC Lacks Authority to Waive the 39% National
          Ownership Cap Instituted by Congress. ........................... 5

    II.    The FCC's Media Bureau Has Not Demonstrated That a
          Waiver Is in the Public Interest. ....................................... 9

        A.    The FCC's Media Bureau Did Not Adequately
             Address Whether a Waiver Promotes Economic
             Competition. ........................................................ 10

        B.    The FCC's Media Bureau Did Not Adequately
             Address Whether a Waiver Promotes Diversification
             of Viewpoints. ..................................................... 13

CONCLUSION ............................................................................. 14

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Barnhat v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ................................................................................ 6

*Busse Broad. Corp. v. Fed. Commc'ns Comm'n*,
  87 F.3d 1456 (D.C. Cir. 1996) ................................................................ 9

*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991) ................................................................................ 8

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) .................................................................................. 7

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ................................................................................ 7

*Kingdomware Techs., Inc. v. U.S.*,
  579 U.S. 162 (2016) ................................................................................ 6

*Levine/Shwab Partnership v. Fed. Commc'ns Comm'n*,
  61 F.4th 183 (D.C. Cir. 2023) ................................................................. 8

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) .................................................................................. 6

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................ 2

*Prometheus Radio Project v. Fed. Commc'ns Comm'n*,
  373 F.3d 372 (3d Cir. 2004) ................................................................ 5, 6

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ................................................................................ 6

### ADMINISTRATIVE MATERIALS

*In the Matter of Applications for Consent to the Transfer of Control of
  TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion & Order, MB
  Dkt. No. 25-331 (Mar. 19, 2026) ............................................................ 5

vi

*In the Matter of Applications of TEGNA Inc. and Nexstar Media, Inc. for Consent to Transfer Control of Licenses*, Petition to Deny of Newsmax Media, Inc., MB Docket No. 25-331 (Dec. 31, 2025) ............................ 11

STATUTES & RULES

5 U.S.C. § 706(2)(A) ...................................................................... 10

5 U.S.C. § 706(2)(C) ...................................................................... 9

47 C.F.R. § 1.3 ............................................................................ 8

OTHER AUTHORITIES

Andrew Langer, *Protecting Conservative Voices in a Changing Media Landscape: CPAC at the FCC in 2025* (Dec. 17, 2025), https://www.cpac.org/post/protecting-conservative-voices-in-a-changing-media-landscape-cpac-at-the-fcc-in-2025 ............................ 1, 2

Telecomm. Act of 1996, § 202 .............................................. *passim*

# **GLOSSARY**

| CRF | Center for Regulatory Freedom |
|---|---|
| CPAC Foundation | Conservative Political Action Coalition Foundation |
| FCC | Federal Communications Commission |
| MVPDs | Multichannel Video Programming Distributors |
| Newsmax | Newsmax Media, Inc |
| Nexstar | Nexstar Media Inc. |
| TEGNA | TEGNA Inc. |

## <u>INTEREST OF *AMICUS CURIAE*</u>

The American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation ("CPAC Foundation")) Center for Regulatory Freedom ("CRF") is a project of the CPAC Foundation, an independent 501(c)(3) nonprofit, nonpartisan research, and education foundation.  The CPAC Foundation is an organization deeply committed to defending constitutional principles, free markets, and limited government.  Its mission is to ensure the risks and costs of regulations are based in scientific and economic evidence and that the voices, interests, and freedoms of Americans are fully represented in the regulatory process and debates.

Protecting free speech and a diverse media marketplace of ideas is a core interest of CRF and the CPAC Foundation and CRF has authored numerous formal comments to the Federal Communications Commission ("FCC") regarding the future of broadcast television.[1]  CRF believes that regulation, generally, serves as administrative law's attempt to find a balance between the exercise of freedom and the protection of individual rights, and that broadcast regulation exists to preserve localism, protect free speech, and

---

[1] *See, e.g.*, Andrew Langer, *Protecting Conservative Voices in a Changing Media Landscape: CPAC at the FCC in 2025* (Dec. 17, 2025), https://www.cpac.org/post/protecting-conservative-voices-in-a-changing-media-landscape-cpac-at-the-fcc-in-2025.

ensure the public can hear the widest possible range of voices in the marketplace of ideas.[2]  Indeed, the comments CRF submitted to the FCC throughout 2025 conveyed a consistent message: protect localism, respect congressional boundaries, and ensure the public continues to benefit from a diverse and competitive media environment.  CRF also believes that, especially in light of the U.S. Supreme Court's 2024 *Loper Bright* decision, the discretionary power of agencies to interpret statute is sharply (and rightly) limited.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

To that end, CRF views the FCC's waivers of the National Television Ownership Rule and duopoly rule, which cap the number of commonly owned stations, to permit a merger between Nexstar Media Inc. ("Nexstar") and TEGNA Inc. ("TEGNA") to be in direct contradiction to these principles. Waiving the ownership rules will only encourage further media consolidation and cultural polarization and limit the public's access to independent local voices.  Moreover, it is CRF's view that the FCC does not have the authority to make such a waiver.

