**[NOT SCHEDULED FOR ORAL ARGUMENT]**

**No. 26-1065; 26-1062**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

FREE PRESS, NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS—COMMUNICATIONS WORKERS OF AMERICA, THE NEWSGUILD—COMMUNICATIONS WORKERS OF AMERICA, UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY, INC., AND PUBLIC KNOWLEDGE,

*Appellants-Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee-Respondent*.

————————————

On Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

————————————

## EMERGENCY MOTION TO STAY
————————————

Gigi B. Sohn
G Squared Strategies
3503 Alton Place, NW
Washington, DC 20008

Paul R.Q. Wolfson
Kali Schellenberg
Bradley Girard
Andrew Bookbinder
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellants-Petitioners*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1:

- Free Press certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- National Association of Broadcast Employees and Technicians— Communications Workers of America certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest. National Association of Broadcast Employees and Technicians—Communications Workers of America is a sector of Communications Workers of America, which certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The NewsGuild—Communications Workers of America certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest. The NewsGuild—Communications Workers of America is a sector of Communications Workers of America, which certifies that it has no parent

companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- The United Church of Christ Media Justice Ministry, Inc. certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

- Public Knowledge certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.** **Parties and Amici.**

Appellants (hereinafter "Public Interest Appellants") are Free Press, National Association of Broadcast Employees and Technicians—Communications Workers of America ("NABET-CWA"), The NewsGuild—Communications Workers of America ("TNG-CWA"), the United Church of Christ Media Justice Ministry, Inc., and Public Knowledge. Appellee/Respondent is the Federal Communications Commission. The following persons or entities also participated in proceedings before the Commission:

- American Federation of Teachers

- American Economic Liberties Project

- American Television Alliance

- Asian Americans Advancing Justice

- Asian and Pacific Islander American Vote

- Broadband Communications Association of Pennsylvania

- Broadband Communications Association of Washington

- Business Forward

- CCB License, LLC

- Center for American Rights

- Center for Journalism & Liberty at Open Markets Institute

- Christopher Rollins

- Cincinnati Bell Extended Territories LLC d/b/a AltaFiber

- Committee for the First Amendment

- Common Cause

- Consumer Action

- Digital First Project

- DIRECTV, LLC

- EchoStar Corporation

- Empowering Pacific Islander Communities

- Eric Williams

- Fourth Branch Action

- Get Free

- Hispanic Federation

- Hispanic Tech and Telecommunications Partnerships

- Indiana Cable and Broadband Association

- Indivisible

- Japanese American Citizens League

- Jim Petzel

- LGBT Tech

- Local Independent Online News Publishers

- Mafia Monthly

- Maher Akremi

- MANA, A National Latina Organization

- Media and Democracy Project

- Mississippi Internet and Television

- Multicultural Media & Correspondents Association

- Multicultural Media, Telecom and Internet Council

- NAACP

- National Action Network

- National Association of Black Owned Broadcasters

- National Black Justice Collective

- National Coalition on Black Civic Participation

- National Content & Technology Cooperative

- National Council of Asian Pacific Americans

- National Council of Negro Women

- National Hispanic Media Coalition

- National LGBTQ Taskforce Action Fund

- National Newspaper Publishers Association

- National Urban League

- Newsmax Media Inc.

- Nexstar Media Inc.

- NTCA-The Rural Broadband Association

- OCA-Asian Pacific American Advocates

- One Ministries, Inc.

- Public Citizen

- SAG-AFTRA

- Sean Patrick Patterson

- Sikh American Legal Defense and Education Fund

- Sinclair Inc.

- TEGNA Inc.

- Tennessee Cable and Broadband Association

- Terry B.

- The Leadership Conference on Civil and Human Rights

- TIG Advisors LLC

- VCTA—Broadband Association of Virginia

- Writers Guild of America East

- Writers Guild of America West

**B. Ruling Under Review.**

The ruling under review is the March 19, 2026 order of the Media Bureau of the Federal Communications Commission granting the applications to transfer

control of broadcast licenses held by TEGNA Inc. to Nexstar Media Group, Inc. The order is reproduced at App.1-40.[1] Immediately after the Media Bureau issued its order, Nexstar announced that the merger had closed. The next day, Public Interest Appellants, along with other parties, filed an application for review requesting that the full Commission review the Bureau's order, and also filed a motion asking the Commission to stay the order. Due to the urgent need to stop the parties from taking any further steps toward integration of the two companies, the parties requested a ruling by March 21 at 3 PM, and stated that, absent a ruling by that time, they would seek relief from this Court. As of this filing, the Commission has not acted on Appellants' stay motion.

