**ORAL ARGUMENT NOT YET SCHEDULED**
No. 26-1062

# United States Court of Appeals
# for the District of Columbia Circuit

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA – BROADBAND ASSOCIATION OF VIRGINIA; and NEWSMAX MEDIA INC.,

*Appellants/Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent.*

On Notice of Appeal from
an Order of the Federal Communications Commission,
MB Docket No. 25-331

## BRIEF FOR MICHAEL O'RIELLY AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS/PETITIONERS

*Amicus Curiae* Michael O'Rielly
2304 N Harrison St
Arlington, VA 22205
202-412-3892

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR 23 2026

RECEIVED

March 23, 2026

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned certifies the following:

**A.    Parties and *Amici***

Except for *amicus* Michael O'Rielly, *amicus* American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation) Center for Regulatory Freedom, and any other amici who have not yet entered an appearance in this Court, all parties, intervenors, and amici appearing before the Federal Communications Commission and in this Court are listed in Appellants/Petitioners' Notice of Appeal Or, In the Alternative, Emergency Petition for Writ of Mandamus.

**B.    Ruling Under Review**

Reference to the ruling at issue appears in Appellants/Petitioners' Notice of Appeal Or, In the Alternative, Emergency Petition for Writ of Mandamus.

**C.    Related Cases**

As also stated in Appellants/Petitioners' Notice of Appeal Or, In the Alternative, Emergency Petition for Writ of Mandamus, amicus is aware of no related cases pending in this Court.

i

## RULE 29 CERTIFICATE

This brief was not authored in whole or in part by a party or its counsel. No party or party's counsel contributed money intended to fund the preparation or filing of this brief; and no person other than *amicus curiae* contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................... i

RULE 29 CERTIFICATE.................................................................. ii

TABLE OF AUTHORITIES .............................................................v

INTEREST OF *AMICUS CURIAE*....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

BACKGROUND ............................................................................5

I.      History Of The Audience Reach Cap ......................................5

II.     Congress Enacts The 39% Audience Reach Cap ....................8

ARGUMENT .................................................................................12

I.      The CAA's Text And Structure Mandate The 39% Cap.............13

        A.      The 2004 Amendments Created A Mandatory Cap...........13

                1.      Congress Required The FCC To Impose A 39% National Audience Reach Cap ....................................13

                2.      Congress Tied A Mandatory Divestiture Requirement To The 39% Cap, And Enshrined Both In Statute ....................................................14

                3.      Congress Removed The 39% Cap From The FCC's Mandate To Review Its Regulations Periodically ...................15

                4.      Congress Prohibited The FCC From Forbearing From Enforcement Against Violators Of The 39% Cap .......................................18

        B.      The Major Questions Doctrine Resolves Any Doubt That The 39% Cap Is Mandatory .................................................20

II.     Legislative And Regulatory History Confirm That The Cap Is
        Mandatory .................................................................................................21

        A.     The Drafters Of The Cap Considered It Mandatory ..........................21

        B.     The FCC Considered The Cap Mandatory..........................................22

        C.     Commissioner O'Rielly Has Long Treated The Cap As
               Mandatory .........................................................................................23

CONCLUSION ......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affum v. United States,*
    566 F.3d 1150 (D.C. Cir. 2009) ............................................................... 17

*Bridgeport Hosp. v. Becerra,*
    108 F.4th 882 (D.C. Cir. 2024) ............................................................... 13

*Fox Television Stations, Inc. v. FCC.,*
    280 F.3d 1027, *opinion modified on reh'g,* 293 F.3d 537 (D.C. Cir.
    2002) ............................................................................................ 6, 16, 17

*Kingdomware Techs., Inc. v. United States,*
    579 U.S. 162 (2016) ........................................................................... 13, 14

*Learning Res., Inc. v. Trump,*
    146 S. Ct. 628 (2026) ...................................................................... 20, 21, 23

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ........................................................................... 21, 22

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ........................................................................... 17, 18

*Mack Trucks, Inc. v. E.P.A.,*
    682 F.3d 87 (D.C. Cir. 2012) ................................................................. 22

*Metzenbaum v. FERC,*
    675 F.2d 1282 (D.C. Cir. 1982) ........................................................... 22, 23

*Nat'l Ass'n of Broadcasters v. FCC,*
    569 F.3d 416 (D.C. Cir. 2009) ............................................................... 15

*Nat'l Fed'n of Indep. Businesses v. Dep't of Lab.,*
    595 U.S. 109 (2022) ............................................................................. 23

*Prometheus Radio Project v. FCC,*
    373 F.3d 372 (3d Cir. 2004) ................................................................... 8

v

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)..................................................................24

*Van Buren v. United States*,
   593 U.S. 374 (2021)..................................................................15

*Vanguard Interstate Tours, Inc. v. ICC*,
   735 F.2d 591 (D.C. Cir. 1984)................................................16

*West Virginia v. EPA*,
   597 U.S. 697 (2022)..................................................................20

