Nos. 26-1062; 26-1065

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

BROADBAND COMMUNICATIONS ASSOCIATION OF
PENNSYLVANIA, ET AL.

*Appellants-Petitioners*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee-Respondent.*

v.

FREE PRESS, ET AL.

*Appellants-Petitioners*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee-Respondent.*

_____

On Notice of Appeal from
an Order of the Federal Communications Commission

_____

## BRIEF OF NATIONAL RELIGIOUS BROADCASTERS AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS-PETITIONERS

---

MICHAEL P. FARRIS
NATIONAL RELIGIOUS BROADCASTERS
800 Maryland Avenue NE
Washington, D.C. 20002
571-359-6000
mfarris@nrb.org
*Counsel for Amicus Curiae National Religious Broadcasters*

March 25, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, and consistent with D.C. Circuit Rule 26.1, *amicus curiae* states that National Religious Broadcasters (NRB) is an independent 501(c)(3) nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization. NRB is an international association of Christian communicators.[1]

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, counsel certifies that no party's counsel authored this brief in whole or in part, and no party, counsel, or person other than this *amicus curiae* contributed money that was intended to fund preparing or submitting the brief.

i

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES................................................................ iii

STATEMENT OF INTEREST OF AMICUS CURIAE, AUTHORITY TO FILE, AND CERTIFICATE OF NECESSITY ...........................................1

ARGUMENT ..................................................................................2

   I.   The Commission May Not Override the Express Mandate of Congress. .................................................................................2

   II.  The Bureau's Order Disproportionately Harms Independent Broadcasters.........................................................................4

      A.   Structural Imbalance Between Large and Independent Broadcasters....................................................................4

      B.   Real-World Market Effects ......................................................5

      C.   Evolving Television Distribution Markets Exacerbate Harm to Independent Broadcasters ......................................................7

      D.   Public Expectations Favor Local Ownership and Caution Against Further Consolidation .................................................9

   III. The Effectively Irreversible Nature of This Merger and Harm to Third Parties, If Allowed to Proceed, Necessitates a Stay............11

CONCLUSION ...............................................................................12

CERTIFICATE OF COMPLIANCE.......................................................13

CERTIFICATE OF SERVICE..............................................................14

# TABLE OF AUTHORITIES

*Page*

**Cases**

*California v. Am. Stores Co.*, 492 U.S. 1301 (1989) ............................... 11

*F.T.C. v. Weyerhaeuser Co.*, 648 F.2d 739 (D.C. Cir. 1981) .................... 12

**Other Authorities**

Federal Communications Commission, "Applications of Tribune Media
Company (Transferor) and Sinclair Broadcast Group, Inc.
(Transferee) for Transfer of Control of Tribune Media Company and
Certain Subsidiaries WDCW(TV), et. al. and for Assignment of
Certain Licenses from Tribune Media Compny and Certain
Subsidiaries, Hearing Designation Order, FCC 18-200," 33 FCC Rcd
6830, July 19, 2018 ............................................................................ 4

George Winslow, New Poll Shows Widespread Opposition to Broadcast
TV Station Mergers, TV Technology (Dec. 19, 2025) .......................... 10

## STATEMENT OF INTEREST OF AMICUS CURIAE, AUTHORITY TO FILE, AND CERTIFICATE OF NECESSITY

NRB is a non-partisan association of Christian broadcasters united by their shared purpose of proclaiming Christian teaching and promoting biblical truths. NRB's 1,035 members reach a weekly audience of approximately 141 million American listeners, viewers, and readers through radio, television, the Internet, and other media.[1] NRB has consistently advocated for maintenance of and compliance with the national and local ownership caps that enable smaller independent broadcasters, like its members, to compete in the market and bring diversity and localism to media and serve community needs. NRB offers a practical, experience-grounded perspective on the harmful consequences of the underlying FCC Media Bureau order in this case.

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, all parties to Nos. 26-1062 and 26-1065 have consented to the filing of this *amicus* brief.

Pursuant to Circuit Rule 29(d), counsel certifies that it did not learn of this motion or the underlying ruling until after the filing of the other amici curiae's brief and was therefore unable to seek to consolidate its arguments with the other amici in a single brief.

1

## ARGUMENT

### I. The Commission May Not Override the Express Mandate of Congress.

The National Television Ownership Cap, first promulgated by the FCC under President Reagan, prevented networks or station groups from owning stations that reached more than 25% of U.S. households. In 2004, Congress legislated that the National Cap be increased to 39%. Contrary to the Media Bureau's assertions, Congress did not grant the Commission, much less the Media Bureau, authority to waive the national television ownership cap. The Media Bureau's Order cites no statutory language giving it this power, because none exists. Nor does the Order cite to any statutory language directing that the FCC reexamine the appropriateness of the 39% cap periodically, because none exists. Instead, it attempts to argue that Congress's decision to omit surplus language that went beyond what Congress deemed sufficient to enshrine the national cap in statutory law somehow gives it the power to rewrite the statute when it deems it necessary. To the contrary, by amending Section 202(c)(1)(B) of the 1996 Act via the statutory 39% national cap, Congress withdrew the Commission's *prior* authority to set, waive, and modify the

cap. Any changes to the National Cap can thus only be undertaken by Congress.

