<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA, ET AL., | ) ) ) ) | |
| *Appellants*, | ) ) | |
| v. | ) ) | No. 26-1062 |
| FEDERAL COMMUNICATIONS COMMISSION, | ) ) ) | |
| *Appellee*, | ) ) | |
| DIRECTV, LLC, ET AL., | ) ) | |
| *Intervenors*. | ) ) | |

Consolidated with 26-1065

## INTERVENOR NEXSTAR MEDIA INC.'S OPPOSITION TO MOTIONS FOR STAY AND INJUNCTION PENDING APPEAL

Thomas M. Johnson, Jr.
Kathleen A. Kirby
Jeremy J. Broggi
Eve Klindera Reed
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
tmjohnson@wiley.law

*Counsel for Nexstar Media Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

GLOSSARY.................................................................................................... viii

INTRODUCTION ..............................................................................................1

BACKGROUND ...............................................................................................3

      A.    Commission Authority...............................................................3

      B.    The Transaction and Record .....................................................3

      C.    The Order ................................................................................4

      D.    Legal Challenges ....................................................................5

STANDARD OF REVIEW ................................................................................5

ARGUMENT .....................................................................................................5

    I.    Appellants Fail to Show Irreparable Harm .................................5

    II.    Appellants Are Unlikely to Succeed on the Merits...................9

      A.    The Court Lacks Jurisdiction ...................................................9

      B.    The FCC Has Statutory Authority to Waive the National Cap ....14

      C.    The Bureau Acted Within Its Delegated Authority ......................18

      D.    The Order Was Reasonable and Reasonably Explained...............21

    III.    The Public Interest Strongly Disfavors a Stay .........................23

CONCLUSION.................................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*In re Al Baluchi,*
  952 F.3d 363 (D.C. Cir. 2020)................................................................7

*American Hospital Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016).............................................................13

*Astroline Communications Co. v. FCC,*
  857 F.2d 1556 (D.C. Cir. 1988)...........................................................22

*AT&T Corp. v. Iowa Utilities Board,*
  525 U.S. 366 (1999).............................................................................17

*Barnhart v. Peabody Coal Co.,*
  537 U.S. 149 (2003).............................................................................17

*Brotherhood of Locomotive Engineers & Trainmen v. STB,*
  457 F.3d 24 (D.C. Cir. 2006).................................................................9

*California v. Texas,*
  593 U.S. 659 (2021).............................................................................19

*City of Arlington v. FCC,*
  569 U.S. 290 (2013).............................................................................17

*Coastal Bend Television Co. v. FCC,*
  231 F.2d 498 (D.C. Cir. 1956).............................................................23

*Core Communications, Inc. v. FCC,*
  592 F.3d 139 (D.C. Cir. 2010)...............................................................8

*CREW v. FEC,*
  892 F.3d 434 (D.C. Cir. 2018).............................................................19

---

[*]  Authorities upon which we chiefly rely are marked with asterisks.

*Darby v. Cisneros*,
    509 U.S. 137 (1993)...................................................................................12

*\*FCC v. National Citizens Committee for Broadcasting*,
    436 U.S. 775 (1978).................................................................................6

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).......................................................................14, 17, 21

*Federal Education Ass'n v. Trump*,
    2025 WL 2738626 (D.C. Cir. Sep. 25, 2025)....................................................5, 9

*\*Fox Television Stations, Inc. v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002)..............................................................14, 15

*Fox Television Stations, Inc. v. FCC*,
    293 F.3d 537 (D.C. Cir. 2002)..................................................................14

*Fraternal Order of Police v. Library of Congress*,
    639 F. Supp. 2d 20 (D.D.C. 2009)..............................................................6

*Friedman v. FAA*,
    841 F.3d 537 (D.C. Cir. 2016)..................................................................12

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001)...................................................................7

*Groff v. DeJoy*,
    600 U.S. 447 (2023)..............................................................................18

*Gulf Oil Corp. v. Copp Paving Co.*,
    419 U.S. 186 (1974)..............................................................................16

*Hameed v. DEA*,
    2025 WL 2985074 (D.C. Cir. Oct. 20, 2025)......................................................5

*Healthy Gulf v. DOI*,
    152 F.4th 180 (D.C. Cir. 2025)...................................................................8

*Indian Peak Properties LLC v. FCC*,
    2023 WL 8494465 (D.C. Cir. Dec. 7, 2023) ....................................................11

iii

*International Telecard Association v. FCC,
166 F.3d 387 (D.C. Cir. 1999)..................................................................10

*KalshiEX LLC v. CFTC,
119 F.4th 58 (D.C. Cir. 2024)..............................................................5, 9

Keller Communications, Inc. v. FCC,
130 F.3d 1073 (D.C. Cir. 1997)...............................................................22

Loma Linda-Inland Consortium for Healthcare Education v. NLRB,
2023 WL 7294839 (D.C. Cir. May 25, 2023) ..............................................7

Metropolitan Council of NAACP Branches v. FCC,
46 F.3d 1154 (D.C. Cir. 1995)................................................19, 20, 23

Mexichem Specialty Resins, Inc. v. EPA,
787 F.3d 544 (D.C. Cir. 2015)...................................................................6

