Nos. 26-1062 & 26-1065

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA, ET AL.,

APPELLANTS/PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION,

APPELLEE/RESPONDENT.

————————

FREE PRESS, ET AL.,

APPELLANTS/PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION,

APPELLEE/RESPONDENT.

————————

ON APPEAL OF AN ORDER OF THE
MEDIA BUREAU OF THE FEDERAL COMMUNICATIONS COMMISSION

————————

**FEDERAL COMMUNICATIONS COMMISSION'S
OPPOSITION TO EMERGENCY MOTIONS FOR STAY**

————————

D. ADAM CANDEUB
GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

JAMES M. CARR
WILLIAM J. SCHER
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ...............................................................................1

BACKGROUND ................................................................................2

    A.    Statutory and Regulatory Background ..................................2

    B.    The Nexstar-TEGNA Transaction and the Agency
        Proceeding ........................................................................5

ARGUMENT .....................................................................................9

I.    Appellants Are Not Likely To Prevail On The Merits. ............9

    A.    The Bureau Has Authority To Waive The National
        Television Ownership Rule. .................................................9

    B.    The Bureau's Waivers Of The National And Local
        Television Ownership Rules Were Reasonable And
        Reasonably Explained. ......................................................14

    C.    The Bureau Was Not Required To Designate The
        Applications For A Hearing. ...............................................18

II.    The Remaining Factors Weigh Against A Stay. ......................22

CONCLUSION .................................................................................24

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMIT ........................................................................................25

CERTIFICATE OF FILING AND SERVICE ...................................26

(Page 2 of Total)

# TABLE OF AUTHORITIES

## CASES

*Astroline Commc'ns Co. v. FCC*, 857 F.2d 1556 (D.C. Cir. 1988)..................................................................19

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999) ....................................................................................14

*Bechtel v. FCC*, 957 F.2d 873 (D.C. Cir. 1992).................................................................3

*Citizens for Responsibility and Ethics in Washington v. FEC*, 904 F.3d 1014 (D.C. Cir. 2018)...........................................................................................9

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ................................................................... 2, 14, 18

*FCC v. WNCN Listeners Guild*, 450 U.S. 582 (1981) ....................................................................................20

*Fox Television Stations v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002).................................................................11

*In re Al Baluchi*, 952 F.3d 363 (D.C. Cir. 2020) ...........................................22

*Int'l Telecard Ass'n v. FCC*, 166 F.3d 387 (D.C. Cir. 1999)...................................................................................2

*KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024)....................................................................................22

*Marin Audubon Soc'y v. FAA*, 129 F.4th 869 (D.C. Cir. 2025)......................................................................9

*Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943) ....................................................................................12

*Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164 (D.C. Cir. 1990)..................................................................................15

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008)....................................................................................18

*Nken v. Holder*, 556 U.S. 418 (2009)................................................................9

*NTCH, Inc. v. FCC*, 877 F.3d 408 (D.C. Cir. 2017) ........................................2

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ...............................................................................14

*Reynolds Metals Co. v. FERC*, 777 F.2d 760 (D.C. Cir. 1985).................................................................................2

*United States v. FCC*, 652 F.2d 72 (D.C. Cir. 1980)(en banc)...........................................................................22

*United States v. Storer Broad. Co.*, 351 U.S. 192 (1956) ...............................................................................3

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .......................................22

*Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828 (8th Cir. 2025)...............................................................3

## STATUTES

47 U.S.C. § 155(c)(7).................................................................................2

47 U.S.C. § 160(a)(1)...............................................................................12

47 U.S.C. § 201(b).....................................................................................14

47 U.S.C. § 303 ........................................................................................2

47 U.S.C. § 309(d)(2)...............................................................................19

47 U.S.C. § 309(e).....................................................................................19

47 U.S.C. § 325(b)(3)(C) .........................................................................23

47 U.S.C. § 334 .......................................................................................11

Consolidated Appropriations Act, Pub. L. No. 108-199, 118 Stat. 3 (2004) .................................................... 4, 9, 13

Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, 114 Stat. 2762 (2000) ...................................................11

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 111-12 (1996)............................................................4, 9