---

[2] *Id.*

## SUMMARY OF ARGUMENT

In its Memorandum Opinion and Order dated March 19, 2026, the Media Bureau of the FCC granted the application for consent to transfer control of TEGNA to Nexstar in clear violation of congressional boundaries and in a profound exercise of unlawful regulatory action.

*First*, the National Television Multiple Ownership Rule, which imposes a 39% national audience reach cap on broadcast station owners, was explicitly established by Congress in 2004 and intentionally removed from the FCC's periodic ownership review authority.  Any attempt to waive this threshold during agency review of an application for transfer of control runs afoul of the separation of powers and must fail judicial scrutiny.  The FCC cannot disregard statutory text to pursue its desired policy outcomes.

*Second*, the FCC Media Bureau's unauthorized waiver of the National Television Multiple Ownership Rule, as well as its waiver of the duopoly rule, is unaccompanied by the requisite public interest analysis.  Among other things, the FCC failed to perform a proper competition analysis or to consider the impact of its waiver on the diversification of viewpoints, both of which are mandated by agency precedent and this Court's prior decisions.  This omission resulted in a failure by the FCC to account for the serious downstream consequences of broadcaster consolidation and increased

3

audience reach.  As discussed below, substantial evidence submitted to the FCC in comments illustrates how dominant broadcast conglomerates already use retransmission leverage to exclude independent voices from programming lineups, thereby decreasing competition and reducing ideological pluralism essential to a functioning democracy.

For these reasons, CRF urges the Court to review the FCC Media Bureau's unlawful waiver and to grant Appellants' Emergency Motion for Stay and Injunction Pending Appeal of the FCC Media Bureau's Memorandum Opinion and Order.

## ARGUMENT

### I.    The FCC Lacks Authority to Waive the 39% National Ownership Cap Instituted by Congress.

"The national television ownership rule caps the number of television stations that a single entity may own on a national basis." *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 373 F.3d 372, 395–96 (3d Cir. 2004). Contrary to the assertions of the FCC's Media Bureau in its Memorandum Opinion and Order dated March 19, 2026, this congressionally mandated cap on national ownership cannot be waived.[3] *In the Matter of Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion & Order ¶ 3, MB Dkt. No. 25-331 (Mar. 19, 2026) (hereinafter, the "Order").

Through the Telecommunications Act of 1996 (the "1996 Act"), "Congress limited the number of commonly owned stations to those reaching no more than 35% of the national audience." *Prometheus Radio*, 373 F.3d at 396 (citing 1996 Act § 202(c)(1)(B)). Today, the plain text of the 1996 Act, as amended in 2004, imposes a non-discretionary requirement on the FCC to set the ownership cap at 39% (the "39% cap").

---

[3] For the reasons set forth herein, the FCC and the Media Bureau also do not have the authority to revise or eliminate the 39% cap.

In statutory construction, courts begin "with the language of the statute." *Barnhat v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Where, as here, the "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent' . . . [t]he inquiry ceases." *Id.* (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).

The 1996 Act clearly states that the FCC "***shall*** modify its rules for multiple ownership" by "increasing the national audience reach limitation for television stations to 39 percent." 1996 Act § 202(c)(1)(b) (emphasis added). It is well settled that "the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (recognizing that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion"). Accordingly, the statutory language "shall modify" signals what the Third Circuit described as a "statutory directive" for the FCC to impose a "precise 39% cap" on national ownership. *Prometheus Radio*, 373 F.3d at 396.

This conclusion is supported by the fact that, prior to the 2004 amendments, the 1996 Act required the FCC to "review its rules" every two years and "repeal or modify any regulation it determines to be no longer in the public interest." 1996 Act § 202(h) (1996 version). But in 2004, Congress

6

amended this provision to "not apply to any rules relating to the 39 percent national audience reach limitation," thereby taking any discretionary power to review and modify the national ownership provision away from the FCC.[4] 1996 Act § 202(h) (amended 2004 version).