## C.  Related Cases.

Another group of appellants has filed a notice of appeal from the same Commission order appealed in this case. *See Broadcast Communications Ass'n of Pa. v. Federal Communications Comm'n*, No. 26-1062 (filed March 21, 2026).

---

[1] "App." refers to the appendix to the Notice of Appeal on this appeal.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ iii

GLOSSARY OF ABBREVIATIONS................................................................ xi

INTRODUCTION .......................................................................................... 1

BACKGROUND ........................................................................................... 4

    A.     Public Interest Appellants' opposition .................................... 4

    B.     The Media Bureau's decision.................................................. 5

    C.     The need for emergency relief ................................................ 9

ARGUMENT ............................................................................................... 10

I.     Appellants are likely to succeed on the merits.................................11

    A.     The Commission has no authority to waive the 39% cap...................11

    B.     The Commission's and Bureau's actions are procedurally improper, arbitrary and capricious, and exceed the Bureau's statutory authority. ................................................................ 13

    C.     The Media Bureau's public interest analysis was arbitrary and capricious. ......................................................................... 14

        1.     The Bureau's findings on the public interest harms and benefits of the merger are unreasonable and unsupported by the evidence. ................................................. 15

        2.     The Bureau's waiver of the 39% rule and local ownership rules was arbitrary and capricious......................... 18

II.     The remaining factors support a stay........................................... 20

    A.     The merger will cause irreparable harm. ......................................... 20

    B.     The balance of equities and public interest favor a stay. .................. 22

CERTIFICATE OF COMPLIANCE .........................................................................

CERTIFICATE OF SERVICE..................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Astroline Commc'ns Co. v. FCC,*
    857 F.2d 1556 (D.C. Cir. 1988)................................................................14

*Competitive Enter. Inst. v. FCC,*
    970 F.3d 372 (D.C. Cir. 2020)...................................................................5

*F.T.C. v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001)..................................................................20

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ...................................................................................2

*Genuine Parts Co. v. EPA,*
    890 F.3d 304 (D.C. Cir. 2018)..................................................................15

*Humane Soc'y of U.S. v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017)..................................................................15

*In re Al Baluchi,*
    952 F.3d 363 (D.C. Cir. 2020)..................................................................20

*NetworkIP, LLC v. FCC,*
    548 F.3d 116 (D.C. Cir. 2008)..................................................................19

*Nken v. Holder,*
    556 U.S. 418 (2009) ...........................................................................10, 22

*Prometheus Radio Project v. FCC,*
    2003 WL 22052896 (3d Cir. 2003) ..........................................................23

*Times-Picayune Publ'g Co. v. U.S.,*
    345 U.S. 594 (1953) .................................................................................17

*Washington Metro. Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977)..................................................................10

**STATUTES**

47 U.S.C. § 307 ......................................................................................................15

47 U.S.C. § 309(d)(2) ...........................................................................................5, 14

47 U.S.C. § 310(d) ..................................................................................................2

47 U.S.C. § 402(b) ................................................................................................10

**REGULATIONS**

47 C.F.R. § 0.283(c) .............................................................................................6, 13

**OTHER AUTHORITIES**

Transcript of Nexstar CEO Perry Sook, Deutsche Bank 34th Annual Media,
Internet & Telecom Conference (Mar. 9, 2026), https://perma.cc/Z2WJ-
LQVJ ................................................................................................................19

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| App. | Appendix |
| CAA | Consolidated Appropriations Act of 2004, Public Law No. 108-199 |
| CWA | Communications Workers of America |
| FCC | Federal Communications Commission |

## INTRODUCTION

When two of the four largest television broadcasters asked the Federal Communications Commission to bless the largest broadcast merger in history—which would allow one company to reach 80% of the national audience—the Commission was required to follow statutory and regulatory requirements, carefully weigh evidence, and issue a reasoned analysis of how the merger would affect the public interest. The Commission did none of this. In a slapdash decision, the Commission's Media Bureau sped past the limits on its (and the Commission's) authority. And it ignored extensive evidence that the merger would harm the public interest, instead relying heavily on a conclusory letter submitted to the Commission the day the decision was issued. The decision was an exercise in ends justification—a point underscored by Nexstar's statement that the merger had closed a mere 15 minutes after the Bureau's decision, less time than it would take most to read the decision itself. Because the Bureau was wrong at every turn, this Court should grant an emergency stay.

To begin, the Commission had no statutory authority to approve this merger. Doing so required defying the clear terms of the Consolidated Appropriations Act of 2004, in which Congress, concerned by the Commission's raising of the maximum national audience that any one owner of broadcast licenses could reach, took the matter back for itself, repudiated the Commission's action, and prohibited the

Commission from embarking on any such adventure again. Yet now, the Commission has purported to "waive" that national-audience cap, even though no such waiver authority exists. That is reason enough to stay the Commission's order.