## STATUTES

5 U.S.C. § 553(b)(B)......................................................................22

47 U.S.C.
   § 160.......................................................................................19
   § 160(a).............................................................................18, 19
   § 303 note..............................................................................13

Pub. L. No. 98-396, § 304, 98 Stat. 1369, 1423 (1984)..................5

Pub. L. No. 104-104, 110 Stat. 56, 111 (1996) ...........6, 13, 16, 18

Pub. L. No. 104-104, 110 Stat. 56, 111 (1996), *as amended*, Pub. L.
   No. 108-199, § 629, 118 Stat. 3, 99 (2004), *codified at* 47 U.S.C.
   § 303 note.......................................................................13, 14, 15

Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) ...........9, 10, 14, 16, 19

## REGULATIONS

9 Fed. Reg. 5442, 5442 (May 23, 1944)..........................................5

19 Fed. Reg. 6099, 6102 (Sept. 17, 1954)........................................5

49 Fed. Reg. 31877, 38177-78 (Aug. 9, 1984)................................5

50 Fed. Reg. 4666, 4672 (Feb. 1, 1985) .........................................6

68 Fed. Reg. 46286, 46328 (Aug. 5, 2003) ....................................7

72 Fed. Reg. 16283, 16284 (Apr. 2, 2007)................................11, 22

*Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2285 (Apr. 30, 1941).................................................................5

## OTHER AUTHORITIES

149 Cong. Rec. H12838, 22021 (2003) ..............................7, 8, 10, 11

150 Cong. Rec. S141 ........................................................................10

*Amend. of Section 73.3555(e) of the Commission's Rules, Nat'l Television Multiple Ownership Rule,* Report and Order, 31 FCC Rcd. 10213 (2016)...................4, 8, 9, 21, 23, 24

*Amend. of Section 73.3555(e) of the Commission's Rules, Nat'l Television Multiple Ownership Rule,* Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 (2017) ....................1, 9, 10, 24

*In the Matter of Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.,* Memorandum Opinion and Order, MB Docket No. 25-331 (Mar. 19, 2026) ............................... 4, 11, 12, 15, 17, 19, 20

*In the Matter of 1998 Biennial Regulatory Review,* Biennial Review Report, 15 FCC Rcd. 11058 (1998)..........................................6

Randolph J. May, *The FCC's Tumultuous Year 2003: An Essay on An Opportunity for Institutional Agency Reform,* 56 Admin. L. Rev. 1307 (2004)..................................................................................7, 8

Telecommunications: Preliminary Information on Media Ownership, Gov't Accountability Off. 1 (2007), https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-08-330R/pdf/GAOREPORTS-GAO-08-330R.pdf ...................................7

William Safire, *Regulate the F.C.C.,* N.Y. TIMES (June 16, 2003).........................8

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Michael O'Rielly served as a Commissioner of the Federal Communications Commission (FCC) from 2013 to 2020.[1] Earlier in his career, Mr. O'Rielly worked in the office of Senator John Sununu, serving as a Senior Legislative Assistant to Senator Sununu from 2003 to 2007. In that position, Mr. O'Rielly assisted in negotiating the Consolidated Appropriations Act of 2004, which established a new broadcast ownership cap that prohibits any person or entity from owning or controlling television stations that collectively reach more than 39 percent of all television households in the United States (the 39% cap). He brings "firsthand experience" from the "meetings and huddles" that produced this law. *Amend. of Section 73.3555(e) of the Commission's Rules, Nat'l Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785, 10808-09 (2017) (Statement of Commissioner Michael O'Rielly). Commissioner O'Rielly was later charged with enforcing this same law as a Commissioner. He is intimately familiar with its background and requirements from both a legislative and agency

---

[1] Mr. O'Rielly has had no formal involvement in the proceeding before the Court, which the Commission initiated in MB Docket No. 25-331. His views in this document reflect his earnest recollection of the creation of current ownership limitations from 2004 and consideration since. Inclusion of references to public statements made in other proceedings in which Mr. O'Rielly participated at the Commission are made for contextual and historical purposes and do not constitute any attempt to litigate those matters, which are not before the Court or under debate here.

perspective.  Mr. O'Rielly submits this brief to explain that the proper interpretation of the 39% cap is that Congress fixed the ownership limit at that level and did not delegate any discretion to, or otherwise allow, the FCC to waive, repeal, or modify that limit.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2004, Congress stepped in to resolve a vigorous policy debate about broadcast television ownership. The FCC had long restricted ownership of television stations to prevent consolidation and promote competition. Throughout the late 1990s and the early 2000s, Congress and the FCC made some modifications to those rules and continued to debate further changes. Ultimately, Congress settled the debate by requiring the FCC to prohibit any entity from owning television stations capable of reaching more than 39% of the total potential national audience. The 39% cap was intended by Congress to be mandatory, was understood by the FCC to be mandatory, and is indeed mandatory.