The Media Bureau's rushed approval of Nexstar's application and decision to ignore a federal statute and the Commission's own regulations represents a sudden about-face from the Commission's consistent, if reluctant, enforcement of both national and local ownership caps. By contrast, in 2018, the FCC held that Sinclair and Tribune Media's application to transfer certain Sinclair licenses to Tribune in order to bring Sinclair into compliance with ownership caps looked like a "sham" transaction that would not in fact divest Sinclair of control of the required number of stations, prompting Sinclair to withdraw the applications and the parties to cease merger efforts. *See* Federal Communications Commission, "Applications of Tribune Media Company (Transferor) and Sinclair Broadcast Group, Inc. (Transferee) for Transfer of Control of Tribune Media Company and Certain Subsidiaries WDCW(TV), et. al. and for Assignment of Certain Licenses from Tribune Media Company and Certain Subsidiaries, Hearing Designation Order, FCC 18-200," 33 FCC Rcd 6830, July 19, 2018. The FCC's Media Bureau must be required to return to compliance.

3

## II. The Bureau's Order Disproportionately Harms Independent Broadcasters.

The Commission has long understood that broadcast ownership rules are about more than efficiency or scale. They exist to protect core public-interest values like viewpoint diversity, localism, and a healthy mix of owners. The Media Bureau's order approving the Nexstar-TEGNA merger runs counter to these rules and counter to the values they protect, damaging independent broadcasters and media diversity and localism.

### A. Structural Imbalance Between Large and Independent Broadcasters

Independent broadcasters, including many of NRB's faith-based and educational member stations, operate under materially different conditions than large, multi-market commercial entities. Unlike national broadcast groups, these stations typically:

- Rely on local or regional advertising, donations, or underwriting rather than national ad buys;

- Operate with mission-driven programming priorities rather than profit-maximization strategies;

- Face higher per-station costs for content acquisition, technology upgrades, and regulatory compliance; and

- Lack centralized sales, programming, legal, and compliance infrastructure.

When ownership rules are ignored to accelerate consolidation, these structural differences translate into competitive disadvantages that independent broadcasters cannot realistically overcome.

The Media Bureau's unilateral and illegal ignoring of the National Cap would allow for massive television consolidation at the national level, further undermining the Commission's mission to support competition, diversity of viewpoints and localism.

### B. Real-World Market Effects

In practice, consolidation driven by ownership rule changes often produces the following outcomes:

- Escalating programming costs, as large groups outbid independent stations for syndicated or network content;

- Reduced acquisition opportunities, as station valuations rise beyond the reach of small and nonprofit buyers; and

- Concentrated advertising markets, where large ownership groups can bundle inventory across stations and markets, pricing out smaller operators.

NRB's concern is that in mid-sized and smaller television markets, a single ownership group can come to control multiple top-rated stations across major networks. As consolidation increases, independent operators face higher barriers to entry, reduced negotiating power, and growing pressure to exit the industry altogether. While selling may offer a practical financial exit, it often comes at a cost to viewers—particularly in the faith-based space—because large ownership groups without experience in mission-driven broadcasting are unlikely to preserve religious or educational formats once a station is acquired. Instead, these stations are frequently repurposed to carry network or syndicated programming that better aligns with national business priorities.

These outcomes are not hypothetical, they are the expected result of policy changes that prioritize size and scale without considering how independent broadcasters actually operate.

The Commission's Local Television Ownership Rule, particularly the Top-Four Prohibition, has long served as an important safeguard against excessive consolidation within local television markets. Undue consolidation at the local level, like the Media Bureau improperly authorized here, undermines localism, diminishes viewpoint diversity,

and weakening the ability of independently owned and mission-driven stations to serve their communities with responsive, community-focused programming.

### C. Evolving Television Distribution Markets Exacerbate Harm to Independent Broadcasters

This appeal is occurring at a moment of significant change in how television programming is distributed and consumed changes that are not affecting all broadcasters equally. In today's environment, independent stations are bearing a disproportionate share of the disruption, particularly when compared to large, vertically integrated, or network-affiliated station groups.

One of the most significant developments is the continued decline of traditional multichannel video programming distributors ("MVPDs"), including cable, satellite, and telco providers. Pay-television penetration has steadily eroded as viewers shift toward over-the-top ("OTT") streaming platforms. While virtual MVPDs ("vMVPDs") such as YouTube TV, Hulu + Live TV, Fubo, and Philo have captured some of this audience migration, these services operate under very different economic and regulatory frameworks and face their own competitive constraints. Importantly, they do not offer the same carriage certainty that

independent broadcasters have historically relied upon to reach local audiences.