Michigan v. Bay Mills Indian Community,
572 U.S. 782 (2014)................................................................................16

Murray Energy Corp. v. FERC,
629 F.3d 231 (D.C. Cir. 2011)................................................................21

NAB v. FCC,
147 F.4th 978 (D.C. Cir. 2025)...............................................................21

National Treasury Employees Union v. Trump,
2025 WL 1441563 (D.C. Cir. May 16, 2025) .............................................9

Nken v. Holder,
556 U.S. 418 (2009)..................................................................................5

NLRB v. SW General, Inc.,
580 U.S. 288 (2017)................................................................................17

NRC v. Texas,
605 U.S. 665 (2025)................................................................................13

*NTCH, Inc. v. FCC,
877 F.3d 408 (D.C. Cir. 2017)........................................................9, 11, 12

*In re NTE Connecticut, LLC*,
  26 F.4th 980 (D.C. Cir. 2022)...................................................................13

*Ohio v. EPA*,
  603 U.S. 279 (2024)...............................................................................11

*Ruggiero v. FCC*,
  278 F.3d 1323 (D.C. Cir. 2002)...............................................................16

*SAS Institute, Inc. v. Iancu*,
  584 U.S. 357 (2018)...............................................................................16

*Slaughter v. Trump*,
  2025 WL 2551247 (D.C. Cir. Sep. 2, 2025).........................................5

*Stone v. FCC*,
  466 F.2d 316 (D.C. Cir. 1972)............................................................22, 23

*In re Stone*,
  940 F.3d 1332 (D.C. Cir. 2019)..........................................................13, 14

*Talbott v. United States*,
  2025 WL 3533344 (D.C. Cir. Dec. 9, 2025) ..........................................6

*Telecommunications Research & Action Center v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)..............................................................12, 13

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025)...............................................................................23

*Trump v. Wilcox*,
  145 S. Ct. 1415 (2025)...........................................................................11

*United States v. Denedo*,
  556 U.S. 904 (2009)...............................................................................13

*United States v. Storer Broadcasting Co.*,
  351 U.S. 192 (1955)...........................................................................14, 23

*Virgin Islands Housing Finance Authority v. FEMA*,
  151 F.4th 409 (D.C. Cir. 2025)................................................................20

v

*Waterway Communications Systems, Inc. v. FCC,*
    851 F.2d 401 (D.C. Cir. 1988)....................................................................10

*Western Union Telegraph Co. v. FCC,*
    773 F.2d 375 (D.C. Cir. 1985)....................................................................10

*Winter v. NRDC,*
    555 U.S. 7 (2008)........................................................................................24

**Statutes**

47 U.S.C. § 154.................................................................................................11

*47 U.S.C. § 155...........................................................................3, 10, 11, 18, 20

47 U.S.C. § 309.................................................................................................22

47 U.S.C. § 310...................................................................................................3

47 U.S.C. § 325...................................................................................................9

47 U.S.C. § 402...........................................................................................1, 6, 11

47 U.S.C. § 503...................................................................................................6

*Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118
    Stat. 3 ....................................................................................................6, 14

Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553,
    114 Stat. 2762 ............................................................................................16

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ...................14

**Legislative Materials**

Preservation of Localism, Program Diversity, and Competition in
    Television Broadcast Service Act of 2003, H.R. 2052, S. 1046,
    108th Cong. (May 9 & 13, 2003) ................................................................15

**Regulatory Materials**

47 C.F.R. § 0.61 ............................................................................................3, 18

47 C.F.R. § 0.283 ........................................................................................18, 20

47 C.F.R. § 1.3 ..............................................................................................19

47 C.F.R. § 73.3555 .......................................................................................3

47 C.F.R. § 76.65 ...........................................................................................9

*Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC
    Rcd. 3390 (2017) ....................................................................................14

*Comsearch & C3Spectra Request for Waiver*, Order, DA 25-362
    (May 20, 2025)........................................................................................19

*Delta Radio, Inc.*, 18 FCC Rcd. 16889 (2003) ............................................20

*FM Translator Station K245DC*, 39 FCC Rcd. 5944 (2024) .....................20

*Reorganization and Revision of Chapter*, 28 Fed. Reg. 12,386 (Nov.
    22, 1963) .................................................................................................19

**Other Authorities**

*Free Press v. FCC*, 735 F. App'x 731, No. 17-1129, 2017 WL
    6507881 (Dec. 19, 2017) ..................................................................15, 18

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CAA | Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 (2004) |
| DOJ | Department of Justice |
| FCC or Commission | Federal Communications Commission |
| NOA.App. | Industry Appellants' Notice of Appeal Appendix |

## INTRODUCTION

Appellants challenge a 40-page order of the Federal Communications Commission's Media Bureau in which the Bureau concluded that Nexstar's acquisition of TEGNA's broadcast licenses would "further FCC media policy goals, help promote better service in local markets, and benefit consumers."  NOA.App.2. The Department of Justice also unconditionally cleared the transaction following an extensive seven-month review.