## REGULATIONS

47 C.F.R. § 1.3 ....................................................................................1, 10

47 C.F.R. § 73.3555(b)..............................................................................3

47 C.F.R. § 73.3555(b)(1)(ii) ....................................................................3

47 C.F.R. § 73.3555(e)(1) .........................................................................3

47 C.F.R. § 73.3555(e)(2) .........................................................................3

47 C.F.R. § 76.65 ..................................................................23

**ADMINISTRATIVE MATERIALS**

*2002 Biennial Regulatory Review*, 18 FCC Rcd
   13620 (2003) .................................................................4, 16

*Amendment of Section 73.3555(e)*, 31 FCC Rcd
   10213 (2016) ........................................................ 10, 13, 14

*Amendment of Section 73.3555(e)*, 32 FCC Rcd
   3390 (2017) .....................................................................10

*Amendment of Section 73.5555*, 100 FCC 2d 74
   (1985) ...............................................................................4

**LEGISLATIVE MATERIALS**

S. 1046, 108th Cong., 1st Sess. (2003) ............................................11

(Page 5 of Total)

**INTRODUCTION**

After carefully reviewing an extensive administrative record and receiving substantial commitments from Nexstar Media Inc., the FCC's Media Bureau granted applications for consent to transfer control of broadcast and other licenses held by TEGNA Inc. to Nexstar. *Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, DA 26-267 (MB released March 19, 2026) (*Order*) (Attachment A hereto). In a detailed decision, the Bureau reasonably found that in light of a transformed media landscape, as well as Nexstar's commitments concerning divestiture of certain stations, increased local news programming, and maintenance of retransmission consent rates, the public interest benefits of the proposed transaction outweighed any potential public interest harms. *Order* ¶¶ 65-88.

The Court should deny appellants' motions for a stay of the *Order* pending appeal. Appellants have not shown that they have a likelihood of success on their claims, nor have they satisfied the other stringent requirements for obtaining such extraordinary relief.  The Bureau exercised its power to waive the Commission's national television ownership cap, as well as the local ownership limits in certain markets, for "good cause shown." 47 C.F.R. § 1.3. As it explained, approval of Nexstar's acquisition of TEGNA will advance the Commission's longstanding goals by allowing the combined

entity's stations to "continue and in fact expand their investments in local news," "compete more effectively in the modern media marketplace," and "counteract the growing imbalance of power between those local broadcast TV stations … and the powerful Big Four national programmers." *Order* ¶ 2. Because approval of the transaction will result in these significant public benefits, the Bureau justifiably concluded that it would serve "the public interest, convenience, and necessity." *Id.* ¶ 88.[1]

## BACKGROUND

### A.    Statutory and Regulatory Background

"The Federal Communications Commission possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303).

---

[1] The Communications Act bars judicial review of orders issued by Commission staff; instead, review must await an order of the Commission. *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999); *NTCH, Inc. v. FCC*, 877 F.3d 408, 414 (D.C. Cir. 2017) (parties may not appeal "directly to this Court from a decision made by" FCC staff on "delegated authority"). *See* 47 U.S.C. § 155(c)(7). Appellants Broadband Communications Association of Pennsylvania, et al. acknowledge as much. *See* Notice of Appeal in No. 26-1062 at 25-26 & n.2. Regardless of this Court's power to entertain a request for a stay under the All Writs Act, *see Reynolds Metals Co. v. FERC*, 777 F.2d 760, 762 (D.C. Cir. 1985), this Court lacks jurisdiction over the notices of appeal in Nos. 26-1062 and 26-1065, and the FCC plans to file a motion to dismiss in due course.

Exercising this authority, the Commission historically has limited the number of media outlets that a single entity may own. *See, e.g.*, *United States v. Storer Broad. Co.*, 351 U.S. 192, 202-05 (1956) (limiting the number of broadcast stations that one entity may own nationwide). The Commission's local television ownership rule limits a single entity to no more than two television stations licensed in the same Nielsen Designated Market Area (DMA). 47 C.F.R. § 73.3555(b).[2] The national television ownership rule limits an entity to ownership of stations with a combined audience reach of 39% of television households in the United States. *Id.* § 73.3555(e)(1).[3]

The Commission has reviewed its regulations periodically to ensure that they continue to serve the public interest, revising them as necessary in response to changing circumstances. *See Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("changes in factual and legal circumstances may impose upon the [FCC] an obligation to reconsider a settled policy or explain its

---

[2] Although the local television ownership rule previously limited common ownership of two stations ranked among the top four in local audience share, 47 C.F.R. § 73.3555(b)(1)(ii), this limitation was vacated in *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 839-40 (8th Cir. 2025).