The "differences in language" between this provision as to national ownership and the neighboring provision as to local ownership also "convey differences in meaning" that reinforce the conclusion that the FCC lacks authority to waive the 39% cap. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017). In the local broadcast ownership provision, Congress explicitly instructed the FCC to "conduct a rulemaking proceeding to determine whether to retain, modify, or eliminate its limitations on the number of television stations that a person or entity may own, operate or control" within a single market. 1966 Act § 202(c)(2). The lack of any similar discretion-conferring language in the national ownership provision signals,

---

[4] The FCC argues that "[t]he National Cap's removal from the quadrennial review process did not serve to codify the 39% limitation" because the amendment to Section 202(h) "merely provides that the [FCC] is not *required* to review the national audience reach cap quadrennially" and is silent on whether the FCC is "*allowed* to review the rule at any point." Order ¶ 36. That argument is unavailing. Here, Congress explicitly instructed the FCC *not* to review or revise the 39% cap despite requiring regular review of other broadcast ownership rules. The court must give that amendment a "real and substantial effect." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258–59 (2004).

therefore, that the exclusion was deliberate.[5] *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

The FCC's Media Bureau argues, however, that it nevertheless has authority to "waive" the 39% cap for "good cause" shown. Order ¶ 4 (citing 47 C.F.R. § 1.3; *Levine/Shwab Partnership v. Fed. Commc'ns Comm'n*, 61 F.4th 183, 186 (D.C. Cir. 2023) ("The FCC may waive its rules 'where particular facts would make strict compliance with a rule inconsistent with the public interest.'" (citation omitted))). Not so. What the Media Bureau omits is that the FCC may only "suspend[ ], revoke[ ], amend[ ], or waive[ ] for good cause shown, in whole or in part, at any time" any of its own rules, "subject to the provisions of the Administrative Procedure Act and the provisions of this chapter." 47 C.F.R. § 1.3. This waiver authority is, therefore, limited by the Administrative Procedure Act and the requirement that the FCC may not

---

[5] Likewise, the 1996 Act's provisions on local radio diversity provide that the FCC may permit an entity to own, operate or control stations beyond the statutorily imposed cap "if the Commission determines" that it "will result in an increase in the number of radio broadcast stations in operation." 1996 Act § 202(b)(2). No such language exists in the national ownership provision.

act contrary to or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). It cannot be used to circumvent congressionally mandated provisions of the 2004 amendments to the 1996 Act, including the 39% cap.

Accordingly, the textual indicia of the 2004 amendments to the 1996 Act plainly point to a congressionally mandated 39% cap on national ownership and the Court should find that the FCC lacks the authority to waive that requirement.

## II.    The FCC's Media Bureau Has Not Demonstrated That a Waiver Is in the Public Interest.

Even if the FCC had the authority to waive application of the 39% cap—which it does not—the FCC's Media Bureau has failed to demonstrate that such waiver, as well as waiver of the FCC's duopoly rule relating to local television ownership, is in the public interest in the context of Nexstar's acquisition of TEGNA. With respect to the duopoly rule, for example, this Court has found that it is "[s]ettled Commission precedent" "that, in considering a request to waive the duopoly rule, the agency's overriding goal is to determine whether a waiver is in the public interest, including whether it is consistent with the . . . goals of promoting economic competition and diversification of viewpoints." *Busse Broad. Corp. v. Fed. Commc'ns Comm'n*, 87 F.3d 1456, 1464 (D.C. Cir. 1996). The FCC Media Bureau's

9

cursory treatment of both competition and diversity in its Memorandum Opinion and Order does not support a positive determination on either issue. As a result, the Court should set aside the FCC's waivers as arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### A. The FCC's Media Bureau Did Not Adequately Address Whether a Waiver Promotes Economic Competition.

In its Order, the Media Bureau purports to undertake a "competitive analysis," which it acknowledges as forming "an important part of the public interest evaluation."  Order ¶ 18.  On the topic of competition, the Media Bureau reaches three broad conclusions:  *First*, that the media marketplace is thriving, with viewers having access to video content through "a plethora of video distribution technologies," including online video distributors such as virtual Multichannel Video Programming Distributors ("MVPDs").  Order ¶ 27.  *Second*, that powerful national programmers no longer rely heavily on affiliates like Nexstar and TEGNA for programming distribution given their ability to place programming directly on their associated streaming platforms. Order ¶ 29.  *Third*, that Nexstar's common ownership of more than two broadcast stations in 21 Nielsen Designated Market Areas following its acquisition of TEGNA will not harm competition because "at least one of the stations . . . is weak relative to the stronger stations in the market."  Order ¶ 52.