Even on the generous assumption that the Commission's claimed waiver authority *does* exist, the order also contravenes fundamental principles that have governed the Commission's regulation of broadcasting for nearly a century. When the Commission approves the transfer of a broadcast license, it must determine that the transfer will serve "the public interest, convenience, and necessity." 47 U.S.C. § 310(d). Here, the Commission would have to find a compelling reason not to follow at least two distinct sets of rules: both the 39-percent national-audience cap that Congress itself wrote into law, and the Commission's longstanding Local Television Ownership Rule, which prohibits any entity from owning more than two television stations in the same local market. Those rules "seek to promote competition, localism, and viewpoint diversity by ensuring that a small number of entities do not dominate a particular media market." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021).

The Public Interest Appellants submitted extensive evidence establishing that the merger would not serve those public-interest principles; in fact, it would be ruinous of them. To start with competition: The merger would be by far the largest in broadcasting history, and it would increase the level of concentration well past the

level that the federal government has considered presumptively unlawful, both nationally and in more than 20 highly concentrated local markets. That concentration would have predictable, palpable adverse effects on localism and viewpoint diversity—resulting in repetition of messages in dozens of local markets directed from a central corporate office. The quantity and quality of news and public affairs that viewers have enjoyed and relied on for decades will consequently be impoverished.

The merger will also distort the market for broadcast labor, especially the technicians who make television stations run, as the new combined behemoth will be able to dramatically reset the terms of labor negotiations for years to come. And consumers will suffer pocketbook injury too, for the new combined entity will extract higher retransmission consent fees from cable and satellite systems, and those operators will then find it necessary to pass on those costs to consumers, charging them yet more for their subscriptions.

The Commission's response was to wave away all these concerns. As for competition, it scarcely disputed that the merger would result in dramatic concentration in local broadcast markets, instead suggesting that the merger would allow a gigantic Nexstar to compete with every *non-broadcast* source of information—an unbounded inquiry that finds no footing in the Communications Act. As to localism, the Commission suggested that licensees newly under the

Nexstar umbrella could benefit from Nexstar's Washington, D.C., news bureau—hardly a vision of local coverage. As to viewpoint diversity, the order says hardly anything at all. And the order throughout evinces a credulous acceptance of Nexstar's vaporous assurances of competitive and pricing restraint, which run counter to evidence, experience, Nexstar's own boasts to investors about the deal's benefits, and common sense.

The Commission's blithe blessing of such a consequential merger is troubling for many reasons. At a minimum, on its face the Commission's order raises such grave concerns of legality that this Court should pause it while briefing proceeds in this case. For once the companies are truly combined, the opportunity to correct the Commission's grave errors may be lost—perhaps forever.

## BACKGROUND[2]

### A. Public Interest Appellants' opposition

Public Interest Appellants are a union, the Communications Workers of America (CWA), and three nonprofits: Free Press, the United Church of Christ Media Justice Ministry, Inc. (UCC Media Justice), and Public Knowledge. Public Interest Appellants filed a petition to deny in the FCC, explaining the harms that the

---

[2] Public Interest Appellants agree with and incorporate Industry Appellants' background. *See* No. 26-1062, Mot. for Stay 4-14. For the sake of efficiency, we will not duplicate it here.

merger would cause them and their members. *See, e.g.*, App.418-430.[3] The 143-page petition explained in detail that the merger would harm the public interest by granting Nexstar immense power—exceeding both national and local caps on ownership. The petition demonstrated how market consolidation undermines competition, localism, viewpoint diversity, and the labor market. *See, e.g.*, App.445-446, App.456-471. And the petition explained why Nexstar's purported benefits were not in the public interest, but instead would serve only Nexstar's already-comfortable bottom line. *See, e.g.*, App.447-456.

### B. The Media Bureau's decision

After public pressure from President Trump and public statements from FCC Chairman Brendan Carr, on March 19—less than four months after the application was filed and less than two-thirds of the way through the Commission's standard 180-day timeline—the FCC's Media Bureau approved the merger. The Bureau decided the application without holding a hearing, despite the requirement for a hearing on any application presenting significant questions of fact, *see* 47 U.S.C. § 309(d)(2). And although the Bureau cannot decide novel questions of policy or

---

[3] Public Knowledge joined the petition as an informal objector, App.412 n.6, but also has Article III standing, *see* App.743-749. "[E]ven a non-party to FCC proceedings may seek judicial review" if the Commission had the chance to consider its arguments. *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 380 (D.C. Cir. 2020).

law, *see* 47 C.F.R. § 0.283(c), the Bureau relied on "dramatic changes" of the media landscape in the last 20 years to waive statutory and regulatory ownership caps and bless the largest merger in broadcast history, App.2 ¶ 4.