The FCC has now reversed its yearslong position and declared that the 39% cap is waivable. It is not. The text and structure of the 39% cap clearly indicate Congress's intent to set the national audience reach limit at 39% once and for all, unless and until *Congress* chooses to revise it. Congress mandated that the FCC change the governing regulations to impose the cap, coupling that instruction with a statutory requirement that any entity not in compliance with the cap divest stations within two years to the extent necessary to reduce audience reach below the cap. At the same time, Congress constrained the FCC's discretion in two additional ways: It removed any rules "relating to" the 39% cap from the FCC's mandate to periodically review and revise its ownership regulations, and provided that the FCC

3

could not rely on the forbearance authority conferred by the Communications Act to refrain from enforcing the 39% cap.

It is no surprise, then, that legislators understood the 39% cap as mandatory when they enacted it. The FCC, too, understood the cap that way; the FCC modified its regulations to implement the cap without undergoing notice-and-comment review, a procedure that it deemed permissible only because the FCC believed that Congress itself had directly imposed the rule as a binding requirement. Commissioner O'Rielly, too, has always understood the 39% cap to be mandatory, based on his involvement in enacting it and his duty as a Commissioner of the FCC to enforce it.

The question for this Court is not whether the 39% cap is a good idea—indeed, Commissioner O'Rielly has his doubts about whether it remains necessary.[2] The relevant question is whether Congress mandated the cap by law. The answer is yes. The 39% cap is mandatory, and the FCC has no authority to waive or deviate from it. The Court therefore should stay the Media Bureau's Order[3] granting the

---

[2] *See Amend. of Section 73.3555(e) of the Commission's Rules, Nat'l Television Multiple Ownership Rule*, Report and Order, 31 FCC Rcd. 10213, 10251-52 (2016) (Dissenting Statement of Commissioner Michael O'Rielly) [hereinafter "O'Rielly 2016 Statement"] ("I would be open to considering an increase in the national ownership limit, if the Commission had the authority to do so.").

[3] *In the Matter of Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331 (Media Bureau Mar. 19, 2026) ("Waiver Order").

4

applications to transfer control of broadcast licenses held by TEGNA Inc. to Nexstar Media Group, Inc.

## BACKGROUND

### I.    History Of The Audience Reach Cap

The FCC has long regulated ownership of television stations. In 1941, pursuant to its broad authority to regulate broadcasting, the FCC promulgated a rule limiting ownership of multiple TV stations by a single entity in order to "foster competition," promote "distinct and separate" broadcast services and avoid the "concentration of control." Broadcast Services Other Than Standard Broadcast, 6 Fed. Reg. 2282, 2285 (May 6, 1941). Over the next several decades, the FCC continued to limit the number of television stations that one entity could own or maintain a cognizable interest in nationwide, increasing the cap from three to seven stations. *See id.* (three); 9 Fed. Reg. 5442, 5442 (May 23, 1944) (five); 19 Fed. Reg. 6099, 6102 (Sept. 17, 1954) (seven).

In 1984, the FCC announced its intention to remove the cap on station ownership after a six-year transitional period. 49 Fed. Reg. 31877, 38177-78 (Aug. 9, 1984). But Congress swiftly blocked the FCC from imposing this change. *See* Pub. L. No. 98-396, § 304, 98 Stat. 1369, 1423 (1984). Following that rejection, the FCC changed its approach. It reinstated a numerical cap on stations with no sunset, and added a new kind of restriction, limiting an owner to a "maximum audience

reach" of 25% of U.S. television households.  50 Fed. Reg. 4666, 4672 (Feb. 1, 1985).

Congress then decided that further changes were warranted.  In the Telecommunications Act of 1996 ("1996 Act" or "Telecommunications Act"), Congress directed the FCC to amend its rules to impose an audience reach cap of 35%, and to eliminate the numerical limitation for national television station ownership.  *See* Pub. L. No. 104-104, § 202(c)(1), 110 Stat. 56, 111 (1996). Congress also required the FCC to "review its rules adopted pursuant to this section and all of its ownership rules biennially" and to "determine whether any of such rules are necessary in the public interest as the result of competition."  *Id.* § 202(h). The Commission was required to "repeal or modify any regulation it determines to be no longer in the public interest."  *Id.*

In its first biennial review in 1998, the FCC left the 35% cap in place.  It noted that "Congress prescribed an increase in the cap from 25% to 35%," and explained that it preferred to "observe[] and assess[]" the effects of the 35% cap, and other changes to local television ownership rules, before altering the 35% cap further.  *In the Matter of 1998 Biennial Regulatory Review*, Biennial Review Report, 15 FCC Rcd. 11058, 11072-75 (2000).  This Court held that was arbitrary and capricious in *Fox Television Stations, Inc. v. FCC.*, 280 F.3d 1027, 1043-44, *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).  Focusing on Section 202(h)'s mandate of

6

biennial review, the Court explained that, under the 1996 Act, the FCC was *required* to reevaluate the cap—the 35% cap was "only the starting point," which the Commission had a "duty" to "examine critically" as part of the review. *Id.* at 1043. The Court said that to retain the cap without determining it was still necessary would "default upon this ongoing duty." *Id.* Because the FCC had not provided sufficient justification for retaining the cap at 35%, this Court remanded the FCC's decision to retain the cap back to the agency for further consideration. *Id.* at 1049.