At the same time, legacy MVPDs are actively reshaping their business models. Satellite providers have begun limiting new satellite installations in certain markets in favor of streaming alternatives, while cable and telco operators increasingly prioritize broadband services over traditional video offerings. The practical effect is that the distribution pathways that once ensured broad, predictable, and nondiscriminatory access to local broadcast stations are steadily narrowing.

For decades, independent broadcasters, particularly those without national network affiliations or multi-market scale have relied on the Commission's must-carry framework to ensure access to viewers through local MVPD systems. While must-carry does not provide compensation, it has served as a reliable mechanism for sustaining audience reach, advertising, underwriting, and community support. OTT and vMVPD platforms, however, are not subject to these obligations. As a result, many independent stations, including faith-based and educational broadcasters, are excluded from or marginalized on the very platforms that are increasingly becoming primary points of viewer access.

8

This growing regulatory and marketplace lopsidedness places independent broadcasters at a clear competitive disadvantage. Large broadcast groups are better positioned to secure streaming carriage through scale, network leverage, or ownership relationships, while independent stations lack comparable negotiating power. The result is reduced audience reach, fewer revenue opportunities, and increasing difficulty sustaining locally originated educational and public-interest programming during a period of rapid industry transition.

### D. Public Expectations Favor Local Ownership and Caution Against Further Consolidation

These marketplace and regulatory dynamics are not occurring in a vacuum. They closely align with how viewers themselves continue to view local television and broadcast ownership. Recent public opinion research confirms that Americans across the political spectrum remain skeptical of relaxing broadcast ownership limits and are concerned about the effects of additional consolidation at the local level. A recent poll of likely voters released in December 2025 by the National Hispanic Media Coalition and Defend the Press Campaign found strong opposition among Democrats, Republicans, and independent voters to changes that would allow greater consolidation of local television stations. Respondents

expressed concern that further consolidation would reduce local control, weaken competition, and diminish the availability of programming that is responsive to community needs. *See* George Winslow, New Poll Shows Widespread Opposition to Broadcast TV Station Mergers, TV Technology (Dec. 19, 2025). The survey also found overwhelming support for locally owned broadcast stations, with only a negligible share of respondents favoring ownership by large national media companies. That preference reflects a clear and persistent public expectation that broadcast licensees remain rooted in the communities they serve and accountable to local audiences—not managed primarily to advance national scale or centralized efficiencies.

Congress has long directed the Commission to structure broadcast ownership policy in a manner that promotes localism, viewpoint diversity, and service to community needs. Public opposition to increased consolidation reinforces that ownership rules are not simply technical or economic constructs, but practical safeguards that shape how well local stations fulfill their public-interest responsibilities. The Media Bureau's Order further distances the broadcast system from the locally responsive, community-oriented model that viewers continue to expect and rely upon.

### III. The Effectively Irreversible Nature of This Merger and Harm to Third Parties, If Allowed to Proceed, Necessitates a Stay.

Unwinding a merger years after it has been effectuated is, practically speaking, impossible. Moreover, allowing this merger to proceed pending appeal will cause irreparable harm to the rest of the market in the meantime, potentially forcing broadcasters out of the market altogether and subjecting them to the increased costs described above. Therefore, an injunction preserving the status quo is appropriate. *California v. Am. Stores Co.*, 492 U.S. 1301, 1307 (1989) (granting injunction because continuing merger of two major companies would "substantial[ly] lessen[] competition in the relevant market," outweighing the cost of enjoining even a consummated merger). Given the likelihood of appellants' success on the merits, an injunction staying the Media Bureau's Order and directing Nexstar and TEGNA to hold separate and take no further steps to combine is appropriate and, under the circumstances, quite restrained. *See F.T.C. v. Weyerhaeuser Co.*, 648 F.2d 739, 741 (D.C. Cir. 1981) (ordering dissolution of merger due to concerns that a hold separate order would not be sufficient and the timing of the merger).

## CONCLUSION

This Court should grant the relief requested by Appellants.

Respectfully submitted,

/s/ Michael P. Farris
Michael P. Farris
NATIONAL RELIGIOUS
BROADCASTERS
800 Maryland Avenue NE
Washington, D.C. 20002
571-359-6000
mfarris@nrb.org
*Counsel for Amicus Curiae National
Religious Broadcasters*

March 25, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the length limitations of Fed. R. App. P. 29(a)(5) because it contains 1,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), which is less than one-half the maximum length authorized for a principal brief under Fed. R. App. P. 32(a)(7)(B).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

<u>/s/ Michael P. Farris</u>
Michael P. Farris
*Counsel for Amicus Curiae*

13

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on March 25, 2026. Services was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Michael P. Farris
Michael P. Farris
*Counsel for Amicus Curiae*