Appellants ask the Court to preemptively review the Bureau's Order without affording the Commission any opportunity to satisfy the jurisdictional prerequisite of weighing in first.  And the remedy they seek is unprecedented:  not just to stay the Bureau's order but also to indefinitely micromanage Nexstar's day-to-day business across the country and enjoin its "significant commitments" to "expand[ ] its investment in local news and programming."  NOA.App.3.[1]

Appellants come nowhere near establishing entitlement to that extraordinary relief.  Foremost, they fail to show irreparable harm.  Appellants principally claim harm from their supposed inability to obtain "appellate review."  But appellate review will remain available, as will a clear remedy.  If Appellants prevail in court following Commission review, the Order can be "revers[ed]," 47 U.S.C. § 402(h),

---

[1]  Intervenor DIRECTV and eight States seek similar relief in the Eastern District of California.

1

and the FCC can ensure Nexstar's compliance.  Appellants offer no reason why they cannot obtain a final remedy without immediate relief.

Appellants also will not prevail on the merits.  At the threshold, this Court lacks jurisdiction because Appellants' challenge is incurably premature under binding precedent.  Appellants' principal statutory argument fares no better.  The statute directed the Commission to "modify its rules" by setting the National Television Ownership Cap at 39%, and nobody disputes the FCC's authority to waive "its rules."  Appellants also flounder in their effort to have this Court preemptively review the FCC's regulatory delegation to its bureau.  The Bureau's well-reasoned Order did not settle any novel questions that could not be resolved under existing Commission precedent.  And Appellants' scattershot of record arguments amount to nothing more than policy disagreements with the expert agency.

Finally, in addition to the obvious harm to Nexstar, a stay would substantially harm the public interest.  The Bureau, on a full record, found the transaction would deliver concrete benefits to viewers via enhanced access to news and information, increased wherewithal to technologically innovate, and a stronger competitor to other, more powerful, sources of media.  NOA.App.33-35.  Nexstar already paid $6.2 billion to make good on those public-interest benefits.  The balance of harms weighs decisively against a stay.

## BACKGROUND

### A.    Commission Authority

The Communications Act requires FCC consent before transferring any broadcast license.  47 U.S.C. § 310(d).  The agency has broad authority to determine whether "the public interest, convenience, and necessity will be served" by a transfer.  *Ibid.*  Under a statutory delegation provision, § 155(c), the Commission has delegated authority to the Bureau to process "applications for … transfer of" television-station licenses and to "act on … waiver requests."  47 C.F.R. § 0.61(a), (h).  Bureau decisions are not directly reviewable.  Instead, an application for review by the full Commission is a "condition precedent to judicial review," and the time to seek such review does not begin until after "dispos[ition] of [such] applications for review."  47 U.S.C. § 155(c)(7).

### B.    The Transaction and Record

In August 2025, Nexstar announced an agreement to acquire TEGNA for $6.2 billion.  Nexstar and TEGNA filed applications seeking the FCC's approval, with each application including a detailed justification for grant.  NOA.App.41-325.  The applications sought waivers of the National Television Ownership Cap, 47 C.F.R. § 73.3555(e), and the Duopoly Rule, 47 C.F.R. § 73.3555(b), and offered extensive record evidence to justify those requests.  NOA.App.61-158, 163-193.

3

In December, the Bureau accepted the applications for filing and established a pleading cycle. A robust record formed, as DOJ simultaneously performed its own seven-month review, in which Nexstar submitted more than two-million documents. *See* Transcript, https://tinyurl.com/bda79av3 (Mar. 4, 2026). On March 19, 2026, the Bureau adopted and released the Order, the DOJ unconditionally cleared the transaction, and the transaction closed.

### C. The Order

The Order held the transaction would generate strong public-interest benefits, including "expand[ing] the production of local news and information" and "promoting the FCC's longstanding media policy goals." NOA.App.1-2, 28-35. The Order conditioned grant of the applications on compliance with commitments by Nexstar, including to (1) expand its investment in local news and programming; (2) offer certain cable and satellite companies an extension of retransmission-consent agreements at existing rates until November 30, 2026; and (3) divest six televisions stations within two years, provided that a Duopoly Rule waiver remains necessary at that time. *See, e.g.*, NOA.App.3, 11-12, 19-20, 24, 28-33, 35. The Bureau found these conditions cemented the transaction's public-interest benefits. *Ibid.*

**D.    Legal Challenges**

On March 20, 2026, Appellants jointly asked the FCC to review the Bureau's Order and unilaterally imposed an extra-statutory 24-hour deadline on the Commission.  Industry.NOA.17.  After the FCC did not issue a Saturday ruling, Appellants instituted these actions.

## STANDARD OF REVIEW

"A stay pending appeal is an extraordinary remedy," *Slaughter v. Trump*, 2025 WL 2551247, at \*1 (D.C. Cir. Sep. 2, 2025) (quotations omitted), that requires movants to meet "stringent requirements," *Hameed v. DEA*, 2025 WL 2985074, at \*1 (D.C. Cir. Oct. 20, 2025).  Movants must (1) make a "strong showing that [they are] likely to succeed on the merits," and demonstrate (2) "irreparable injury," and that (3) the balance of "harm[s]" and "the public interest" favor relief.  *Nken v. Holder*, 556 U.S. 418, 433-35 (2009).  Appellants cannot satisfy any of these requirements.