[3] For purposes of calculating national audience reach, the rule provides that ultra-high frequency (UHF) television stations "shall be attributed with 50 percent of the television households in their DMA market." 47 C.F.R. § 73.3555(e)(2).

3

failure to do so"). In the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 111-12 (1996) (1996 Act), Congress regularized the FCC's review of its broadcast ownership rules, directing the agency to review the rules every two years to determine if they remain "necessary in the public interest as the result of competition." *Id.* § 202(h). Congress also instructed the FCC to "modify its rules ... by increasing the national audience reach limitation for television stations to 35 percent." *Id.* § 202(c)(1)(B). (The FCC had established a 25% cap in 1985. *Amendment of Section 73.5555*, 100 FCC 2d 74, 87-88 ¶ 31 (1985).)

The Commission subsequently took steps to raise the national audience reach cap from 35% to 45%. *2002 Biennial Regulatory Review*, 18 FCC Rcd 13620, 13842-45 ¶¶ 578–84 (2003). In response, Congress in 2004 amended section 202(c)(1)(B) of the 1996 Act "by striking '35 percent' and inserting '39 percent.'" Consolidated Appropriations Act, Pub. L. No. 108-199, § 629(1), 118 Stat. 3, 99 (2004) (CAA). The amended provision directed the FCC to again "modify its rules," this time "by increasing the national audience reach limitation for television stations to 39 percent." Congress also removed the national cap from the FCC's obligation to periodically review its rules (which had been changed to every four years). *Id.* § 629(3).

4

**B.    The Nexstar-TEGNA Transaction and the Agency Proceeding**

On November 19, 2025, Nexstar Media Inc. and TEGNA, Inc. (collectively, "the Applicants") filed applications with the Commission's Media Bureau seeking consent to transfer control of TEGNA to Nexstar. *Order* ¶ 8. The Applicants stated that, following the proposed transaction, Nexstar would reach 54.5% of the national television audience (taking into account the 50% discount for UHF stations) and, therefore, requested a waiver of the national television ownership cap. *Id.* ¶ 9. The Applicants also stated that the proposed transaction would create combinations of more than two television stations in 23 local markets, and requested waivers of the local television ownership cap for those markets. *Id.*

The Bureau accepted the applications for filing on December 1, 2025, released a public notice, and established a pleading cycle. *Order* ¶ 10. The Bureau received numerous comments, replies and other submissions, including from the parties to this litigation. *Id.* ¶¶ 11-16. The pleading cycle officially closed on January 26, 2026. *See id.* ¶ 16. At the end of the proceeding, Nexstar made "significant commitments in the agency's record," *id.* ¶ 6, including agreeing to divest stations in six markets, expand investment in local news and programming, and extend existing retransmission consent agreement rates for a period of time. *Id.* ¶¶ 1, 6-7, 55,

5

68, 75, 82-83; Letter from Perry Sook, Chairman and Chief Executive Officer, Nexstar Media Group, Inc., to Brendan Carr, Chairman, FCC, MB Docket No. 25-331 (filed Mar. 19, 2026) (https://www.fcc.gov/ecfs/document/103190920414991/1) (Nexstar Commitment Letter) (Attachment B).

"After carefully and thoroughly reviewing the record," the Bureau granted the applications on March 19, 2026. *Order* ¶ 7. The Bureau concluded that approving the transaction would "promote[] the FCC's longstanding media policy goals" "by allowing the relevant local broadcast TV stations to continue and in fact expand their investments in local news," *id.* ¶ 2, and to "compete more effectively in the modern media marketplace" against "streaming services, cable operators, virtual cable operators, and many other digital and traditional distributors of news, content, and information." *Id.* ¶¶ 2, 66. The Bureau also concluded that approving the transaction would promote a competitive balance between the Applicants' local television stations and "the powerful Big Four national programmers," "Comcast, Disney, Paramount, and Fox," thereby further "enhancing localism," the underlying goal of the national television ownership rule. *Id.* ¶¶ 2, 45. "[O]n balance," the Bureau concluded that "the benefits outweigh any potential public interest harms," *id.* ¶ 65; *id.* ¶¶ 77-88, particularly in

light of Nexstar's commitments, which the Bureau accepted "as enforceable." *Id.* ¶¶ 68, 75. *See also id.* ¶ 90 (ordering the applications approved "subject to Nexstar's commitments").