10

None of these cursory observations, however, is supported by any meaningful data or empirical analysis.  With respect to the increase in video distribution options, for instance, the Media Bureau failed to consider or explain how alternatives like streaming platforms, virtual MVPDs, and video sharing sites impact competition for national television ownership and omitted any discussion of the ownership rules' impact on broadcast stations' ability to compete with these unregulated video providers.

Moreover, the FCC Media Bureau's Order ignored two additional competition-related issues of significance, both of which were raised by Newsmax Media, Inc ("Newsmax") in its December 31, 2025 Petition to Deny.[6] *In the Matter of Applications of TEGNA Inc. and Nexstar Media, Inc. for Consent to Transfer Control of Licenses*, Petition to Deny of Newsmax Media, Inc., MB Docket No. 25-331 (Dec. 31, 2025).  The first issue relates to the interplay between broadcast station ownership and distribution leverage.  As broadcasters amass a greater number of broadcast stations and increase their audience reach, their leverage in carriage negotiations with distributors grows.  Notably, broadcasters like Nexstar can use—and have

---

[6] In its Order, the Media Bureau finds that Newsmax is not a "party of interest" because it seeks protection of private rather than public interests. Order ¶ 64.  CPAC disagrees with this characterization.

used—such leverage to benefit their own channels (including little-watched non-broadcast channels) and to demand restrictions on carriage of competitors' channels. Yet the Media Bureau did not consider the heightened risk of market exclusion aimed at the parties' competitors and the impact this will have on competition as a whole as part of its decision.

As to the second issue, while the Media Bureau suggested that its decision will help Nexstar compete against "the powerful Big Four national programmers" and their streaming services, the Media Bureau did not consider the competitive harm likely to arise from substituting one form of concentration for another. Order ¶ 2. Broadcasters and the technology platforms operated by Comcast, Disney, Paramount, and Fox operate under different business models, technological constraints, and regulatory obligations. The answer to the purported dominance of the Big Four should be robust antitrust enforcement, *not* the weakening of broadcast ownership rules. The public will not benefit from the creation of a few massive conglomerates across both linear and digital video markets. Instead of increasing competition, this approach will only sideline smaller players and reduce the number of alternative viewpoints and innovative programming available to viewers. The FCC's Media Bureau, however, failed to address this.

### B.    The FCC's Media Bureau Did Not Adequately Address Whether a Waiver Promotes Diversification of Viewpoints.

In its Order, the FCC's Media Bureau included general statements that its decision to waive broadcast ownership rules as to the Nexstar-TEGNA transaction "promotes the FCC's longstanding policy goals" relating to diversity. Order ¶ 2. But as with the issue of competition, the Media Bureau did not provide an analysis regarding the transaction's real-world impact on the diversification of viewpoints, particularly among conservative and independent media outlets.

Significantly, the Media Bureau's decision failed to include an analysis regarding the relationship between a broadcaster's increased national audience reach and the availability and reach of smaller, independent political voices. As discussed in Section II.A, *supra*, the recent experiences of Newsmax in carriage negotiations demonstrate that major station groups such as Nexstar can and do use their increased reach to influence carriage decisions to the detriment of emerging or non-aligned conservative outlets. This experience provides direct evidence that increased ownership consolidation threatens to marginalize voices that offer ideological and political perspectives that are distinct from those held by dominant media conglomerates.

13

The CPAC Foundation believes that the FCC has a responsibility to ensure that the broadcast ownership rules do not contribute to viewpoint homogenization under the banner of market efficiency.  The Media Bureau's omission of any discussion in its Order regarding the impact of consolidation on the elevation of corporate voices over smaller, independent ones ignores that responsibility and puts ideological and political diversity under threat.

## CONCLUSION

As explained, the FCC, through its Media Bureau, lacks the authority to waive the congressionally mandated National Television Ownership Rule and, in the alternative, has failed to demonstrate how this waiver—as well as its waiver of the duopoly rule—is in the public interest.  For these reasons, the Court should grant Appellants' Emergency Motion for Stay and Injunction Pending Appeal.

Respectfully submitted,

/s/ Arthur J. Burke

Arthur J. Burke
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4352
arthur.burke@davispolk.com

Dated:  March 21, 2026

14

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the length limitations of Fed. R. App. P. 29(a)(5) because it contains 2,787 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), which is less than one-half the maximum length authorized for a principal brief under Fed. R. App. P. 32(a)(7)(B).

I further certify that the attached *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 14-point Times New Roman font.

/s/ Arthur J. Burke

Arthur J. Burke
*Counsel for Amicus Curiae*

15

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on March 21, 2026.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Executed this 21st day of March, 2026.


/s/ Arthur J. Burke

Arthur J. Burke
*Counsel for Amicus Curiae*

16