**1.** Eschewing "strict application" of legal limits, App.14 ¶ 30, the Bureau allowed Nexstar to acquire TEGNA's licenses. The Bureau concluded that the FCC was free to waive Congress's 39% national cap, codified in the 2004 Appropriations Act. *See* App.17-18 ¶¶ 36-38, n.120, 123. And although an applicant "must plead with particularity the facts and circumstances" justifying a waiver, App.19 ¶ 42, the Bureau accepted at face value Nexstar's general statements about how the combined company "will better serve its local communities," *see* App.19-20 ¶¶ 43-45. Likewise, the Bureau waived the local-ownership cap, App.21-24 ¶¶ 49-54, concluding that ownership of more than two stations is justified because without the merger some of those stations allegedly would fail, App.22-24 ¶¶ 50-53.

**2.** Turning to standing, the Bureau recognized standing only for competitors and residents of a specific station area (or regular viewers of that station). App.25 ¶ 56. The Bureau recognized that organizations can show representational standing on behalf of their members, but did not address (or even acknowledge) organizational standing. App.25 ¶ 56. As a result, the Bureau concluded that Public Interest Appellants had standing as to specific markets in which they identified employees, viewers, and residents. App.26-27 ¶ 60.

**3.** The Bureau next addressed—and quickly dismissed—the reams of public-interest harms raised by opponents of the merger without addressing the specific facts and arguments they raised. *See, e.g.*, App.28-30 ¶¶ 65-76. Instead, the Bureau relied on "commitments" made by Nexstar to conclude that "the Transaction will not raise any material public interest harms." *See* App.28 ¶ 65.

As support for these so-called commitments, and for many of its factual conclusions, the Bureau did not cite any declarations or affidavits. Instead, it cited a letter that Nexstar sent to Chairman Carr on March 19—*the day of the decision*. *See, e.g.*, App.2-3 n.5; App.29 ¶ 69 n.223-25. The March 19 Letter is not sworn, and it does not contain any citations to support its factual assertions. *See* App.667-670. Yet the Bureau cited the letter 26 times to support its conclusions.

For example, the Bureau stated that merger opponents "appear to claim" that the merger "will result in a reduction in local news." App.28 ¶ 67. But the Bureau dismissed that argument offhand by stating without citation that "[t]he record does not support their position." App.28 ¶ 67. The Bureau did not cite, much less rebut, the detailed 40 pages of economic analysis of the product and labor markets submitted by the Public Interest Appellants. App.433-473. Nor did it cite or refute the Public Interest Appellants' 75 pages of detailed market-by-market Herfindahl-Hirschman Index data and Commission rule-compliance analysis. *See* App.473-548. Instead, the Bureau wholesale copied language from the March 19 Letter, in which

Nexstar touted its own "track record," provided unverified data about an increase in local coverage following a previous merger, and promised to increase local-programming hours for two years. *Compare* App.29 ¶ 68 *to* App.667-668. The Bureau also relied on the March 19 Letter to dismiss concerns about retransmission fees, App.29-30 ¶¶ 71-75, and anticompetitive effects, App.30-32 ¶¶ 77-80.

Likewise, the Bureau relied on the March 19 Letter to dismiss one of the primary concerns raised by Public Interest Appellants—jobs. "Regarding the arguments that Nexstar may cut news staff," the Bureau did not conclude that the merger would not result in significant job losses. App.32-33 ¶ 82. Instead, it concluded that Nexstar's March 19 commitment to increasing the availability of local programming "in the aggregate" for two years would somehow "offset any potential harms." *Id.*

The Bureau devoted one paragraph to the public interest in localism and viewpoint diversity—concluding that "access to national and state news bureaus" will provide "public interest benefits to viewers" without explaining what those benefits are or why they serve localism or viewpoint diversity. App.32 ¶ 81. The Bureau simply quoted a party *supporting* the merger to conclude (once again, without support) that the merger will "enhance the ability of local stations to invest in journalism," and that "[t]he record contains no evidence" that the merger "will

reduce local news output, eliminate independent editorial judgment, or diminish viewpoint diversity." App.32 ¶ 81 (quoting Digital First Project's Reply at 1).

**4.** Finally, turning to potential public-interest benefits of the merger, the Bureau recognized that benefits are cognizable only if they are verifiable and flow to consumers. App.33 ¶ 83. Nevertheless, the Bureau again described the benefits of the merger in vague terms—quoting Nexstar's statements to conclude that Nexstar will have "the ability" to invest in local news, that Nexstar believes the merger is "the best course for the future," and that its March 19 Letter committed (for two years) to "increase the amount and availability of local programming in the aggregate." App.33-34 ¶¶ 83-84.