In its next biennial review, the FCC took a different tack. In 2003, it increased the national audience cap to 45%, reasoning that the 35% cap was unnecessarily stringent and that a higher cap would allow stations to offer more programming. 68 Fed. Reg. 46286, 46328 (Aug. 5, 2003).

This announcement generated significant backlash. Over 500,000 public comments were filed in response to the FCC's order.[4] The FCC also received around 750,000 messages before the decision.[5] On the day of the agency's vote on the new ownership restrictions, "protesters erupted in shouts inside the Commission's

---

[4] Telecommunications: Preliminary Information on Media Ownership, Gov't Accountability Off. 1 (2007), https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-08-330R/pdf/GAOREPORTS-GAO-08-330R.pdf

[5] *See* Randolph J. May, *The FCC's Tumultuous Year 2003: An Essay on An Opportunity for Institutional Agency Reform*, 56 Admin. L. Rev. 1307, 1317 (2004) (750,000 emails); *see also* 149 Cong. Rec. 22021 (2003).

meeting room, while sign-waving picketers marched and chanted outside agency headquarters."[6]  Senator John McCain was quoted in a New York Times opinion piece as saying, "[t]his sparked more interest than any issue I've ever seen that wasn't organized by a huge lobby."[7]  Other senators noted that the list of opponents to the media ownership rules included groups and individuals with a wide range of views.[8]  And several stakeholders immediately sued to enjoin the new ownership rules, including the 45% cap.  *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 388-89 (3d Cir. 2004).

## II.     Congress Enacts The 39% Audience Reach Cap

In 2004, Congress stepped in to "settle [this] recurring and particularly contentious media ownership issue." O'Rielly 2016 Statement at 10251.  At the time, Amicus was serving as a Senior Legislative Assistant to Senator John Sununu. In that role, Mr. O'Rielly assisted in negotiating the Consolidated Appropriations Act of 2004 (CAA).

---

[6] Randolph J. May, *The FCC's Tumultuous Year 2003: An Essay on An Opportunity for Institutional Agency Reform*, 56 Admin. L. Rev. at 1317.

[7] William Safire, *Regulate the F.C.C.*, N.Y. TIMES (June 16, 2003), https://www.nytimes.com/2003/06/16/opinion/regulate-the-fcc.html.

[8] *See* 149 Cong. Rec. 22025 (2003) (listing "the National Rifle Association, the U.S. Conference of Catholic Bishops, the National Organization for Women, Senator Jesse Helms, the National Council of Churches, [and] MoveOn," among others).

The CAA directed the FCC to implement an audience reach cap of 39%. This "heavily negotiated and painstakingly crafted" statute represented a compromise. O'Rielly 2016 Statement at 10251. The law imposed a mandatory 39% audience reach cap—set between the prior 35% cap and the new 45% cap that had sparked controversy—which prevented any then-existing station group from being forced to sell off stations.[9]

In enacting this compromise, Congress stepped in to resolve a difficult policy question with which the FCC and its stakeholders had been struggling. The mandatory 39% cap was the linchpin of this plan. Indeed, the CAA included several provisions that reinforced the 39% cap and eliminated the FCC's discretion to adopt a different limit.

*First*, Congress specifically directed the FCC to amend its rules to set the cap at 39%. *See* CAA, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004).

*Second*, Congress amended Section 202 of the 1996 Act to add a provision entitled "Divestiture," which required any entity whose audience reach exceeded the 39% cap to "come into compliance" with the cap "not more than 2 years after exceeding such limitation." *Id.* at 99.

---

[9] *See Amend. of Section 73.3555(e) of the Commission's Rules, Nat'l Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785, 10808-09 (2017) (Statement of Commissioner Michael O'Rielly) [hereinafter "O'Rielly 2017 Statement"].

*Third*, Congress modified Section 202(h) of the 1996 Act (which required biennial review) to specifically exempt the 39% cap from the review process, which was intended to identify rules that no longer serve the public interest and, in turn, that the FCC should "repeal or modify." The revised language provided that the review process "does not apply to any rules relating to the 39 percent national audience reach limitation." § 629, 118 Stat. at 100. Congress also changed the periodic review process from biennial to quadrennial. *Id.*

*Finally*, Congress added another new section entitled "Forbearance," which provided that Section 10 of the Communications Act—which gives the FCC the authority to forbear from enforcing certain statutory requirements—"shall not apply" to "any person or entity that exceeds the 39 percent national audience reach limitation." *Id.*