## ARGUMENT

**I.    Appellants Fail to Show Irreparable Harm**

"[F]ailure" to show "irreparable harm" is "fatal" to a stay motion.  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63-64 (D.C. Cir. 2024); *e.g.*, *Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at \*2 (D.C. Cir. Sep. 25, 2025) (denying on this ground "alone").

Appellants fall far short of the "high standard for irreparable injury." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

Appellants principally claim their right to "appellate review" will be frustrated if Nexstar and TEGNA merge. Industry.Mot.24; Special-Interest.Mot.20. That fails because Appellants show neither injury nor irreparability.

As to the latter, any merger-related injury is reparable. If Appellants prevail on the merits (they will not), the Consolidated Appropriations Act of 2004 provides an "entity that exceeds the" National Cap up to two years to "divest[ ]." CAA, Pub. L. No. 108-199, § 629(3), 118 Stat. 3, 99. Further, the Supreme Court has upheld an FCC "order [of] divestiture" for "[e]xisting combinations." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978). Because the FCC could order "corrective relief" if Appellants "prevail[ ] on the merits," any harm is not "irreparable." *Talbott v. United States*, 2025 WL 3533344, at *11 (D.C. Cir. Dec. 9, 2025); *e.g.*, *Fraternal Ord. of Police v. Libr. of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (injury from "consummation of the merger … not irreparable").

Divestiture aside, a final judgment for Appellants could "revers[e]" the Order. 47 U.S.C. § 402(h). That would render ownership of the acquired licenses unlawful and, absent compliance within two years, could subject Nexstar to severe penalties. *See* 47 U.S.C. § 503(b). Appellants offer *zero* explanation for their apparent position that a merged company can forever break the law.

6

Moreover, if these remedies were truly ineffective, Appellants are in an even *more* untenable position. Nexstar and TEGNA have already merged. If Appellants are correct that "mergers" are "irreversible," "impossible to turn back," and "impossible" to "unscrambl[e]," Industry.Mot.24, then Appellants' motion should be denied because "no injunctive relief could redress" any "irreparable harm." *Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, 2023 WL 7294839, at *11 (D.C. Cir. May 25, 2023).

Irreparability aside, Appellants have not even shown *injury* (nor can they). Industry Appellants' only purported injury is frustration of "appellate review." But their review right is not going anywhere. Even if "Nexstar and TEGNA" act "to integrate in record time," Industry.Mot.24, Appellants could appeal a Commission-level order resolving their application for review under Section 402(b). Appellants do not offer any reason why they would lose their ability to seek review in the normal course.

Appellants' cases do not hold otherwise. Their lead case, *In re Al Baluchi*, 952 F.3d 363 (D.C. Cir. 2020), found imminent "physical destruction of evidence" would "frustrate[ ] later appellate review." *Id.* at 368. No such risk exists in this closed-record case. And Appellants' footnotes and dicta from decades-old cases about the FTC's antitrust authority are irrelevant. None hold that a private party is irreparably injured when third parties consummate a merger. *See FTC v. H.J. Heinz*

7

*Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (FTC need not show "irreparable damage" because it is "not held to the high thresholds applicable [to] private parties"). To the extent those cases suggest undoing some mergers is difficult in the context of Clayton Act remedies, that does not matter unless the merger has caused harm in the first place—which Industry Appellants do not assert in their motion.

Special-Interest Appellants' purported injuries fare no better. The Bureau rejected their arguments (at 21-22) regarding harm to broadcast labor and news quality, finding the merger would *increase* "invest[ments] in journalism, weather coverage, and public-interest programming"—a conclusion buttressed by a binding condition for Nexstar to increase "local programming hours for a minimum of two years from consummation." NOA.App.32-33. Appellants offer no reason why this Court should not "defer to [the] agency['s] … fact finding." *Healthy Gulf v. DOI*, 152 F.4th 180, 191 (D.C. Cir. 2025).

Intervenor DIRECTV's claim of "higher retransmission-consent fees" (at 20-22) is irrelevant. None of the movants claim this injury, and, in any event, this Court "do[es] not consider … new arguments … raise[d]" by an "intervenor" that offers "no reason why it could not have petitioned" itself. *Core Commc'ns, Inc. v. FCC*, 592 F.3d 139, 146 (D.C. Cir. 2010).

DIRECTV's arguments also fail. Nexstar cannot raise retransmission-consent rates under its contracts "through November 30, 2026." NOA.App.31-32. Thus,

8

any future injury is not "imminent," *Fed. Educ. Ass'n*, 2025 WL 2738626, at *3, and does not warrant emergency relief. That distant alleged injury is also wholly "speculative" with no "evidence" beyond a self-serving affidavit. *KalshiEX*, 119 F.4th at 65. Even if DIRECTV might suffer some non-speculative future injury, it offers no specifics to show the kind of "*significant* financial injury" that could justify extraordinary relief. *Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (emphasis added). Further, complaints about retransmission consent are reparable under a separate procedure. *See* 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65. Finally, any purported injury (DIRECTV at 21-22) from automatic rate increases under DIRECTV's contract (whenever they might occur) is "entirely self-inflicted" because DIRECTV "agreed to that [provision] in its" retransmission-consent agreement. *Bhd. of Locomotive Eng'rs & Trainmen v. STB*, 457 F.3d 24, 28-29 (D.C. Cir. 2006).