The Bureau emphasized that "the full Commission" had "previously determined" that the agency has authority to modify the national television ownership rule. *Order* ¶ 3. *See id.* ¶ 34 & n.109. And it reaffirmed the Commission's "straightforward reading" of the statute, finding it buttressed by "additional indications of statutory meaning." *Id.* ¶ 35. Observing that the rule "was last updated by the FCC twenty years ago," *id.* ¶ 4, the Bureau went on to find that special circumstances justified the rule's waiver to permit the proposed transaction. The Bureau explained that waiver would, among other things, enable Nexstar to bolster its ability to provide popular programming, including news programming, that "will better serve its local communities." *Id.* ¶ 44. *See also id.* ¶¶ 3-4; 43-45.

The Bureau also concluded that special circumstances warranted waiver of the local television ownership rule's limit of two stations in a local market to allow Nexstar to own three television stations in 21 of the 23 markets where Nexstar had requested waivers. *Order* ¶ 52. As the Bureau explained, in each of those markets, "at least one of the stations in the proposed combination is weak relative to the stronger stations in the market,"

7

and even in those markets in which the weak station "is the fifth-ranked station," "it is a distant fifth." *Id*.  The Bureau observed that neither competition nor the public interest would be served "by further diminishing these already weak stations, or in the event a buyer could not be found, letting them go dark." *Id*.

Shortly after the Bureau granted the applications, Nexstar and TEGNA closed their transaction. *See* Broadband Mot. 14.

On Friday afternoon, March 20, 2026, Appellants Broadband Communications Association of Pennsylvania, et al. (Broadband Appellants) filed an emergency application for review of the *Order* with the Commission and an emergency petition for stay pending appeal, requesting a ruling on the stay petition within 24 hours. The next day, they filed in this Court a "Notice of Appeal Or, In the Alternative, Emergency Petition For Writ of Mandamus" and "Emergency Motion For Stay and Injunction Pending Appeal." The same day, DIRECTV, LLC intervened and filed a response. The following Monday, March 23, Free Press, et al. (Free Press) filed their own notice of appeal or in the alternative, emergency petition for mandamus, accompanied by a separate emergency motion for stay pending appeal.

8

## ARGUMENT

A stay pending appeal is "extraordinary relief." *Citizens for Responsibility and Ethics in Washington v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). It is not to be granted unless the movants can show that (1) they are likely to succeed on the merits, (2) they will suffer irreparable harm without a stay, (3) a stay will not harm other parties, and (4) a stay is in the public interest. *Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 871 (D.C. Cir. 2025). Even then, a stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 427 (2009). A stay is unwarranted here.

## I.    APPELLANTS ARE NOT LIKELY TO PREVAIL ON THE MERITS.

### A.    The Bureau Has Authority To Waive The National Television Ownership Rule.

The Bureau correctly concluded that the Commission has authority to waive the national television ownership rule. By choosing to amend section 202(c)(1)(B) of the 1996 Act, Congress in the CAA directed the FCC to "modify its rules" to "increas[e] the national audience reach limitation" to 39%. 1996 Act, § 202(c)(1)(B). *See* Pub. L. No. 108-199, § 629(1), 118 Stat. 3, 99 (2004). As the FCC determined in 2016, section 202(c)(1)(B), as amended, "simply directed the Commission to revise its rules to reflect a 39 percent

9

national audience reach cap and removed the requirement to review the national ownership cap from the Commission's quadrennial review requirement." *Amendment of Section 73.3555(e)*, 31 FCC Rcd 10213, 10222 ¶ 21 (2016) (*2016 Order*). It did not, as the FCC explained, "impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule." *Id*. In granting partial reconsideration of the *2016 Order* a year later, the FCC left this conclusion about its authority to modify the rule "undisturbed." *Amendment of Section 73.3555(e)*, 32 FCC Rcd 3390, 3398 n.60 (2017).

There was thus nothing "novel" about the Bureau's determination, as Broadband Appellants (Mot. 19-20) and Free Press (Mot. 13) contend. On the contrary, the Bureau faithfully followed the Commission's lead when it concluded that, "[b]y directing the Commission to 'modify its rules,'" "Congress left the National Cap embedded in the Commission's rules and accordingly left undisturbed the FCC's general authority to waive any of its rules for 'good cause' shown." *Order* ¶ 34 & n.110 (quoting 47 C.F.R. § 1.3).