### C. The need for emergency relief

Almost immediately after the Bureau issued its decision, the Commission issued a release celebrating the "Agency Approval" of the transaction. App.671-672. And within fifteen minutes of the decision, Nexstar publicly stated that the merger had closed. *See* App.673.

The following day, a group of parties, including Public Interest Appellants, filed with the FCC an application for review by the full Commission along with a motion to stay the Bureau's decision. App.676-708; App.709-732. Given Nexstar's public statement that the deal had already closed, the parties informed the FCC that

if it did not act within 24 hours, they would seek emergency relief in this Court. As of this filing, the FCC has still not acted on the application or stay motion.

## ARGUMENT

In reviewing motions for a stay of agency action pending appeal, this Court examines the likelihood of success on appeal, irreparable injury to the movant, the possibility of harm to other parties, and the public interest. *Washington Metro. Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). The application of these factors is not a technical counting exercise about the "mathematical probability of success" but rather is designed to ensure that the Court may consider the merits of a serious dispute while avoiding undue harm to the parties. *Id.* at 844; *see Nken v. Holder*, 556 U.S. 418, 429 (2009) (a stay, unlike an injunction, "simply suspends … alteration of the status quo"). Here, all four of the traditional equitable factors point decisively towards granting a stay pending appeal.

Public Interest Appellants seek to preserve the status quo so that this Court may effectively exercise the jurisdiction assigned to it in 47 U.S.C. § 402(b). Nexstar and TEGNA are rushing to integrate; indeed, Nexstar has announced that the deal has already closed. App.673. Absent a stay, the consolidation of the two entities may proceed to the point where it would become impracticable, if not impossible, to unwind the merger. And it would circumvent this Court's review.

## I. Appellants are likely to succeed on the merits.

The Media Bureau's order is fatally flawed because it is contrary to law. And it has many other flaws as well: procedural irregularities reflecting a rush to judgment; a casual disregard of the factors—competition in broadcasting, localism, and viewpoint diversity—that have guided the Commission's analysis of the public interest for decades; uncritical acceptance of Nexstar's proffered evidence without considering the conflicting evidence of the objecting parties; and overall a failure to recognize the severely adverse effects that the merger will have for the public interest as broadcasting licenses become even more massively concentrated in the hands a few.

### A. The Commission has no authority to waive the 39% cap.

As the Industry Appellants explain in their motion to stay (at 6-7), Congress in the Consolidated Appropriations Act of 2004 put an end to the Commission's regulatory attempts to ratchet up the national ownership reach of any one entity, and decided the matter for itself: The limit is 39 percent. In the interest of judicial economy, Public Interest Appellants join in the Industry Appellants' arguments and do not repeat them at length. But a few points warrant emphasis.

In many circumstances, Congress grants agencies broad authority to adjust regulatory limits as developments may suggest proper. Here, Congress did the opposite. When the Commission raised the national audience cap from 35 percent

(which Congress had previously instructed it to set) to 45 percent, Congress put a stop to that. It enacted a modest raise of the cap to 39 percent and then made clear: No more. Congress wrote the 39 percent cap into positive law, required divestitures by noncompliant entities, and prohibited the Commission from forbearing enforcement of the cap in the future.

The Bureau states that the cap is not really a cap, *see* App.15-18, but why would Congress have done all this if it did not intend the 39 percent cap to be binding and durable? Under the Commission's view, it could have waived the cap one day after the Consolidated Appropriations Act took effect, and could have set the cap again at 45 percent. That would have been instantly recognized as a blatant defiance of Congress's instructions. Here, the passage of time may make the defiance seem less glaring, but defiance it is nonetheless.

In the past, the Commission ordered divestitures to secure compliance with the cap, rather than "forbearing" enforcement, which Congress prohibited it from doing. *See* No. 26-1062, Mot. for Stay 8. Here, however, the Bureau came to the opposite conclusion. At a minimum, the Bureau's order raises grave questions of legality and authority, and the Court should stay it to allow orderly briefing on the merits of this consequential question.

**B. The Commission's and Bureau's actions are procedurally improper, arbitrary and capricious, and exceed the Bureau's statutory authority.**

This proceeding has been beset by procedural irregularities from the start, reflecting the Commission's determination to accomplish its desired result without regard for consequences. The Commission's rush to approve the merger in just a few months tells in the order's serious analytical flaws. Again, Public Interest Appellants will not repeat the Industry Appellants' argument at length, but emphasize two grave procedural flaws.