Consistent with these new provisions, Congress and the FCC understood the cap to be permanent. At the time, legislators clearly indicated that they viewed the 39% cap as enshrined in law. For example, former Senator Ted Stevens—the lead sponsor of the bill—"scream[ed] that, if some station group wanted to go above 39 percent, they could come to Congress to try to get the cap amended." O'Rielly 2017 Statement at 10808. Other legislators agreed with Senator Stevens's premise, describing the 39% cap as "permanent," 150 Cong. Rec. S141 (2004) (statement of Sen. Leahy), and characterizing the CAA as "forbid[ding] the FCC from raising or

10

lowering the 39 percent limit." 149 Cong. Rec. H12838 (2003) (statement of Rep. Tauzin); *see also id.* (noting that bill would "eliminat[e] the FCC's discretion over the national audience-reach limit"). Because these Representatives wanted the cap to be even *lower*, they had every incentive to characterize it as discretionary—yet they did not.

The FCC, too, understood the 39% cap to be mandatory. After the CAA became law, the FCC changed its rules to implement the 39% cap without undertaking notice-and-comment rulemaking, "because the rule modifications are mandated by the applicable provisions of the Appropriations Act and Telecommunications Act." 72 Fed. Reg. 16283, 16284 (Apr. 4, 2007). Although the FCC has occasionally solicited views on whether the 39% cap could be waived, repealed, or modified, the FCC never purported to waive, repeal, or modify the 39% cap.

That changed this past week, when the FCC, acting through its Media Bureau, issued an order waiving the 39% cap as part of its decision approving the transfer of control of 64 television stations (and a few radio stations) from TEGNA Inc. to Nexstar Media Group, Inc.[10] The order concluded that, despite the overlapping mechanisms through which Congress took pains to eliminate any discretion for the agency to modify or repeal the 39% cap, the FCC is entitled to waive that limit

---

[10] *See generally* Waiver Order.

because it "left undisturbed the Commission's general authority to waive any of its rules for 'good cause' shown."[11]

## ARGUMENT

The FCC's waiver of the 39% cap exceeds the agency's authority under the 1996 Act. In 2004, Congress set the national audience reach cap at 39%—and required that it stay there. The CAA added four key provisions to the 1996 Act, all of which indicate that Congress intended to fix the audience reach limit without allowing modification or waiver by the FCC. To the extent there is any ambiguity about what Congress intended, the major questions doctrine makes clear that its specification of the 39% cap (which *constrains* the FCC's discretion) cannot operate as an amorphous *grant* of authority to the FCC to modify the cap at will. Consistent with the text and structure of the statute, legislators—and the FCC itself—understood when the cap was passed that it was mandatory.

Congress stepped in to resolve a policy debate for an area that it believed the Commission was mishandling. In response to robust public debate, Congress affirmatively chose to alter and set a 39% audience reach cap and fix it in place, rather than having unelected regulators consider and revise the audience reach cap. That is as it should be. In light of Congress's clear directives, the FCC does not have

---

[11] *Id.* ¶ 34.

authority to waive, repeal, or modify the cap. The Court therefore should vacate the FCC's Waiver Order.

## I.     THE CAA'S TEXT AND STRUCTURE MANDATE THE 39% CAP

Congress's 2004 amendments to the 1996 Act required the FCC to implement the 39% cap, and eliminated the FCC's discretion to change that cap in several ways. The Act's text and structure, as amended, clearly indicate that the 39% cap is mandatory and the FCC does not have authority to waive or deviate from it.

### A.     The 2004 Amendments Created A Mandatory Cap

#### 1. Congress Required The FCC To Impose A 39% National Audience Reach Cap

In the CAA, Congress modified the 1996 Act to instruct that "[t]he Commission shall modify its rules for multiple ownership … by increasing the national audience reach limitation for television stations to *39 percent*." Pub. L. No. 104-104, § 202(c)(1)(B), 110 Stat. 56, 111 (1996), *as amended*, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99 (2004) (*codified at* 47 U.S.C. § 303 note (emphasis added)).[12] "[T]he word 'shall' generally signals a mandatory duty." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) (citation omitted).

The "surrounding subsections of [Section 202] confirm that Congress used the word 'shall' in [Section 202] as a command." *Kingdomware Techs., Inc. v. United*

---

[12] Citations to statutory sections are to the 1996 Act, as amended by the CAA in 2004, unless otherwise noted.

*States*, 579 U.S. 162, 172 (2016). Throughout its amendments to Section 202, Congress referred specifically to "the 39 percent national audience reach limitation,"—rather than invoking "the audience reach limitation" generically, or some similar phrasing. *E.g.*, § 202(c)(3) (imposing conditions on "[a] person or entity that exceeds *the 39 percent national audience reach limitation*" (emphasis added)); *id.* § (c)(4) (directing that statutory forbearance provision "shall not apply to any person or entity that exceeds *the 39 percent national audience reach limitation* for television stations" (emphasis added)). Congress's repeated and express invocation of the specific 39% limit indicates that it wanted *that* figure, and only that figure, being used for the audience reach limitation. And these references hard-code the 39% figure into the statutory text of the 1996 Act.