Because Appellants lack irreparable injury, this Court should deny the motion.

## II. Appellants Are Unlikely to Succeed on the Merits

### A. The Court Lacks Jurisdiction

Appellants challenge "the Media Bureau's order." Industry.NOA.7; *see* Special-Interest.NOA.10. They cannot succeed because "this court has no jurisdiction" over "a bureau decision." *NTCH, Inc. v. FCC*, 877 F.3d 408, 409, 412 (D.C. Cir. 2017) (citation omitted).

9

The statutory prohibition is ironclad.  First, section 155(c)(7) provides "the filing of an application for review … shall be a condition precedent to judicial review of any order" made by a bureau "pursuant to a delegation."  Stopping there, Industry Appellants argue they satisfied this precondition by filing an application for review.  But the second sentence of section 155(c)(7) says the time "within which an appeal must be taken … shall be computed from the date upon which public notice is given of orders disposing of all applications for review filed in any case."  This makes clear "the filing 'window'" for judicial review does not open until the Commission acts on the application.  *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 377 (D.C. Cir. 1985) (Scalia, J.); *id.* at 377-78 (court lacks jurisdiction over petitions filed too early or too late); *Waterway Commc'ns Sys., Inc. v. FCC*, 851 F.2d 401, 405-06 (D.C. Cir. 1988) (dismissing appeal filed too early).

Indeed, the Court rejected Industry Appellants' exact argument in *International Telecard Association v. FCC*, 166 F.3d 387 (D.C. Cir. 1999).  There, a company received an adverse bureau decision, sought Commission review and, just like Appellants, argued that "the act of filing an application for Commission review satisfies the statutory perquisite to judicial review."  *Id.* at 387-88.  "Lest there be any misunderstanding," this Court "expressly h[e]ld" that a request for judicial review "filed after a bureau decision but before resolution by the full Commission is subject to dismissal as incurably premature."  *Id.* at 388; *see, e.g.*,

10

*Indian Peak Props. LLC v. FCC*, 2023 WL 8494465, at \*1 (D.C. Cir. Dec. 7, 2023) (dismissing challenge to bureau order as premature because "application for review [was] pending").

Industry Appellants request (at 26 n.2) an *Irons* footnote "overruling" *International Telecard*. But this Court's "emergency docket, while fit for some things, should not be used to overrule or revise existing law." *Trump v. Wilcox*, 145 S. Ct. 1415, 1418 (2025) (Kagan, J., dissenting); *see Ohio v. EPA*, 603 U.S. 279, 323 (2024) (Barrett, J., dissenting) ("we should proceed all the more cautiously" "without the benefit of full briefing"). In any event, section 155(c)(7) is clear and dispositive.

Second, section 402(b) authorizes only "[a]ppeals … from … orders of *the Commission*." 47 U.S.C. § 402(b) (emphasis added). "The Commission" means the "five commissioners appointed by the President, by and with the advice and consent of the Senate." 47 U.S.C. § 154(a). "When Congress says 'the Commission,' it means the Commission," *NTCH*, 877 F.3d at 413, not "the Bureau" *id.* at 412.

Appellants assert the Bureau's "order is properly attributed to the full Commission." Industry.NOA.22; *see* Special-Interest.NOA.12 (similar). That is wrong. As explained, section 155(c)(7) bars judicial review until an application for review is "fil[ed]" with and "dispos[ed] of" by the Commission. Meanwhile, section 155(c)(3) says "[a]ny order" made by a bureau "shall have the same force and effect"

11

as a Commission order.  These provisions reinforce the commonsense understanding that a "Bureau's order [is] not a Commission order and, therefore, [that] it [is] not an order subject to judicial review." *NTCH*, 877 F.3d at 413.  Tellingly, Appellants cannot cite a single authority supporting their view that bureau orders are Commission orders.

Appellants claim the Commission constructively denied their applications by not acting on them within hours.  *But see Telecomms. Rsch. & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 80-81 (D.C. Cir. 1984).  They cite *Friedman v. FAA*, 841 F.3d 537 (D.C. Cir. 2016), but that case relies on "Administrative Procedure Act … finality principles." *Id.* at 541.  That difference matters because, "where the APA applies, an appeal to 'superior agency authority'" does not stop judicial review except "when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (quoting 5 U.S.C. § 704).  Because the Communications Act "expressly require[s]" Commission-level review and expressly provides that a bureau order is operative pending that review, a different rule applies.

Appellants alternatively assert jurisdiction under the All Writs Act, but that "Act and the extraordinary relief [it] authorizes are not a source of subject-matter

12

jurisdiction."[2]  *United States v. Denedo*, 556 U.S. 904, 913 (2009).  Nor have Appellants established the "threshold requirements" for prospective jurisdiction.  *In re Stone*, 940 F.3d 1332, 1338 (D.C. Cir. 2019).

First, Appellants have not shown "a clear and indisputable right" to immediate Commission action.  *Ibid.*; *see Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016) ("where plaintiffs allege that agency delay is unreasonable despite the absence of a specific statutory deadline, the entire *TRAC* factor analysis may go to the threshold jurisdictional question").  Appellants cite *In re NTE Connecticut, LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022), but that case involved a statutory deadline.  No "rule of reason" requires Commission action on Appellants' timeline.  *TRAC*, 750 F.2d at 80.