Moreover, as the Bureau explained, the Commission's "straightforward reading" of the statutory text "is reinforced by additional indications of statutory meaning." *Order* ¶ 35.

10

For one thing, Congress in the CAA chose to direct the Commission to "modify its rules," even though this Court had decided, in *Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002), that this formulation did not insulate the national cap from agency revisions under the then-applicable biennial review process for broadcast ownership rules. *Order* ¶ 35.

For another, the Bureau observed, Congress knows how to take away the Commission's authority to waive or modify its rules, but it "chose not to do so" in the CAA. *Order* ¶ 35 & n.116. *See, e.g.*, 47 U.S.C. § 334 (prohibiting the FCC from revising its equal employment opportunity rules); Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, § 632(a)(1), 114 Stat. 2762, 2762A-111 (2000) (prohibiting the FCC from modifying minimum distance separations for FM stations without further express authorization by Act of Congress). Indeed, "Congress considered and rejected language that would have codified the National Cap into statutory law." *Order* ¶ 35 (citing *Ex Parte* Letter of Thomas M. Johnson, Jr., MB Docket No. 17-318, at n.34) (https://www.fcc.gov/ecfs/document/121687219916/1). *See, e.g.*, S. 1046, 108th Cong., 1st Sess., § 3(a) (2003) (forbidding the FCC from allowing the grant, transfer, or assignment of any license that would result in the control of

11

television stations having an "aggregate national audience reach exceeding 35 percent").

Finally, it would have been "odd for Congress to have permanently embedded an ownership limit into statute" "regardless of subsequent market conditions," particularly given the "dynamic nature of the broadcast market." *Order* ¶ 35. *See Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) (recognizing that "the dominant characteristic" of the broadcast industry is "the rapid pace of its unfolding").

The central premise of appellants' attack on the Bureau's statutory reading is that the 39% cap is a "statutory requirement[.]" Broadband Mot. 15; Free Press Mot. 12 (the cap is written into "positive law"). That premise is mistaken. The CAA does not enact a statutory limit; by amending section 202(c)(1)(B), it directs the Commission to "modify its rules."

Broadband Appellants contend that their contrary reading of the statute is buttressed by the CAA's provision that the Commission's authority to forbear from the Communications Act or its regulations "shall not apply" to the national audience reach limitation. Broadband Mot. 15-16. *See also* DIRECTV Resp. 8. But that provision has no application to entities that are not "telecommunications carriers." 47 U.S.C. § 160(a)(1). *See Order* ¶ 37. In any event, Congress understands that "the Commission's forbearance and

12

waiver authority are distinct." *Id*. & n.123 (explaining that where Congress has intended to address the FCC's waiver authority, it has used the term "waiver," not "forbearance").[4]

Broadband Appellants argue that the Bureau's statutory reading cannot be squared with the exception from the two-year divestiture requirement, CAA, § 629(2), for entities that exceed the cap through "population growth." Mot. 16. But that exception does not speak to the Commission's authority to waive the rule. It merely limits the divestiture requirement's application to entities that exceed the cap through organic growth. And the divestiture requirement itself only applies to entities to which the ownership limit applies, not to those for whom it has been waived. *Order* ¶ 36.

Finally, the fact that the CAA removed the national television ownership rule from section 202(h)'s quadrennial review process did not

---

[4] Broadband Appellants point (Broadband Mot. 15, 18) to the FCC's statement, in a footnote in the *2016 Order*, that the forbearance provision "is most reasonably interpreted as a congressional directive that the Commission not decline to enforce against any person or entity the stricter national cap that Congress required the Commission to adopt." 31 FCC Rcd at 10222–23 ¶ 21 n.77. But this statement is best read to refer to the findings required for forbearance, rather than the FCC's distinct waiver authority. Indeed, the agency appears to have exercised its authority to waive the cap in the very same order. *See id.* at 10235 ¶ 47 (grandfathering station groups that would exceed the cap as a result of eliminating the national television ownership rule's UHF discount).