First, the Bureau had no business issuing this order. FCC regulations grant the Bureau the authority to resolve "matters which are minor or routine or settled in nature." 47 C.F.R § 0.5(c). No objective observer could conclude that approval of the largest broadcasting merger in history, raising far-reaching questions of statutory interpretation and regulatory policy, answers to that description. And the merger certainly presents "novel questions of law, fact[,] or policy," which have been withdrawn from Bureau delegation. *See* 47 C.F.R. § 0.283(c). That is especially true given the Bureau's novel reliance on a market definition that incorporates many products beyond broadcast television, including streaming services, websites, and social media. App.2 ¶ 4; App.29 ¶ 70.

Second, the Commission failed to set this transaction for a hearing. The Communications Act requires a hearing on a license transfer "[i]f a substantial and

13

material question of fact is presented" by the application and the objections. 47 U.S.C. § 309(d)(2). And "in evaluating a request for an evidentiary hearing," the Commission must assume that facts set forth in a petition to deny are true. *Astroline Commc'ns Co. v. FCC*, 857 F.2d 1556, 1560-61 (D.C. Cir. 1988). So the Commission may not simply accept without scrutiny a transfer applicant's assurances that all will go well after the merger, especially in light of conflicting evidence.

But that is exactly what the Bureau did here. Even though the opponents, including Public Interest Appellants, submitted extensive evidence demonstrating the adverse effects of the merger on competition in broadcasting, viewpoint diversity, and localism, as well as employment of broadcasting employees, *see infra* 15-22, the Bureau ignored virtually all of that material. Instead, the Bureau credited an unverified, unsworn letter from Nexstar submitted on the day of the decision (calling into question how the Bureau's order could have been drafted and approved on that same day), which provided vague assurances that Nexstar would invest in local broadcasting and would exercise commercial restraint for two years. *See infra* 16-17. This was not even the semblance of a hearing, and was not a valid way to resolve substantial and material questions of fact.

### C. The Media Bureau's public interest analysis was arbitrary and capricious.

The Bureau's action was not only outside the Commission's authority and procedurally defective; it was also substantively unsound. The Commission is

statutorily obligated to ensure that broadcasters serve "the public interest." 47 U.S.C. § 307. Paying lip service to that standard, the Bureau concluded that the merger served the public interest and, likewise, that it was in the public interest to waive both statutory and regulatory caps on ownership. The Bureau was doubly wrong.

### 1. The Bureau's findings on the public interest harms and benefits of the merger are unreasonable and unsupported by the evidence.

An agency decision is arbitrary and capricious if it ignores evidence that does not support its conclusion, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018), or is insufficiently reasoned, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 603 (D.C. Cir. 2017). The Bureau's decision suffers both flaws. More than 45 organizations and companies offered ample evidence of the public-interest harms that the merger will cause. Instead of seriously considering that evidence, the Bureau accepted as fact Nexstar's self-serving statements to the contrary. And in dismissing concerns about Nexstar's potential monopoly in multiple product markets, the Bureau invented a near-limitless set of competitors against which to evaluate the merger's impact. Alone, each error justifies a stay of this unprecedented merger. Together, there can be no question.

**A.** Public Interest Appellants explained myriad ways that the merger will harm the public interest. Among other things, they submitted substantial evidence that economic incentives favor national content over local journalism. *See* App.447-448. They highlighted research showing that when conglomerates—and specifically,

Nexstar—take over stations, original news reporting is replaced with repackaged and repurposed content. App.446; App.452. And they provided evidence outlining Nexstar's pattern of cutting jobs, consolidating newsroom operations, and running centralized content following consolidation. *See, e.g.*, App.456-471.[4]

The Bureau simply disregarded or ignored that evidence. *See, e.g.*, App.29 ¶¶ 68-69. Instead, the Bureau repeatedly accepted without question Nexstar's empty (and unenforceable) promises that the merger will serve the public interest. For example, the Bureau uncritically credited Nexstar's "commit[ments]" to "expand its investment in local news and programming after its acquisition of TEGNA is complete," to "increas[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years." App.19-20 ¶ 44; App.24 ¶ 53; App.33 ¶ 82. Likewise, it accepted Nexstar's promises to show restraint for six months in negotiating some retransmission consent agreements and refusing to consider possible blackouts. App.30 ¶ 75; App.31-32 ¶¶ 79-80. It adopted Nexstar's argument that the merger will lead local stations to invest in "journalism, weather coverage, and public-interest programming by enabling scale and operational efficiency," without considering the problem—indeed, endorsing as a benefit—that

---

[4] Indeed, layoffs are already occurring. App.462-464.

the merger will make local stations more dependent on national direction and resources. App.32 ¶ 81. And it failed to consider evidence that the companies touted to their investors that staffing "synergies"—laying off employees—would be a benefit of the merger. App.377-378.