### 2. Congress Tied A Mandatory Divestiture Requirement To The 39% Cap, And Enshrined Both In Statute

The divestiture requirement Congress added in the CAA further confirms that it intended the 39% cap to be fixed and permanent, unless or until amended through a new statute. Section 202(c)(3), which the CAA added to the 1996 Act, requires any entity that "exceeds the 39 percent national audience reach limitation . . . through grant, transfer, or assignment" of licenses to comply with that cap within two years. § 202(c)(3), 118 Stat. at 99. Notably, this directive is codified in the statute itself; *any* entity that exceeds the 39% cap via the specified means must "come into compliance with such limitation"—i.e., the "39 percent national

14

audience reach limitation"—within "2 years." *Id.* This hard-coding of the 39% requirement indicates that Congress intended to fix that requirement.

Indeed, if the FCC could waive, repeal, or modify the 39% cap, Section 202(c)(3) would make no sense. Even if the agency waived the cap as to a specific entity, the entity would still have to divest licenses to "come into compliance" with the "39 percent national audience reach limitation," *id.*—because the limit, as well as the divestiture requirement, is set by the statute, and no authority allows the FCC to waive this statute. *See Nat'l Ass'n of Broad. v. FCC*, 569 F.3d 416, 426 (D.C. Cir. 2009) (FCC may "waive requirements not mandated by statute"). The Waiver Order seeks to avoid this result by positing that waiving the 39% cap means there is no longer any limitation with which a station group owner must come into compliance. Waiver Order ¶ 36. But that circular logic overlooks that Congress's specific reference to the 39% cap in the CAA—as opposed to a national audience reach limitation more generally—undermines any claim of waiver authority. Reading the 39% cap as fixed and non-waivable avoids any incongruity and "places the provision's parts 'into an harmonious whole.'" *Van Buren v. United States*, 593 U.S. 374, 389 (2021) (citation omitted).

>    3. *Congress Removed The 39% Cap From The FCC's Mandate To Review Its Regulations Periodically*

In the 1996 Act as originally enacted, Congress required the FCC to "review its rules adopted pursuant to this section and all of its ownership rules biennially …

and [] determine whether any of such rules are necessary in the public interest as the result of competition." § 202(h), 110 Stat. at 110-11. Congress coupled this review directive with an explicit mandate that the FCC "repeal or modify any regulation it determines to be no longer in the public interest." *Id.* The review mandate applied to all relevant regulations, including the national television ownership rules. *See Fox Television Stations*, 280 F.3d at 1043-44.

In the CAA, Congress took this review power *away* from the FCC for one provision alone: the 39% cap. Congress added a new sentence to Section 202(h) explaining that the periodic-review section—including both the mandate to review and the instruction to repeal or modify—"does not apply to any rules relating to the 39 percent national audience reach limitation." *See* § 629(3), 118 Stat. at 100. Thus, after the 2004 CAA, the FCC was no longer required to "review" the 39% cap and determine whether it was still necessary. *Id.* It likewise was no longer empowered to "repeal or modify" any regulation related to the 39% cap, *id.*, underscoring that Congress did not want the FCC to change the cap.

This amendment reaffirms that Congress intended the 39% cap to be mandatory. "Read against the backdrop of a prior practice of broad delegation, the specific language of [Section 202(h)] must be understood as Congress altering the prior scheme of delegated authority." *Vanguard Interstate Tours, Inc. v. ICC*, 735 F.2d 591, 596 (D.C. Cir. 1984). Congress had previously *required* the FCC to

16

review and (if warranted) "repeal or modify" the audience reach limitation, *see Fox Television Stations* 280 F.3d at 1033-34, but in the CAA it amended the statute to expressly carve the audience-reach limitation out of that periodic-review mandate. In doing so, Congress plainly removed the FCC's authority to alter the 39% cap.

The FCC's Waiver Order concludes that Congress meant only to exclude the cap from the periodic review process, not to prevent it from being changed at all. Waiver Order ¶ 36. But that interpretation makes no sense. It is completely inconsistent with the rest of the discretion-constraining amendments to the 1996 Act. *Supra* 13-16; *see also infra* 18-20. Moreover, courts "presume that '[w]hen Congress acts to amend a statute, . . . it intends its amendment to have real and substantial effect.'" *Affum v. United States*, 566 F.3d 1150, 1161 (D.C. Cir. 2009) (alterations in original) (citation omitted). If Congress had wanted the FCC to retain the ability to modify, repeal, or waive the 39% cap, "it would have made little sense for it to amend the [1996] Act" to tell the FCC *not* to review this provision periodically in the course of identifying rules to change. *Id.* And if the rule could nonetheless be revised, despite Congress's decision to carve the 39% cap out of the quadrennial review process, that would create an enormous loophole enabling the agency to thwart congressional intent. "To permit [the FCC] to expand its power in the face of a congressional limitation" on its authority "would be to grant to the agency power to override Congress." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355,

374-75 (1986). The amendments to Section 202(h) *remove* authority that Congress previously granted to the FCC, and must be understood to remove its discretion to waive, repeal, or modify the 39% cap.