Second, Appellants have "other adequate means" to attain relief.  *Stone*, 940 F.3d at 1338; *see NRC v. Texas*, 605 U.S. 665, 682 (2025) (alternative path to judicial review precludes nonstatutory review).  Those include statutory review of a Commission order, section.I, *supra*, and the California litigation seeking similar emergency relief under the Clayton Act, n.1, *supra*.

Because these "threshold requirements are jurisdictional," *Stone*, 940 F.3d at 1338 (quoting *Burwell*, 12 F.3d at 189), the Court "must dismiss the [mandamus]

---

[2]  Appellants' mandamus request also fails on the merits for reasons Nexstar will address if "permitted … by the court."  D.C. Cir. R. 21(a).

petition for lack of jurisdiction." *Ibid.*

## B.     The FCC Has Statutory Authority to Waive the National Cap

The FCC "possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303). Accordingly, the FCC has long regulated permissible broadcaster reach. *See United States v. Storer Broad. Co.*, 351 U.S. 192, 203 (1955); *Amendment of Section 73.3555(e) of the Commission's Rules*, 32 FCC Rcd 3390, 3391, ¶¶ 3-4 (2017).

In 1996, Congress directed the Commission to "modify its rules … by increasing the national audience reach limitation for television stations to 35 percent." Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1), 110 Stat. 56, 111. Congress's directive that the FCC "modify its rules" showed its "choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002); *see Fox Television Stations, Inc. v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002) ("Had the Congress wished to insulate" the cap from FCC review "it need only have enshrined the 35% cap in the statute itself"). A few years later, Congress amended the 1996 Act "by striking '35 percent' and inserting '39 percent.'" CAA § 629(1), 118 Stat. 99-100. The Bureau rightly concluded that "Congress left the National Cap embedded in the

14

Commission's rules" and, therefore, subject to the FCC's "authority to waive any of its rules." NOA.App.16.

Appellants contend the Bureau erred because "[t]he 39% language comes directly from a statute." Industry.Mot.15; *see id.* at 16 ("[the] statute say[s] '39 percent' in five places"). That is the precise argument this Court rejected under the 1996 Act. *Fox*, 280 F.3d at 1042-43. As the Bureau explained, "Congress's choice to direct the Commission to 'modify its rules' again in 2004 shows that it 'intended the phras[ing]' to preserve the FCC's authority." NOA.App.16-17 (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233-34 (2020)); *accord* FCC Br. at 38, *Free Press v. FCC*, 735 F. App'x 731, No. 17-1129, 2017 WL 6507881 (Dec. 19, 2017) ("By keeping the same formulation that it previously used in 1996, Congress again left open the possibility that the agency could later amend its rules to modify the audience reach cap."). Appellants never address Congress's decision to keep the "modify its rules" language.

Indeed, Congress considered language in 2004 that would have set the Cap by statute. *See* Preservation of Localism, Program Diversity, and Competition in Television Broadcast Service Act of 2003, H.R. 2052, S. 1046, 108th Cong. §§ 2(a)(3), 3(a), 3(b)(3) (May 9 & 13, 2003). But Congress rejected it and chose instead to amend the 1996 Act and retain the instruction that the FCC "modify its rules." That "action strongly militates against a judgment that Congress intended a

15

result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200-01 (1974).

When Congress wants the FCC to modify its rules and make no further changes, it says so. In the Radio Broadcasting Preservation Act of 2000, Congress told the FCC to "modify [its] rules" about low-power FM-radio stations *and* that it "may not" modify those rules again unless "expressly authorized" by additional legislation. Pub. L. No. 106-553, § 632(a)(1)-(2), 114 Stat. 2762, 2762A-111; *see Ruggiero v. FCC*, 278 F.3d 1323, 1326 (D.C. Cir. 2002) (this "rescinds the Commission's discretion"), *vacated on other grounds*, 317 F.3d 239 (D.C. Cir. 2003) (en banc). Section 629 contains no similar prohibitory language. "Congress's choice to depart from the model of a closely related statute" cannot be "disregard[ed]." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

Industry Appellants contend (at 17) the CAA enshrined the 39% cap by removing it from the FCC's quadrennial reviews. But "[s]ection 202(h), as amended, merely provides that the Commission is not *required* to review the national audience reach cap quadrennially, it says nothing about whether the Commission is *allowed* to review that rule at any point in time." NOA.App.17. This Court should not endorse Appellants' mistaken "view that … Congress 'must have intended' something broader" than the text it enacted. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014).

16

Furthermore, the FCC adopted its media-ownership rules through its general rulemaking authority. *See Prometheus*, 592 U.S. at 418. And "[n]one of the statutory provisions" of the 1996 Act "displaces the Commission's general rulemaking authority." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 385 (1999); *see City of Arlington v. FCC*, 569 U.S. 290, 293 (2013) (FCC's "rulemaking authority extends to the subsequently added portions of the Act"). Because the FCC retains its general authority over the National Cap, the agency may administer it outside the section 202(h) review process.