13

"enshrine" the 39% cap in statutory law. Instead, it simply relieved the Commission of its obligation to reassess the rule every four years, without displacing the FCC's broad statutory authority to do so "outside the context of" that mandatory review. *Prometheus Radio Project v. FCC*, 373 F.3d 372, 397 (3d Cir. 2004); *Order* ¶ 36. *See 2016 Order*, 31 FCC Rcd at 10222 ¶ 21. *See also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 385 (1999) (lack of a specific reference to the FCC's general rulemaking authority under 47 U.S.C. § 201(b) in provision of the 1996 Act granting state commissions the authority to set rates was "not enough to displace that" general authority).[5]

### B. The Bureau's Waivers Of The National And Local Television Ownership Rules Were Reasonable And Reasonably Explained.

"The FCC may waive its rules where particular facts would make strict compliance [with a rule] inconsistent with the public interest."

---

[5] Free Press (Mot. 12) and DIRECTV (Resp. 9) contend that, under the Commission's statutory interpretation, the agency could have modified or waived the rule the day after the CAA was enacted. That counterfactual scenario is far-fetched. The Administrative Procedure Act would have required the Commission to explain the change in circumstances that justified such a step. It is hard to imagine the agency could have satisfied this burden. *See Prometheus*, 592 U.S. at 423 (federal agency action must "be reasonable and reasonably explained"). In any event, that hypothetical is not presented here. More than 20 years have elapsed since the Commission implemented the CAA's direction, and "dramatic changes ... have taken place in the media marketplace" since then. *Order* ¶ 4.

14

*Levine/Schwab P'ship v. FCC*, 61 F.4th 183, 186 (D.C. Cir. 2023) (quoting *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990)). Here, the *Order* explained how special circumstances warrant a deviation from the rules and how that will serve the public interest.

1. **The National Television Ownership Rule**. The Bureau reasonably explained that in light of media marketplace developments, there was good cause to grant a waiver of the national cap rule. First, "by enabling Nexstar to achieve the scale needed to sustain its operations," approval of the transaction will "better position[]" the company "to acquire and retain rights to popular content." *Order* ¶ 43. Second, the transaction removes the need to implement TEGNA's prior plans "to reduce costs and consolidate certain operations, as part of its extensive cost-containment efforts." *Id.* ¶ 44. And third, the combination will advance "Nexstar's ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community." *Id.* ¶ 45.

Importantly, the transaction also includes Nexstar's commitment to "expand its investment in local news and programming," as well as its agreement to "expand the local news it provides in nine markets," and "increase[] the amount and availability of local programming" in the markets

15

it acquires for at least two years. *Order* ¶ 44 (quoting Nexstar Commitment Letter at 2). In addition, the transaction allows "access by the acquired TEGNA stations to Nexstar's Washington, DC, news bureau and state capital news bureaus," as well as "access by TEGNA's stations to Nexstar's [Aggregated Content Team], and Nexstar's access to TEGNA's Premion platform." *Id.* ¶ 43.

The Commission has long considered the national audience reach cap "necessary to promote localism" by allowing local station owners to engage in "collective negotiation to influence the programming that the networks provide" and to "preempt[]" network programming to "provide programming better suited to its community." *2002 Biennial Regulatory Review*, 18 FCC Rcd at 13832-33 ¶ 546. The Bureau here concluded that the combination provided by the transaction will allow Nexstar to advance those localism-enhancing goals, and "strict compliance" with the national cap therefore "would be inconsistent with [its] purpose." *Order* ¶ 45. Waiver of the rule was thus justified.

**2. The Local Television Ownership Rule**. Nexstar also requested a waiver of the FCC's local television ownership rule to allow the combined company to own more than two stations in 23 DMAs. The Bureau granted the waiver with respect to 21 of the 23 markets. *Order* ¶¶ 49-54. It determined

16

that in those particular markets, the lowest-rated of the three stations in the proposed combination was so weak that it might not survive if Nexstar divested it. None of these stations ranked any higher than "a distant fifth" in its market, *id.* ¶ 52, with "an audience share below the 4 percent threshold that the FCC has recognized as an indicator that a station is failing." Consolidated Opp. to Petitions to Deny, MB Docket No. 25-331 (Jan. 15, 2026), at 32 (https://www.fcc.gov/ecfs/document/1011681858277/1).