Worse yet, the Bureau simply parroted Nexstar's own description—from its March 19 Letter—of its "track record" after the Tribune merger. App.29 ¶ 68. But the Bureau did not consider whether the supposed increased local news coverage was the same content being run in multiple markets and on multiple stations in each market, despite a study in the record showing that Nexstar is notorious for airing duplicative content across its stations. *See* App.452 n.140 (citing Danilo Yanich & Benjamin E. Bagozzi, "Reusing the News: Duplication of Local Content" at 3, University of Delaware, (May 2025)).

**B.** Public Interest Appellants also showed that this merger would result in a monopoly in which Nexstar's market share will be higher than Standard Oil's was when the government broke it up. *See* App.512. The Bureau sidestepped those concerns by dismissing them as not reflective of "today's media environment." App.30 ¶ 76. But when reviewing the legality of proposed mergers, "a relevant market cannot meaningfully encompass [an] infinite range." *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 612 n.31 (1953). The Bureau considered a near-infinite range—including that there are "200 million active websites"—in determining the

relevant market. *See* App.12 ¶ 27; App.30 ¶ 76. But that Nexstar and web platforms like Amazon both sell advertising is largely irrelevant to the Commission's public-interest analysis. While advertising-supported media firms may "compete at some level," that does not mean they operate in the same relevant product market. *See* App.438 n. 107 (quoting *U.S. v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 54 (D.D.C. 2011)). The purpose of market definition is to identify firms that meaningfully constrain a merging party's ability to exercise market power—and it is implausible to suggest that the rates Nexstar charges for advertising during local news broadcasts bear on, or are constrained by, the rates Facebook charges for ads. *See* App.438. By framing the market without any limitation, *see* App.29 ¶ 70, the Bureau did not properly consider the public-interest harms that will arise from the merger.

> 2. **The Bureau's waiver of the 39% rule and local ownership rules was arbitrary and capricious.**

An applicant for waiver "must plead with particularity the facts and circumstances which warrant such action," and waiver is appropriate only "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest." App.19 ¶ 42. The Bureau articulated that standard, but failed to show that Nexstar satisfied it for either the national ownership cap or the local ownership cap.

**A.** In waiving the 39% cap, the Bureau accepted two central propositions advanced by Nexstar: first, that the scale Nexstar will amass through the merger will

promote localism; and second, that only a merger of this magnitude will allow local news-producing stations to remain viable. App.19-20 ¶¶ 43-44. Neither proposition is supported by the record. With respect to localism, the Bureau failed to grapple with substantial evidence showing that increased consolidation has had widespread negative effects on the quality of local news production and that this merger would harm local labor markets. *See, e.g.*, App.446-447, App.456-471; App.376-381. Instead, it credited Nexstar's generalized two year "commitment" to invest in local news as sufficient to outweigh long-term harms. App.19-20 ¶ 44. As to station viability, the Bureau likewise accepted Nexstar's claim that stations would fail absent the merger, App.19-20 ¶ 44, notwithstanding record evidence that both Nexstar and TEGNA are financially strong and that predictions of imminent failure are unsubstantiated, *see* App.450. Indeed, Nexstar's own CEO recently described TEGNA as a "best of breed" broadcast competitor with "the best balance sheet." *See* Transcript of Nexstar CEO Perry Sook, Deutsche Bank 34th Annual Media, Internet & Telecom Conference (Mar. 9, 2026), https://tinyurl.com/zbbde8xz.

**2.** Compounding its errors, the Bureau granted (at App.23-24 ¶¶ 52-53) an unprecedented waiver of the Local Ownership Rules in 21 markets without undertaking a review of whether these waivers "serve[d] the public interest" in the particular markets at issue, *see NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008). The Bureau ignored all the evidence in the record on the harms waiver will

have on competition in those markets, especially to labor, *supra* 16-17, 19. Instead, the Bureau accepted Nexstar's representations that these stations would fail absent waiver of the local-ownership cap—even though the failing-station waiver does not apply to requests to own more than two stations and the Bureau explicitly said it was not applying the waiver. *See* App.22 ¶ 50, n.165 (citing 47 C.F.R. §73.3555, note 7). Moreover, rather than meaningfully analyzing competition in the local markets, the Bureau restated its prior conclusion that competition won't be harmed because one of the stations in each of the 21 markets is weak and Nexstar is promising to increase local programming. App.24 ¶ 53.

## II. The remaining factors support a stay.

### A. The merger will cause irreparable harm.

"[A]n irreversible" event "frustrat[ing] later appellate review" "is a quintessential type of 'irreparable' injury," *In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020). As this Court has recognized, corporate mergers can cause irreversible harm when "it will be impossible as a practical matter to undo the transaction" and "it would be impossible to recreate pre-merger competition." *F.T.C. v. H.J. Heinz Co.,* 246 F.3d 708, 726 (D.C. Cir. 2001) (citation omitted). That is the case here—if allowed, this merger will be virtually impossible to unwind while simultaneously inflicting deep harm on Public Interest Appellants and their members.