Moreover, Congress left other explicit delegations of authority to modify other ownership caps intact when it passed the CAA. For example, Congress also set radio ownership caps in the 1996 Act, *see* § 202(b)(1), 110 Stat. at 110-11, and specifically provided that the FCC may waive those caps under certain circumstances, *id.* § 202(b)(2). Congress further provided that the FCC can "retain, modify, or eliminate" *local* (as opposed to national) television ownership limitations via rulemaking. *Id.* § 202(c)(2). Congress did not modify those provisions in the CAA. Thus, Congress's removal of the national television ownership cap from review, read against these explicit grants of discretion in other contexts, further demonstrates that Congress did not intend for the FCC to modify the 39% cap.

### 4. Congress Prohibited The FCC From Forbearing From Enforcement Against Violators Of The 39% Cap

Ordinarily, the FCC has the power to "forbear from applying any regulation or any provision" applicable to "telecommunications carriers or telecommunications services" if the FCC determines that enforcement is not necessary to ensure that a provider's charges and practices are fair or to protect consumers, and that forbearance is in the public interest. 47 U.S.C. § 160(a). This provision gives the FCC the remarkable power to decline to enforce certain statutes enacted by

Congress, which it is otherwise duty-bound to follow, where its requirements are met. When Congress amended the 1996 Act via the CAA, it yet again constrained the FCC's discretion to act with respect to the 39% cap on national audience reach by specifying that 47 U.S.C. § 160 "shall not apply" to "any person or entity that exceeds the 39 percent national audience reach limitation for television stations." § 629(4), 118 Stat. at 100. In other words, Congress told the FCC that, to the extent the forbearance provision has any application to the 39% cap, the agency could not use that power to refrain from enforcing the cap against station owners that violated it.

Senator Stevens viewed this provision as a "belt and suspenders" approach to ensure the cap would be mandatory and could not be circumvented by the FCC. Although this forbearance authority likely would not have empowered the agency to eliminate the 39% cap—as the Communications Act permits the FCC to forbear from the application of statutory provisions to "telecommunications carriers" or "telecommunications services," not to broadcasters or broadcast services, 47 U.S.C. § 160(a)—Congress's decision to rule out even the theoretical use of forbearance underscores its intent to ensure that the FCC could not waive, repeal, or modify the 39% cap. Indeed, Congress's fears were well warranted given the FCC's assertion in the transaction at issue here that it may waive the 39% cap. *See* Waiver Order ¶

19

32.  This final discretion-constraining amendment provides further support for reading the 39% cap to be mandatory.

### B.  The Major Questions Doctrine Resolves Any Doubt That The 39% Cap Is Mandatory

If the text and structure leave any room for debate about whether the FCC may disregard the 39% cap, the major questions doctrine forecloses that prospect.  Under that doctrine, courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'"  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted).  That's exactly what Congress did here.  In the face of a difficult policy question about the appropriate national audience reach limitation—which the FCC and the public had been struggling with for years—Congress stepped in and fixed the limit itself.  It did so via specific statute and carefully restricted the FCC's discretion accordingly.

Suggesting that the agency nonetheless retains broad, amorphous authority to modify, repeal, or waive the cap flies in the face of the major questions doctrine.  Indeed, if the cap were not mandatory, there is *no* language in the Telecommunications Act as amended that would constrain the FCC's discretion *at all*.  If the FCC does not have to stick to the 39% cap, it could set the cap at 0%, or at 100%.  The notion that Congress left the FCC with that kind of unbridled discretion to enact major changes—particularly in light of its very specific instructions—is utterly implausible.  "Congress seldom effects such sea changes

20

through 'vague language,'" particularly not where it has spoken more specifically to the problem at hand. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 640 (2026) (citation omitted).

Taking the statute's text and structure into account, the "best reading" of Section 202(c)(1)(B) as amended is that it imposed a mandatory 39% cap on audience reach which the FCC may not modify, repeal, or waive. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

## II.    Legislative And Regulatory History Confirm That The Cap Is Mandatory

### A.    The Drafters Of The Cap Considered It Mandatory

*Amicus* was actively involved in personally negotiating the compromise reflected in the CAA's text. At the time, there was no doubt that the CAA was intended to establish the 39% cap as mandatory and binding on the FCC. Legislators described the cap as "permanent" and "eliminat[ing] the FCC's discretion," and Senator Stevens even "scream[ed] that, if some station group wanted to go above 39 percent, they could come to Congress to try to get the cap amended." *Supra* 10-11.