Invoking the negative-inference canon, Appellants purport to derive a limitation from the proviso that entities may exceed the cap "through population growth." Industry.Mot.16. But that canon has no effect where, as here, a statute includes only one exception rather than a list. "Singling out one" thing, the Supreme Court has advised, "generally does not imply anything about other, unaddressed" things. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017); *accord Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168-69 (2003). All the more here where, as explained, Congress entrusted the FCC to manage the National Cap by rule.

Industry Appellants' position (at 17-18) that the FCC has consistently interpreted the CAA as a limitation on its authority is also incorrect. In reality, "the full Commission has previously determined that the agency has the authority to change or modify the current 39% National Television Ownership Rule."

17

NOA.App.2. That, not Appellants' theory, has been the FCC's position for years. *See* FCC Br. at 35-40, *Free Press v. FCC*, 735 F. App'x 731, No. 17-1129 (2018), 2017 WL 6507881 (recounting consistent FCC positions from 1998 to 2017).

Appellants invoke the CAA's forebearance provision. Industry.Mot.15-16, Special-Interest.Mot.12. But this Court must "heed[ ] what [the] statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). The forebearance provision cross-references 47 U.S.C. § 160, which by its terms applies only to "telecommunications carriers" and "telecommunications services," not broadcasters. Furthermore, as the Bureau explained, forbearance and waiver are distinct authorities and the Bureau relied only on waiver. NOA.App.17.

### C.     The Bureau Acted Within Its Delegated Authority

Appellants next claim the Bureau lacked delegated authority. Industry.Mot.19-20; Special-Interest.Mot.13. But the Communications Act vests the FCC with authority to "delegate any of its functions." 47 U.S.C. § 155(c)(1). The FCC has delegated the Bureau authority over "waiver requests." 47 C.F.R. § 0.61(h).

The Bureau did not violate 47 C.F.R. § 0.283(c)'s prohibition on deciding "novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." Under the regulation's plain text, Appellants must

identify a question that is both (1) "novel," and (2) not resolvable "under existing precedents and guidelines." Appellants show neither.

First, the waiver request was not "novel." On "the legal question of whether the Commission can waive the 39% cap," Industry.Mot.19, "the full Commission has previously determined that the agency has the authority to change or modify the … 39% National [Cap]." NOA.App.2, 16 & n.109 (quoting Commission orders). And it is long settled that the agency can "waive[ ]" its television "ownership" rules. *E.g.*, *Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1157 (D.C. Cir. 1995).

Although Appellants cite Commission-level dicta in a footnote about authority to "decline to enforce" the National Cap, Industry.Mot.15, that is beside the point. The Bureau did not "decline to enforce" the National Cap. It *waived* the Cap, so there is "nothing … to enforce." *See California v. Texas*, 593 U.S. 659, 673 (2021). Indeed, if Appellants' position were correct, their challenge would be an unreviewable decision "not to proceed with enforcement." *CREW v. FEC*, 892 F.3d 434, 438 (D.C. Cir. 2018).

The "policy question of when waiver is appropriate," Industry.Mot.19, is also not novel. The Commission has for decades employed a "good cause" waiver standard. *See* 47 C.F.R. § 1.3; *Reorganization and Revision of Chapter*, 28 Fed. Reg. 12,386, 12,416 (Nov. 22, 1963); *accord Comsearch & C3Spectra Request for*

19

*Waiver*, Order, ¶ 7, DA 25-362 (May 20, 2025).  A cursory Westlaw search shows that the Commission and its bureaus have applied this standard *thousands* of times— including to waive media-ownership rules.  *See, e.g.*, *Metro. Council*, 46 F.3d at 1157.  Nor was recognition of competition from additional media "novel," Special-Interest.Mot.13, as that was simply part of the circumstances justifying a waiver.

Second, even if the waiver request was novel (it was not), it was resolvable under "existing precedents and guidelines."  47 C.F.R. § 0.283(c).[3]  The wealth of FCC decisionmaking on the National Cap and the waiver standard more broadly gave the Bureau everything it needed to "decide [the] Waiver Request" even if "the Commission ha[d] not previously considered the exact arguments or circumstances [the applicant] presented."  *FM Translator Station K245DC*, 39 FCC Rcd. 5944, ¶ 5 n.17 (2024); *see Delta Radio, Inc.*, 18 FCC Rcd. 16889, ¶ 6 (2003) (similar).

Finally, Appellants are unlikely to prevail on this issue because the Commission is statutorily required to "pass[] upon" Appellants' application for review.  47 U.S.C. § 155(c)(4).  A favorable Commission ruling will moot Appellants' claimed injuries and, if the Commission "ratifie[s] the [Bureau's]

---

[3] Appellants discuss only novelty and thus "forfeit[ ]" the second half of the standard.  *Virgin Islands Hous. Fin. Auth. v. FEMA*, 151 F.4th 409, 419 (D.C. Cir. 2025).

Order," it will moot their challenge by "resolv[ing] any potential delegation problems." *Murray Energy Corp. v. FERC*, 629 F.3d 231, 236 (D.C. Cir. 2011).

### D. The Order Was Reasonable and Reasonably Explained

The Order also satisfies the APA's arbitrary-and-capricious standard, which requires "that agency action be reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423.