"Requiring divestiture of these weak stations to an independent buyer" was "not likely to enhance competition or preserve and promote increased local programming" because there was no "guarantee that the stations would generate enough revenue to survive." *Order* ¶ 52. "The public interest," the Commission explained, "would not be served by further diminishing these already weak stations, or, in the event a buyer could not be found, letting them go dark." *Id.*[6] Nor would that outcome "serve competition." *Id.* ¶ 53. On the other hand, the transaction brings along with it Nexstar's commitments to "increase[] the amount and availability of local programming in the aggregate in the acquisition markets," and "expand the local news it provides in nine

---

[6] Thus, contrary to Broadband Appellants' contention (Mot. 21), the concern was not simply that one of the stations in each market had lower audience-share ratings than the others; it was that, as the record showed, the weak stations in each market were in danger of ceasing operations altogether.

17

markets." *Id.* (quoting Nexstar Commitment Letter at 2). In all events, the Bureau concluded, "the potential public interest benefits of Nexstar owning the stations" in the 21 markets at issue outweigh the potential harms, given "the weakness of one or more stations in the markets, the breadth of the number of full-power broadcast stations in the DMAs, and the degree of independent ownership of those stations." *Id.* ¶ 54.

Under these "special circumstances," the Bureau reasonably concluded that waiving the local ownership rule to allow these weak stations to remain with the combined company "better serves the public interest than strict application of" the rule. *Order* ¶ 52. The Bureau thus properly applied the FCC's well-established standard for waiver in "special circumstances" where "deviation" from the rules "better serves the public interest." *See NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008). In sum, like its waiver of the national television ownership rule, the Bureau's waiver of the local television ownership rule was "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423.

### C. The Bureau Was Not Required To Designate The Applications For A Hearing.

The Bureau also reasonably determined that the applications did not have to be designated for hearing. The Communications Act directs the Commission to designate an application for transfer of broadcast licenses for

18

hearing only if a "substantial and material question of fact is presented," or if

the FCC is otherwise "unable to make the finding" that grant of the

application would be in the public interest. 47 U.S.C. § 309(e). If, on the

other hand, the FCC finds "on the basis of the application, the pleadings filed,

or other matters which it may officially notice that there are no substantial

and material questions of fact and that a grant of the application would be

consistent with" the public interest, "it shall make the grant." 47 U.S.C.

§ 309(d)(2).

Broadband Appellants contend that the Commission must assume the

truth of the facts alleged in a petition to deny a license transfer application.

Mot. 22 (citing *Astroline Commc'ns Co. v. FCC*, 857 F.2d 1556, 1561 (D.C.

Cir. 1988)). *See also* Free Press Mot. 14. That is incorrect. *Astroline* teaches

only that the FCC must assume the truth of the facts alleged in a petition to

deny for the purpose of determining whether a threshold prima facie case has

been made out. 857 F.2d at 1561. If that "threshold standard" has been met,

*Astroline* makes clear that the FCC is then free to consider the entire record in

determining whether to grant a hearing, including "the application, the

pleadings filed, or other matters which it may officially notice." *Id.* (quoting

47 U.S.C. § 309(d)(2)). And "[t]he Commission enjoys wider latitude in its

determination whether the record as a whole presents a substantial and material question of fact warranting a hearing." *Id*.

Here, after carefully reviewing the evidence, the Bureau reasonably concluded that the proposed transaction "will not raise any material public interest harms," and instead "is likely to result in some tangible benefits by allowing Nexstar to achieve the scale necessary to provide expanded news coverage, enhanced service, and continued innovation to the local communities it serves." *Order* ¶ 65. *See id*. ¶¶ 66-88. Accordingly, the Bureau concluded that "on balance," the "benefits" of the transaction "outweigh any potential public interest harms." *Id*. ¶ 65. That "judgment regarding how the public interest is best served is entitled to substantial judicial deference." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981).

Among other things, the Bureau pointed out, the record showed that "Nexstar has a track record of maintaining and expanding local news following its acquisition of other stations," including increasing "local news coverage by more than 28,000 hours per year" in the "five years following [its] 2019 acquisition of Tribune." *Order* ¶ 68. The Bureau also found that concerns about higher retransmission consent rates—the rates Nexstar charges cable companies and other multichannel video programming

20

distributors (MVPDs) to carry its programming—were "ameliorate[d]" by the ability of consumers to view Nexstar programming for free over the air, *id.* ¶ 72, and to take advantage of video programming on streaming services, *id.* ¶ 73. Moreover, the Bureau noted, Nexstar has committed to "offer those MVPDs with which [it] has an existing retransmission consent agreement" an "extension" of that agreement "at existing rates through November 30, 2026." *Id.* ¶ 75 (quoting Nexstar Commitment Letter at 2-3).