The consolidation will result in member layoffs, worse benefits, depressed wages, and weakened collective bargaining agreement negotiation power for CWA and its members. *See, e.g.*, App.736-737 ¶¶ 13-14, 17; App.637 ¶ 9; App.605-606 ¶¶ 6, 9-11. Even if the merger is ultimately undone, the harms will not be. CWA will shrink as members laid off during the consolidation will be forced to seek other employment, leaving the union. App.739 ¶ 21. And because "each contract serves as the baseline for the next negotiation, a less favorable collective bargaining agreement negotiated following a merger will have a cascading effect on contracts for many cycles. This would set the union and CWA members back for many years, not just one bargaining cycle." App.738-739 ¶ 20. This is especially relevant because many CWA agreements are currently in or will soon enter the bargaining process. App.735-736 ¶¶ 7-13.

The harms of the merger will also reach more broadly, adversely affecting the quality of local broadcasting—a harm the Bureau barely considered, even though it is central to the Commission's statutory charge to serve the public interest. The Bureau focused on Nexstar-owned stations' ability to use central corporate resources, such as a Washington, D.C., news bureau, but it never stopped to consider that commonly owned licensees, streamlined post-merger to avoid "redundancies," would devote fewer resources and have less incentive to explore issues arising in their own communities. Thus, as Public Interest Appellants explained to the

Commission, the deal will permanently reduce or eliminate local investigative journalism and distinctive sources of and voices in local news. App.636, App.638 ¶¶ 5, 17. And about viewpoint diversity, the Bureau said hardly anything.

The merger will also close vital avenues for public interest nonprofit reporting, and in so doing will impair the missions of UCC Media Justice, Public Knowledge, and Free Press, who work to advance a more just and equitable media environment. *See, e.g.*, App.744-747 ¶ 5-10; App.576-577 ¶¶ 4-5, 9-12; App.579, 581 ¶¶ 8-9, 17-19. The merger will force the nonprofits to expend significantly more resources—staff, budget, and programming—to get out their messages and coverage of issues. App.744-745 ¶ 5-7. They will be particularly harmed by the dramatic reduction of local news coverage—a cornerstone for their advocacy efforts. App.576 ¶ 9-11; App.583 ¶ 6; App.746-747 ¶ 9-11. And the merger will permanently reduce or eliminate local investigative journalism as well as distinctive sources of and voices in local news, essential tools for the nonprofits to pursue their missions to build a more equitable media environment. App.636, 638 ¶¶ 5, 17.

### B. The balance of equities and public interest favor a stay.

The balance of equities and the public interest merge when the government is a party, *Nken*, 556 U.S. at 435, and here, favor a stay. A stay would preserve this Court's ability to consider substantial questions before irreversible consequences attach. By contrast, a temporary stay would impose only a limited and expected delay

on the merging parties, who entered the transaction aware of the need for regulatory approval and the likelihood of judicial review. Where the equities so plainly favor preserving the Court's ability to grant effective relief, a stay is warranted. *See generally Prometheus Radio Project v. FCC*, 2003 WL 22052896, at *1 (3d Cir. 2003) (recognizing that, in matters of significant public consequence, the public interest favors a stay pending thorough review).

## CONCLUSION

The Court should stay the Media Bureau's order pending disposition of this appeal.

Respectfully submitted,

| | |
|---|---|
| Gigi B. Sohn | s/ *Paul R.Q. Wolfson* |
| G Squared Strategies | Paul R.Q. Wolfson |
| 3503 Alton Place, NW | Kali Schellenberg |
| Washington, DC 20008 | Bradley Girard |
| | Andrew Bookbinder |
| | Robin F. Thurston |
| | Democracy Forward Foundation |
| | P.O. Box 34553 |
| | Washington, DC 20043 |
| | (202) 448-9090 |

*Counsel for Appellants-Petitioners*

March 23, 2026

23

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32(e) because it contains 5,183 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(a)(1).

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

March 23, 2026

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson

**CERTIFICATE OF SERVICE**

I certify that, on March 23, 2026, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Consistent with 47 C.F.R. § 1.13(b), I also served a true copy of the foregoing upon the Commission's general counsel by email to LitigationNotice@fcc.gov. Consistent with 47 U.S.C. § 402(d) and FRAP 15(c) I will provide a courtesy copy of the foregoing to all other parties listed in section A of the certificate as to parties, rulings, and related cases appended to the front of this filing.

s/ *Paul R.Q. Wolfson*
Paul R.Q. Wolfson