Indeed, the specific 39% cap was part of a careful compromise entered into to "settle" a "contentious media ownership issue." O'Rielly 2016 Statement at 10251. Congress stepped in because it believed it was settling the debate on broadcast ownership, or at least resolving the issue of what cap was appropriate. That belief

21

would make no sense if the cap were merely discretionary and could be undone at any time by the "whims of the Commission." *Id.*

## B.    The FCC Considered The Cap Mandatory

Beyond Congress, the FCC likewise understood the cap to be mandatory when it was passed in 2004.  Courts may look to the "'interpretations and opinions'" of the relevant agency for "guidance" on legal questions, as one factor in their determination. *Loper Bright*, 603 U.S. at 388.  The FCC's "interpretations issued contemporaneously with the statute at issue" here, *id.* at 394, indicate that it, too, understood the 39% cap to be "mandated" by Congress.  72 Fed. Reg. 16283, 16284 (Apr. 4, 2007).

Most notably, when it changed its rule per Congress's instructions, the FCC took the extraordinary step of skipping notice-and-comment rulemaking and enacting the final rule imposing the cap pursuant to the "good-cause exception" to the Administrative Procedure Act.  *See* 5 U.S.C. § 553(b)(B).  The good-cause exception is "narrow" and "only reluctantly countenanced"—meaning that the agency must have a strong justification to invoke it. *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citation omitted).  Here, the FCC explained that good cause was warranted because implementing the 39% cap and associated rules were "nondiscretionary ministerial actions issued in conformity with [a] statute." 72 Fed. Reg. at 16284 n.7 (quoting *Metzenbaum v. FERC*, 675 F.2d 1282, 1291 (D.C. Cir.

22

1982)). In other words, there was no discretion for the FCC to exercise—and thus no need for the APA's robust procedural requirements—because the cap is mandatory.

That the FCC has never waived, repealed, or modified the 39% cap in the 21-plus years since the CAA was enacted further indicates that the law does not allow it to do so. Where an agency has "never before adopted" an expansive interpretation of its authority, that is a good sign that "the mandate extends beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119-20 (2022) (citation omitted); *cf. Learning Res.*, 146 S. Ct. at 640-41 (finding it "telling" that claimed statutory power had not previously been used for the purpose at issue). So too here. That the FCC has never, in years of examining and reexamining this rule, attempted to waive the ownership cap is a strong indication that it does not possess the authority to do so.

### C.  Commissioner O'Rielly Has Long Treated The Cap As Mandatory

Finally, as both a staffer involved in passing the CAA and a Commissioner charged with implementing the FCC's mandate as delegated by Congress, Commissioner O'Rielly has long understood—and consistently maintained—that the 39% cap is mandatory. His view is informed by both his experience passing the CAA and by the amended 1996 Act's text and structure. The cap is "one of the few media ownership rules specifically set by statute." O'Rielly 2016 Statement at

10251. And it is "the only one exempted from the Quadrennial Review process governing the other ownership rules." *Id.* The Waiver Order's position that the FCC can nonetheless modify, repeal, or waive the cap "would effectively create one of the biggest backdoors in the history of legislating." O'Rielly 2017 Statement at 10808. And that position "ignores the deal" that produced the 39% cap in the first place, which relied on a hard cap being set in order to protect certain media groups at the time and retain other rules. *Id.*

Commissioner O'Rielly articulated this view consistently in his official acts. For example, he dissented from a Commission order modifying the "UHF discount," a rule associated with the 39% cap, because he "reject[s] the assertion that the Commission has authority to modify the National Television Ownership Rule in any way." *See* O'Rielly 2016 Statement at 10251-52. These statements, "made in pursuance of official duty" based on Commissioner O'Rielly's "specialized experience," *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), dovetail with the "best reading" of the statute based on its text and structure. *Supra* 13-20.

## CONCLUSION

For the reasons set forth above, the Court should conclude that the FCC lacks authority to waive the 39% cap and accordingly stay the FCC's Waiver Order.

24

March 23, 2026

Respectfully submitted,

*Amicus Curiae* Michael O'Rielly

**CERTIFICATE OF COMPLIANCE WITH RULE 32**

1.    This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because this document contains 5,591 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman Font.

_Amicus Curiae_ Michael O'Rielly

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2026, the foregoing brief was served via

U.S. mail on the following:

Jonathan A. Friedman
Michael D. Hurwitz
Samuel H. Eckland
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006

Paul D. Clement
James Y. Xi
Kevin Wynosky
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314

Mark I. Bailen P.C.
Bailen Law
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036

*Attorneys For Petitioners*

Michael Nilsson
Timothy J. Simeone
E. Austin Bonner
Jason Neal
HWG LLP
1919 M St., NW, 8th Floor
Washington, DC 20036

*Attorneys For Intervenors - DIRECTV*

James M. Carr

William J. Scher
Jacob M. Lewis
Federal Communications Commission
45 L Street NE
Washington DC 20554

*Attorneys For Respondent Federal Communications Commission*

Arthur J. Burke
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

*Attorneys For Amicus Curiae – American Conservative Union Foundation (d/b/a Conservative Political Action Coalition Foundation*

*Amicus Curiae* Michael O'Rielly