Special-Interest Appellants dispute (at 15-19) the Bureau's National-Cap analysis. But the agency thoroughly explained the many public benefits that will arise from waiving the Cap to allow the merger, including "concrete public benefits with respect to localism." NOA.App.19-20. It also recognized "the dramatic changes that have taken place in the media marketplace" since the Cap was last updated, including "an explosion of distribution technologies and programming" affecting its analysis. NOA.App.2. The Bureau concluded waiver serves the public interest, and the Court should not second guess that "policy judgment." *NAB v. FCC*, 147 F.4th 978, 997 (D.C. Cir. 2025).

Industry Appellants (at 21) and Special-Interest Appellants (at 19-20) contend the duopoly waivers were too broad. But the Order evaluated specific showings made in Nexstar's application for each individual waiver and found that, in each relevant market, "at least one of the stations in the proposed combination is weak relative to the stronger stations in the market" and "common ownership of the

21

stations would not harm competition." NOA.App.23-24. That satisfies the FCC's obligation to "explain why deviation better serves the public interest." *Keller Commc'ns, Inc. v. FCC*, 130 F.3d 1073, 1076-77 (D.C. Cir. 1997). The Bureau also denied waivers in two markets and required six divestitures. Its careful market-by-market evaluation is hardly repeal through adjudication. *Contra* Industry.Mot.22.

Industry Appellants argue (at 22-24) the Bureau should have designated the matter for hearing. But a hearing is only required where there are "substantial and material questions of fact." 47 U.S.C. § 309(d); *see Stone v. FCC*, 466 F.2d 316, 322-23 (D.C. Cir. 1972) ("the FCC is not required to hold a hearing where it finds … no substantial and material questions of fact to exist").

Here, "[w]hat the Commission found to be in dispute were not the facts, but rather the conclusions to be drawn." *Stone*, 466 F.2d at 328; *see* NOA.App.10, 14-15 & n.100, 30, 32.[4] The only "fact" Industry Appellants identify (at 23) is the Commission's supposed "2024 position" rejecting waiver. That is a red herring: it refers to a Notice of Apparent Liability (effectively, a charging document) that remains contested, and no waiver was requested. NOA.App.15 n.100. The proposed

---

[4] Industry Appellants suggest (at 22) the FCC must "assum[e] facts alleged in petition to deny are true." (citing *Astroline Communications Co. v. FCC*, 857 F.2d 1556 (D.C. Cir. 1988)). This only applies to the "threshold inquiry" of *prima facie* inconsistency with the public interest, *Astroline*, 857 F.2d at 1561, but the Commission may then assess "whether the totality of the evidence arouses a sufficient doubt on a point that further inquiry is called for." *Ibid*.

divestiture also was not based on "avoid[ing] increased retransmission consent fees," as Appellants suggest, but merely applied the National Cap (again, where no waiver was requested). *Ibid.* The Bureau was not required to "waste time" on an unnecessary hearing. *Storer Broad. Co.*, 351 U.S. at 205; *see Metro. Council*, 46 F.3d at 1160 ("FCC's discretion and expertise are 'paramount in this sphere'").

## III. The Public Interest Strongly Disfavors a Stay

"[I]n equity, the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Trump v. CASA, Inc.*, 606 U.S. 831, 854 (2025) (cleaned). Here, Appellants want the broadest and deepest remedy imaginable—for this Court to micromanage a private company's nationwide business operations during the pendency of a meritless appeal to further their private interests instead of the public interest identified by the Bureau. To the extent *anyone* could offer a story strong enough for that remedy, Appellants are not even close.

Appellants' injunction would pause "Nexstar's commitments to increase the amount and availability of local programming" and deprive "public interest benefits to viewers." NOA.App.33-35. Because these public-interest determinations "must lie at the Commission's door," *Coastal Bend Television Co. v. FCC*, 231 F.2d 498, 500-01 (D.C. Cir. 1956), an injunction here would cause "irreparable harm" to both "the Government" and the "people" it represents, *CASA*, 606 U.S. at 860-61.

Nexstar would also be harmed. Any effort to suspend integration would

23

deprive Nexstar of the "efficiencies created by the Transaction" that "will fuel enhancement to the quantity and quality of broadcast service." NOA.App.34.

Because these public and private harms—assessed by both the Bureau and DOJ—weigh so heavily against Appellants' self-interested speculation about reparable injuries, the equities are dispositive. *See Winter v. NRDC*, 555 U.S. 7, 31-33 (2008).

## CONCLUSION

For the foregoing reasons, the Court should deny the Motions.

Dated: March 26, 2026

*/s/Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.
Kathleen A. Kirby
Jeremy J. Broggi
Eve Klindera Reed
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
tmjohnson@wiley.law

*Counsel for Nexstar Media Inc.*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify:

This Opposition complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because it contains 5,168 words.

This Motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in 14-point proportionally spaced Times New Roman font.  *See* Fed. R. App. P. 27(d)(1)(E).

March 26, 2026                                        */s/Thomas M. Johnson, Jr.*
                                                      Thomas M. Johnson, Jr.

**CERTIFICATE OF SERVICE**

I certify that on March 26, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.