In the end, the Bureau found that, even apart from Nexstar's commitments "to increase the amount and availability of local programming in the aggregate in the acquisition markets," the transaction will serve the public interest by "creat[ing] a broadcaster positioned to navigate the headwinds and competition facing the broadcast industry," *Order* ¶ 83, in the modern media landscape "of streaming platforms, podcasts, video sharing sites, and virtual MVPDs," *id.* ¶ 27, including streaming platforms associated with the major networks, *id.* ¶ 29. The Bureau reasonably concluded that the public interest is served, and consumers are benefited, by the approval of a transaction that "enabl[es] a combined company to emerge as a stronger competitor in the marketplace." *Id.* ¶ 88.

21

## II.    THE REMAINING FACTORS WEIGH AGAINST A STAY.

**1.** "[A] showing of irreparable harm" is also "a necessary prerequisite for a stay." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). The movants must "demonstrate that irreparable injury is *likely*" in the absence of a stay. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). They have failed to do so.

Broadband Appellants base their claim of irreparable harm solely on the assumption that consummation of the Nexstar-TEGNA merger would be "'an irreversible' event 'frustrat[ing] later appellate review.'" Broadband Mot. 24 (quoting *In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020)). *See also* Free Press Mot. 20. That assumption is incorrect. As this Court long ago recognized, the FCC has the power "to employ a full range of remedies" to address the sorts of competitive concerns raised by appellants, "including restrictions, conditions, nonrenewal of licenses, or divestiture." *United States v. FCC*, 652 F.2d 72, 106 (D.C. Cir. 1980) (en banc). The availability of such remedies in the event of a remand from this Court "makes the antitrust problems in this case less immediate, and more controllable, than appellants would suggest." *Id*.

In addition, Free Press contends (Mot. 21-22) that local news operations will be irreparably harmed without a stay. But as the Bureau

22

explained, the record showed that "Nexstar has a track record of maintaining and expanding local news following its acquisition of other stations." *Order* ¶ 68. Moreover, Nexstar made "enforceable commitments" to increase "the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" after the merger with TEGNA is consummated. *Id.* Taking these factors into account, the Bureau reasonably rejected arguments that the transaction would "result in a reduction in local news" that would "harm" consumers. *Id.* ¶ 67.[7]

**2.** The equities and the public interest also weigh against a stay. The Bureau found that the merger of Nexstar and TEGNA will advance the public interest by creating "[e]fficiencies" that "will fuel enhancements to the quantity and quality of broadcast service that neither company alone can continue to provide." *Order* ¶ 85. Approval of the merger promotes

---

[7] Intervenor DIRECTV, for its part, asserts that it will be irreparably harmed because of Nexstar's increased leverage to exact retransmission fees from it. DIRECTV Resp. 20-22. But none of the appellants identifies that harm as a basis for their claim of irreparable injury. In any event, as the Bureau explained, the ability of consumers to switch to over-the-air programming can serve to discipline Nexstar (and MVPDs) in retransmission consent negotiations. *Order* ¶ 72. Furthermore, those negotiations are subject to a statutory "good faith" requirement enforceable through the FCC complaint process. *See* 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. § 76.65.

23

competition by "enabling a combined company to emerge as a stronger competitor" in an increasingly challenging video marketplace for broadcasters. *Id.* ¶ 88. A stay would needlessly delay the realization of these substantial public interest benefits.

## CONCLUSION

The motions for stay should be denied.

Respectfully submitted,

D. ADAM CANDEUB
GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

/s/ William J. Scher

JAMES M. CARR
WILLIAM J. SCHER
COUNSEL

FEDERAL COMMUNICATIONS
  COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

March 26, 2026

24

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒  this document contains <u>5,189</u> words, *or*

    ☐  this document uses a monospaced typeface and contains <u> </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word in Office 365</u> in <u>14-point Times New Roman</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using <u>                              </u> with <u>                        </u>.

*/s/ William J. Scher*

William J. Scher
  Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

25

**CERTIFICATE OF FILING AND SERVICE**

I, William J. Scher, hereby certify that on March 26, 2026, I filed the foregoing Opposition to Emergency Motions for Stay with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
  Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740