# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; INDIANA CABLE AND BROADBAND ASSOCIATION; MISSISSIPPI INTERNET AND TELEVISION; TENNESSEE CABLE & BROADBAND ASSOCIATION; VCTA – BROADBAND ASSOCIATION OF VIRGINIA; and NEWSMAX MEDIA, INC.,

*Appellants/Petitioners*,

&

DIRECTV, LLC

*Intervenor-Appellant/Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee/Respondent*,

&

NEXSTAR MEDIA INC.

*Intervenor-Appellee/Respondent*,

Nos. 26-1062 (L) & 26-1065

## UNDERLYING DECISION FROM WHICH APPEAL/PETITION ARISES

Pursuant to the Court's March 21, 2026 order, counsel for the undersigned parties encloses a copy of the March 19, 2026 Media Bureau order underlying this appeal/petition.

Respectfully submitted,

s/Paul D. Clement

JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellants/Petitioners Broadband Communications Association of Pennsylvania; Broadband Communications Association of Washington; Indiana Cable and Broadband Association; Mississippi Internet and Television; Tennessee Cable & Broadband Association, and VCTA – Broadband Association of Virginia*

MARK I. BAILEN P.C.
BAILEN LAW
1250 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
(202) 656-0422
mb@bailenlaw.com

*Counsel for Appellant/Petitioner Newsmax Media Inc.*

April 20, 2026

**CERTIFICATE OF SERVICE**

I certify that, on April 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Applications for Consent to the Transfer of Control | **)** | MB Docket No. 25-331 |
| of TEGNA Inc. to Nexstar Media Inc. | **)** | |
| | **)** | LMS File Nos. 0000280940 et al. |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  March 19, 2026**                    **Released:  March 19, 2026**

By the Chief, Media Bureau:

**TABLE OF CONTENTS**

Heading                                                                                                         Paragraph #

I.   INTRODUCTION ...................................................................................................................1
II.  BACKGROUND ....................................................................................................................8
     A.  Description of Transaction...............................................................................................8
     B.  Transaction Review Process ...........................................................................................10
III. STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK...........................17
IV.  QUALIFICATIONS OF APPLICANTS AND COMPLIANCE WITH
     COMMUNICATIONS ACT AND FCC RULES AND POLICIES....................................21
     A.  Applicants' Qualifications .............................................................................................22
     B.  Compliance with the Communications Act and FCC Rules and Policies ......................24
         1.  National Television Ownership Rule ........................................................................25
         2.  Local Television Ownership Rule.............................................................................46
         3.  Divestitures...............................................................................................................55
V.   STANDING..........................................................................................................................56
VI.  POTENTIAL PUBLIC INTEREST HARMS AND BENEFITS .........................................65
     A.  Potential Public Interest Harms .....................................................................................77
     B.  Potential Public Interest Benefits...................................................................................83
VII. CONCLUSION ....................................................................................................................89
VIII. ORDERING CLAUSES .......................................................................................................90
APPENDIX – TEGNA Transfer of Control Applications

## I.   INTRODUCTION

1.        The American people benefit from access to trusted sources of local news and information.  As newspapers have closed by the dozen in communities across the country, local broadcast TV stations and the talented reporters that work there have become even more important.  Often, they are the ones in a market doing the gumshoe reporting that citizens value and need.  Today, the FCC takes an action that empowers these local broadcast TV stations to serve the public interest, and it does so by enabling them to expand the production of local news and information.  This is especially so given the concrete commitments that Nexstar has made in the record, including on affordability, localism, and their commitment to divest a number of TV stations.

2.        Put simply, our action today promotes the FCC's longstanding media policy goals of competition, localism, and diversity.  It does so by allowing the relevant local broadcast TV stations to continue and in fact expand their investments in local news.  It does so by allowing them to compete more

effectively in the modern media marketplace. And it does so by allowing them to counteract the growing imbalance of power between those local broadcast TV stations on the one hand and the powerful Big Four national programmers on the other—namely, Comcast, Disney, Paramount, and Fox. While the FCC adopted its TV ownership rules at least in part to strike an appropriate balance of power between the Big Four national programmers and local broadcast TV stations, strict application of our rules in this case would run counter to the very reason for those agency regulations. Approving this transaction—which will allow Nexstar to own less than 15% of television stations—will promote a more balanced relationship between the Big Four and the relevant local broadcast TV stations.[1]

3. Therefore, by this *Memorandum Opinion and Order*, the Media Bureau (Bureau) grants the applications (Applications) seeking consent to the transfer of control of TEGNA Inc. (TEGNA) to Nexstar Media Inc. (Nexstar, and, together with TEGNA, the Applicants), a wholly owned subsidiary of Nexstar Media Group, Inc.[2] In doing so, we grant the Applicants' request for a waiver of the Commission's National Television Ownership Rule.[3] As discussed below, the full Commission has previously determined that the agency has the authority to change or modify the current 39% National Television Ownership Rule. As with other FCC rules, the agency also has authority to waive the rule, and we take that step here today in the context of this specific transaction.

4. As indicated above, we grant this waiver in recognition of the dramatic changes that have taken place in the media marketplace since the National Television Ownership Rule was last updated by the FCC twenty years ago. Since then, there has been an explosion of distribution technologies and programming, which has given viewers more choice and has further strengthened the bargaining position of large Big Four national programming networks relative to their broadcast affiliate stations, like many of those owned by Nexstar and TEGNA. Grant of the relevant waiver, based on the record in this transaction, will most effectively further FCC media policy goals, help promote better service in local markets, and benefit consumers.

5. Turning from the FCC's National Television Ownership Rule to our local one, in the seventeen Nielsen Designated Market Areas (DMAs) where Nexstar proposes to form or acquire a combination of two full power television stations, we find that these combinations comply with the Commission's Local Television Ownership Rule and grant them herein. Regarding Nexstar's proposed ownership of more than two full power television stations in twenty-three DMAs,[4] we grant the Applicants' requests for waiver of the Commission's Local Television Ownership Rule, subject to the

---

[1] As originally proposed, the transaction would result in Nexstar owning 265 full power television stations. Nexstar has committed to divesting 6 stations, bringing the total to 259 after divestiture. This equates to less than 15% of the 1,777 full power television stations. Additionally, there are 397 Class A television stations and 1,760 low power television stations. *See Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[2] The Appendix provides a complete list of the Applications and the subject broadcast television station licenses. The Applications are on file with the Federal Communications Commission (FCC or Commission), which can be found in the Commission's Licensing and Management System (LMS). In addition, the Applicants separately have filed applications for consent to the transfer of control of the TEGNA subsidiaries' earth station, microwave, and land mobile facilities.

[3] 47 CFR § 73.3555(e) (National Television Ownership Rule).

[4] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio of Mid-Missouri, Inc. v. FCC et al.*, 145 F.4th 828 (8th Cir. 2025) (*Zimmer Radio*)) (Local Television Ownership Rule). These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline. The divestitures Nexstar has committed to make in Indianapolis and Norfolk-Portsmouth-Newport News would result in it owning two full power television stations in those DMAs.

divestitures Nexstar has committed to make.[5]  The FCC has previously waived the Local Television Ownership Rule and we do so again here.[6]

6. We note that Nexstar has made significant commitments in the agency's record as well, further ensuring that this transaction promotes the public interest.  To further serve its local communities, Nexstar commits to expanding its investment in local news and programming, including increasing the amount of local news it provides in acquired markets.  Regarding concerns about pricing and affordability, Nexstar commits to offering those multichannel video programming distributors (MVPDs) with which it has an existing retransmission agreement an extension of its agreement at the existing rates for a certain period of time.  Finally, Nexstar commits to equal opportunity employment and nondiscrimination.

7. After carefully and thoroughly reviewing the record, we therefore find that, in light of Nexstar's commitments, there will be no material public interest harms arising from the transaction.  Accordingly, we decline to adopt the conditions or remedies proposed in the record.[7]  We further find that certain transaction-related public interest benefits are likely to be realized, especially given Nexstar's reaffirmed commitment to operating its "broadcast television stations in a manner that serves the public interest through locally focused programming responsive to the needs and interests of the communities [Nexstar] serve[s]."[8]  We note that the upshot of the divestitures and other relief provided here will not result in a single entity owning more than two top four stations plus one additional one based on our review of current station ratings.[9]

## II.    BACKGROUND

### A.    Description of Transaction

8. TEGNA is the ultimate parent of the licensees of 64 full power television stations, one AM radio station, one FM radio station, and other related FCC licenses.[10]  Pursuant to an Agreement and

---

[5] *See* Letter from Perry Sook, Chairman and Chief Executive Officer, Nexstar Media Group, Inc., to Hon. Brendan Carr, Chairman, FCC, MB Docket No. 25-331 at 2 (filed Mar. 19, 2026) (*Nexstar Localism Commitment Letter*). We note that the commitments are being made collectively by Nexstar Media Inc. and Nexstar Media Group, Inc. For the sake of clarity, we reference both entities when referring to the commitments made by Nexstar.

[6] *See Application for Consent to the Assignment of the Licensee of WRTV(TV), Indianapolis, Indiana, from Scripps Broadcasting Holdings LLC to CCB License, LLC*, Order, DA 26-207 (MB Feb. 27, 2026) (*CCB Order*).

[7] *See, e.g.*, *Ex Parte* Letter of Optimum Communications at 1 (filed Mar. 2, 2026) (Optimum *Ex Parte* Letter) (suggesting mitigating "measures" in mergers such as the Transaction, including:  (1) requiring merging parties to forgo enforcement of any "automatic retransmission consent rate increases resulting from after-acquired station clauses, until existing contracts expire;" (2) enforcing Commission rules on sidecar agreements; (3) requiring divestiture of Big-4 triopolies in a local market; and (4) reviewing Commission rules governing blackouts); *Ex Parte* Letter of DIRECTV at 1 (filed Mar. 2, 2026) (DIRECTV Mar. 2 *Ex Parte*) (suggesting conditions that should: (1) address Nexstar's "increased incentive and ability to raise retransmission consent fees;" (2) address Nexstar's ability to black out signals; and (3) prevent Nexstar from evading any such conditions (e.g., through affiliate swaps); *Ex Parte* Letter of State Cable Petitioners at 3 (filed Mar. 9, 2026) (State Cable Petitioners Mar. 9 *Ex Parte* Letter) (suggesting "structural and behavioral conditions," including:  (1) station divestitures; (2) anti-circumvention measures; and (3) barring the triggering of after-acquired station clauses); Reply Comments of Cincinnati Bell Extended Territories LLC (d/b/a altafiber) at 7 (filed Jan. 26, 2026) (altafiber Jan. 26 Reply) (proposing use of a "social contract" to provide actionable remedies if Nexstar fails to act in accordance with the promises it made to secure Commission approval).

[8] *See Nexstar Localism Commitment Letter* at 1.

[9] We note that the ratings and rankings of stations can vary, including by varying across different points in time. Our decision today does not depend on any particular ranking.  Rather, we are observing that, after conducting our review and accepting Nexstar's divestment, the upshot appears to be that there will be no markets where Nexstar owns more than two top four stations, plus one additional station outside the top four.

Plan of Merger dated August 18, 2025,[11] Nexstar seeks to acquire the outstanding equity interests in TEGNA in a cash merger transaction (Transaction).[12] Upon consummation of the Transaction, each share of TEGNA common stock issued and outstanding immediately prior to closing will be converted into the right to receive $22.00, and TEGNA will become a wholly-owned subsidiary of Nexstar Media Group, Inc., which will immediately contribute its shares in TEGNA to Nexstar.[13]

9.        The Applicants state that post-Transaction, Nexstar would reach 54.5% of the national audience, after taking into account the 50% discount applied to UHF stations (UHF Discount),[14] and, therefore, seek a waiver of the National Television Ownership Rule.[15] Furthermore, the Applicants propose in their Applications that Nexstar would form or acquire combinations of two full power television stations (Duopolies) in seventeen DMAs, which they assert complies with the Local Television Ownership Rule and serves the public interest.[16] In addition, the Applicants propose that Nexstar would own more than two full power television stations in twenty-three DMAs and, therefore, seek a waiver of the Local Television Ownership Rule with respect to those DMAs.[17]

### B.        Transaction Review Process

10.        The Bureau accepted the Applications for filing on December 1, 2025, released a public notice establishing a pleading cycle, and designated the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[18] We received fourteen pleadings timely filed as petitions to deny, comments, and other requests.[19] While most of the pleadings filed as petitions to deny[20] and comments oppose the Transaction,[21] other commenters support it.[22]

---

(Continued from previous page)

[10] *See, e.g.*, *Application for Consent to Transfer Control of Belo TV, Inc.*, LMS File No. 0000280940, Comprehensive Exhibit at 1 (Comp. Exh.). A copy of the Comp. Exh. is attached to each of the Applications.

[11] Comp. Exh. at Schedule 4.

[12] *Id*. at 1.

[13] *Id*.

[14] 47 CFR § 73.3555(e)(2).

[15] 47 CFR § 73.3555(e). For purposes of paragraph (e), national audience reach means the total number of television households in the DMAs in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. 47 CFR § 73.3555(e)(2)(i). Further, no market shall be counted more than once. 47 CFR § 73.3555(e)(2)(ii).

[16] These DMAs are: Atlanta; Seattle-Tacoma; Jacksonville; Tucson (Sierra Vista); Spokane; Waco-Temple-Bryan; San Angelo; Sacramento-Stockton-Modesto; Austin; Columbus; Harrisburg-Lancaster-Lebanon-York; Greensboro-High Point-Winston Salem; Wilkes Barre-Scranton-Hazelton; Knoxville; Tyler-Longview (Lufkin & Nacogdoches); Odessa-Midland; and Abilene-Sweetwater. *See* Comp. Exh. at 18, nn. 74-75. *See also Zimmer Radio; Letter from Chief, Video Division to Sinclair, Inc., et al*., Letter Order, DA 26-108 (MB Feb. 3, 2026) (*Sinclair-Cunningham-Roberts Letter Order*) (*application for review pending*). For further discussion, see *infra* Section IV.B.

[17] These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Davenport-Rock Island-Moline; Fort Smith-Fayetteville-Springdale-Rogers; Denver; Hartford & New Haven; and New Orleans.

[18] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Nexstar Media Inc. and Permit-But-Disclose Ex Parte Status for the Proceeding*, MB Docket No. 25-331, Public Notice, DA 25-1000 (MB Dec. 1, 2025) (*Pleading Cycle Public Notice*); *see also* 47 CFR § 1.1206.

[19] In addition to the Applicants, only individuals or entities that file petitions to deny and meet the filing requirements become parties to a licensing or transaction proceeding. *See Entercom Sacramento Licenses, LLC*, Letter Order, 32 FCC Rcd 6880, 6883 (MB 2017); *Cloud Nine Broadcasting, Inc.*, Letter Order, 10 FCC Rcd 11555, 11556 (MB 1995) (*Cloud Nine*). Informal objectors can only become parties to the proceeding if there is no

(continued….)

11. Regarding the Applicants' requests for waiver of the Commission's National Television Ownership Rule and Local Television Ownership Rule, as discussed below, the Petitioners and Opposing Commenters raise several arguments. For example, some assert that the FCC lacks authority either to modify or eliminate the National Television Ownership Rule generally or to grant a waiver to Nexstar,[23] and others advance pragmatic arguments why waiving the rule would be harmful.[24] On the other hand, CAR asserts that the FCC should repeal the National Television Ownership Rule or, alternatively, grant a waiver to Nexstar.[25] Further, some Petitioners assert that the FCC should deny the Applicants' requests for waiver of the Local Television Ownership Rule, arguing that the Applicants do not sufficiently justify waiver of the rule.[26]

12. In addition, some Petitioners and Opposing Commenters express concerns regarding a number of anticompetitive effects that they claim would result from the Transaction. Petitioners and Opposing Commenters allege that the consolidation resulting from the Transaction will harm the public

(Continued from previous page) ─────────────────────

statutory opportunity to file a petition to deny. *Cloud Nine*, 10 FCC Rcd at 11556. For a discussion of standing, see *infra* Section V.

[20] Petition to Deny of DIRECTV, LLC (filed Dec. 31, 2025) (DIRECTV Petition); Petition to Deny of CCB License, LLC (filed Dec. 31, 2025) (CCB Petition); Petition to Deny of Broadband Communications Association of Pennsylvania et al. (filed Dec. 31, 2025) (State Cable Petition); Petition to Deny of United Church of Christ Media Justice Ministry et al. (filed Dec. 31, 2025) (Public Interest Petition); Petition to Deny of EchoStar Corporation (filed Dec. 31, 2025) (EchoStar Petition) (together, the Petitioners). As discussed in greater detail *infra* in Section V, we note that only certain organizations or associations within the State Cable Petitioners and the Public Interest Petitioners have standing as parties-in-interest. For ease of reference, we refer to the groups collectively, as "State Cable Petitioners" and "Public Interest Petitioners."

[21] *See* Petition to Deny of Newsmax Media, Inc. (filed Dec. 31, 2025) (Newsmax Objection). While filed as a petition to deny, as discussed *infra* in Section V, we treat Newsmax's filing as an informal objection. *See also* Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Dec. 1, 2025) (OMI Objection); Comments of Asian Americans Advancing Justice – AAJC et al. (filed Dec. 10, 2025) (AANHPI Coalition Objection); Comments of Asian Americans Advancing Justice – AAJC et al. (filed Dec. 10, 2025) (National Civil Rights Organizations Objection); Brief of Mafia Monthly (filed Dec. 13, 2025); Comments of Business Forward (filed Dec. 15, 2025) (Business Forward Objection); Comments of Sean Patrick Patterson (filed Dec. 13, 2025); Comments of the American Television Alliance (ATVA) and the National Content & Technology Cooperative (NCTC) (filed Dec. 31, 2025) (ATVA and NCTC Objection), (together, the Opposing Commenters). With respect to the OMI Objection, which asks the Commission to "update the cable TV must carry rules to apply" to newer virtual MVPDs (vMVPDs), we note that this matter is best addressed through a rulemaking proceeding rather than the transaction-review process. *See* OMI Objection at 1. We therefore decline to consider that request here. We direct OMI to the open Commission proceeding proposing to modernize the definition of an MVPD. *See Promoting Innovation and Competition in the Provision of Multichannel Video Programming Distribution Services*, MB Docket No. 14-261, Notice of Proposed Rulemaking, 29 FCC Rcd 15995 (2014).

[22] *See* Comments of the Center for American Rights (filed Dec. 30, 2025) (CAR Comments). Others filed comments supporting the Transaction at a later stage of the pleading cycle. See *infra* note 50.

[23] *See, e.g.*, Newsmax Objection at 5-6; State Cable Petition at 10-16; EchoStar Petition at 7-10; ATVA and NCTC Objection at 15-18.

[24] *See, e.g.*, State Cable Petition at 36-44; EchoStar Petition at 9-11. See *infra* Section IV.B. for discussion of the alleged harms attendant to waiver of the National Television Ownership Rule in this Transaction.

[25] *See* CAR Comments at 9-11. CAR responds to arguments raised by State Cable Petitioners regarding the Commission's authority to modify the National Television Ownership Rule in a later *ex parte*. *See* Letter from Daniel R. Suhr, Center for American Rights to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Feb. 11, 2026) (CAR Feb. 11 *Ex Parte* Letter). *See infra* note 52, and, for a discussion of the Commission's authority to waive the National Television Ownership Rule, see *infra* Section IV.B.

[26] *See, e.g.*, State Cable Petition at 27-32; Public Interest Petition at 68-132 (providing a market-by-market analysis).

interest because it will enhance Nexstar's leverage to extract higher retransmission consent fees, which they assert will negatively impact MVPDs and consumers.[27] Some Petitioners further assert that Nexstar has a history of using blackouts to extract higher retransmission consent fees and that the Transaction will give the combined company bargaining leverage.[28] A number of Petitioners also claim that the Transaction is presumptively unlawful under Department of Justice (DOJ) and Federal Trade Commission (FTC) guidelines concerning the definition of the relevant product market and traditional Herfindahl-Hirschman Index measures of concentration.[29] Petitioners also express concern about the impact of "after-acquired station clauses," which allow a broadcaster to bring newly acquired stations under its existing retransmission consent agreement, substituting the acquiring broadcaster's retransmission consent fee for the rate previously negotiated by the MVPDs for the broadcast stations in question.[30] Moreover, some Petitioners and Opposing Commenters assert that the Transaction will increase prices for local advertisers that rely on local broadcast television spot advertisements.[31] With respect to the Indianapolis DMA, CCB License, LLC (CCB) argues that "Nexstar's ability to exert anticompetitive control over the retransmission consent revenue market would inflict economic harm on CCB, which would in turn severely impinge on its ability to survive as a source of local news and programming in the market."[32]

13. Several Petitioners and Opposing Commenters raise concerns regarding localism, viewpoint diversity, and the labor market, arguing that increased access to Nexstar's various news bureaus will not enhance localism and that consolidated news functions will result in duplication of content.[33] For example, EchoStar Corporation (EchoStar), the parent company of DISH Network Corporation (DISH), claims that allowing Nexstar to reach 54.5% of the national audience will "effectively create a single broadcast behemoth with the power to homogenize news coverage, mandate editorial policy, and 'drive diverse political viewpoints' from the local airwaves across the entire country . . . ."[34] Moreover, the State Cable Petitioners claim that the Transaction will reduce locally produced news

---

[27] *See, e.g.*, Newsmax Objection at 11-12; DIRECTV Petition at 16-37; State Cable Petition at 36-48; ATVA and NCTC Objection at 4-9; EchoStar Petition at 2; AANHPI Coalition Objection at 3; National Civil Rights Organizations Objection at 3-4; Public Interest Petition at 42; Business Forward Objection at 1.

[28] *See, e.g.*, State Cable Petition at 47-48; EchoStar Petition at 15-16.

[29] *See, e.g.*, Public Interest Petition at 29-40; DIRECTV Petition at 12-16. We note that our review is independent of DOJ and FTC merger guidelines. Moreover, regarding the State Cable Petitioners' claim that Nexstar's proposed reacquisition of eleven stations from TEGNA that DOJ required it to divest as part of the Tribune transaction would violate the terms of DOJ's settlement, we note that this claim is outside the scope of our proceeding. *See* State Cable Petition at 32-33, citing Final Judgment at 17-18, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020).

[30] State Cable Petition at 41. State Cable Petitioners are comprised of the Broadband Communications Association of Pennsylvania (BCAP), Broadband Communications Association of Washington (BCAW), Indiana Cable and Broadband Association (ICBA), Mississippi Cable Telecommunications Association (MCTA), Tennessee Cable & Broadband Association (TCBA), and VCTA – Broadband Association of Virginia (VCTA).

[31] *See, e.g.*, DIRECTV Petition at 37-41; ATVA and NCTC Objection at 9-10; State Cable Petition at 54-55. We note that the Commission has never defined a market for spot advertising, and, to the extent that the Commission is to consider such an argument, we believe it is better addressed in the context of a rulemaking of industry-wide nature.

[32] CCB Petition at 7.

[33] *See, e.g.*, ATVA and NCTC Objection at 11-12; CCB Petition at 9-10; DIRECTV Petition at 46-53; Newsmax Objection at 13-16; State Cable Petition at 51-54; Public Interest Petition at 46-47.

[34] EchoStar Petition at 24 (internal citations omitted); *but see* CAR Comments at 1 ("More specifically, the applications evidence Nexstar's core commitment to the public interest in viewpoint diverse programming and unbiased, fact-based news.").

content and further "enable Nexstar to replace independent local news with corporate 'must run' segments to further its own political agenda."[35] Likewise, Newsmax Media, Inc. (Newsmax) asserts that "[r]etransmitting the same news—which will likely be weaker, less local, and more national—on an additional weak station does nothing to provide public interest benefits."[36]

14. Other Petitioners and Opposing Commenters raise concerns related to the labor market. For example, Newsmax asserts that it is not possible to achieve the kind of savings that the Applicants claim (i.e., "annual net synergies of approximately $300 million from a combination of revenue synergies and net operating expense reductions[]"),[37] without "ending the employment of journalists and news producers necessary to provide essential news programming."[38] In addition, the Public Interest Petitioners assert that the Transaction would extend Nexstar's "dominant position in local labor markets," resulting in fewer potential employers for broadcast technicians, reduced wages, and layoffs.[39] Similarly, with respect to the Indianapolis DMA, CCB asserts that the proposed combination would "distort the broadcast television employment market," leaving Nexstar, as the dominant competitor, "able to attract the best talent in the market, further harming any other broadcaster's ability to compete."[40]

15. As discussed more fully below, in their Opposition, the Applicants initially assert that each of the pleadings filed as petitions fail to establish standing.[41] The Applicants reiterate the arguments made in their Applications that the Transaction will produce significant public interest benefits, including ushering in a combined company that will provide more "flexibility and better resources to build upon the Applicants' established commitment to locally-focused programming, independent news coverage, and critical emergency information while navigating a rapidly changing video landscape that features intense competition from the largest technology and media companies in the world."[42] Further, the Applicants note that significant advantages will accrue to the TEGNA stations once they have access to Nexstar's Washington, DC, news bureau and state capital news bureaus, as well as its Aggregated Content Team (ACT), which serves to "collect and distribute stories of interest from Nexstar's local stations around the country."[43] In addition, the Applicants state that the "Transaction also will allow Nexstar to accelerate the

---

[35] State Cable Petition at 53.

[36] Newsmax Objection at 16.

[37] *See* Press Release, Nexstar Media Group, Inc. Enters into Definitive Agreement to Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction, (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/.

[38] *See* Newsmax Objection at 8; *see also* State Cable Petition at 48 ("Similarly, Applicants emphasize the 'operational efficiencies,' 'economies of scale,' and the ability to 'reduce costs' following the Transaction, but provide no explanation of how these benefits will materialize in practice and at what cost to local journalism. In reality, Nexstar has used its station acquisitions to make significant job cuts and centralize its production of 'local' news content.") (internal citations omitted).

[39] *See* Public Interest Petition at 51-59. Public Interest Petitioners are comprised of Free Press, the National Association of Broadcast Employees and Technicians - Communications Workers of America (NABET-CWA), The NewsGuild - Communications Workers of America (TNG-CWA), and the United Church of Christ Media Justice Ministry (UCC Media Justice), along with Public Knowledge.

[40] CCB Petition at 8.

[41] Consolidated Opposition of Applicants to Petitions to Deny and Comments at 5-15 (filed Jan. 15, 2026) (Applicants Opposition). For the discussion on standing, see *infra* Section V.

[42] Applicants Opposition at i.

[43] *Id*. at 21-23. In particular, according to the Applicants, the ACT "provides Nexstar's stations with the resources to cover major news events that impact their communities, such as natural disasters, breaking news, and sporting events, through the lens of a local news station." *Id*. at 23. As an example, the Applicants provide that "when a shooter opened fire in a Brown University classroom in December 2025, it affected not only students and faculty in Providence, Rhode Island, but also parents and alumni across the country. The ACT was able to coordinate

(continued….)

shift to ATSC 3.0 for those TEGNA stations that are not already equipped for the next generation broadcast television standard."[44]  Finally, the Applicants state that "local advertisers in the DMAs where Nexstar's stations operate will benefit from Nexstar's integration of TEGNA's digital ad sales platform (Premion) for providing premium connected TV ('CCTV') and over-the-top ('OTT') impressions for local and regional advertisers."[45]  They also contest arguments regarding retransmission consent and spot advertising.[46]  Regarding compliance with the Commission's rules, the Applicants maintain that the Commission has authority to waive the National Television Ownership Rule and that the Applicants have demonstrated that it is in the public interest to do so.[47]  The Applicants also reassert that the public interest would be served by granting Applicants' proposal to form or acquire Duopolies in seventeen DMAs and by granting their requests for waiver of the Local Television Ownership Rule to own more than two television stations in twenty-three DMAs.[48]

16.    We received fourteen timely filed reply pleadings,[49] with some filings supporting the Transaction,[50] and others reiterating their opposition.[51]  After the pleading cycle ended, we received multiple *ex parte* and other submissions.[52]

---

(Continued from previous page)

coverage from Nexstar's WPRI in Providence to help Nexstar's stations serving other affected communities tell this story through a local lens."  *Id*. at 23-24.

[44] *Id*. at 24-25 (internal citations omitted).

[45] *Id*. at 26 (internal citations omitted).

[46] *Id*. at 38-53.

[47] *Id*. at 54-72.

[48] *Id*. at 29-37.

[49] Due to severe weather, the Commission's Headquarters was closed from Monday, January 26 to Tuesday, January 27, 2026.  We therefore accept as timely the replies from Public Interest Petitioners and Digital First Project filed after the reply date established by the *Pleading Cycle Public Notice*.  *See* 47 CFR § 1.4.

[50] Comments of Sinclair Inc. (filed Jan. 15, 2026) (Sinclair Reply); Reply Comments of Digital First Project (filed Jan. 27, 2026) (DFP Reply); Reply Comments of the Center for American Rights (filed Jan. 26, 2026) (CAR Reply), (together, with CAR Comments, the Supporting Commenters).

[51] Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Jan. 2, 2026) (Jan. 2, 2026 OMI Reply); Letter from Keith J. Leitch, President, One Ministries, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 25-331 (filed Jan. 15, 2026) (Jan. 15, 2026 OMI Reply); Reply to Opposition of United Church of Christ Media Justice Ministry et al. (filed Jan. 27, 2026) (Public Interest Petitioners Reply); Reply to Opposition of CCB License, LLC (filed Jan. 26, 2026) (CCB Reply); Reply of Broadband Communications Association of Pennsylvania et al. (filed Jan. 26, 2026) (State Cable Petitioners Reply); Reply to Opposition of DIRECTV, LLC (filed Jan. 26, 2026) (DIRECTV Reply); Reply Comments of NTCA—The Rural Broadband Association (filed Jan. 26, 2026) (NTCA Reply); Reply of EchoStar Corporation (filed Jan. 26, 2026) (EchoStar Reply); Reply of Newsmax Media, Inc. (filed Jan. 26, 2026) (Newsmax Reply); altafiber Jan. 26 Reply; Reply Comments in Support of CCB Petition to Deny of the National Association of Black Owned Broadcasters (NABOB) and the Multicultural Media, Telecom and Internet Council (MMTC) (filed Jan. 23, 2026).

[52] *See, e.g*., Letter from AFT et al. to Chairman Brendan Carr, FCC, MB Docket No. 25-331 (filed Jan. 27, 2026); *Ex Parte* Letter of the Center for American Rights, MB Docket Nos. 25-331 and 17-318 (filed Feb. 6, 2026) (CAR Feb. 6 *Ex Parte* Letter); *Ex Parte* Letter of TIG Advisors LLC, MB Docket Nos. 25-331 and 17-318 (filed Feb. 9, 2026); *Ex Parte* Letter of State Cable Petitioners (filed Feb. 9, 2026) (State Cable Petitioners Feb. 9 *Ex Parte* Letter); CAR Feb. 11 *Ex Parte* Letter; Letter from Reps. Wesley Bell, Troy A. Carter, Sr., Steven Horsford, and Robin L. Kelly, U.S. House of Representatives, to Hons. Brendan Carr, Anna Gomez, and Olivia Trusty, FCC, MB Docket Nos. 25-331, 22-459, and 17-318 (filed Feb. 20, 2026); *Ex Parte* Letter of Cincinnati Bell Extended Territories LLC dba altafiber and Hawaiian Telecom Services Company, Inc., MB Docket Nos. 17-318, 25-322, and 25-331 (filed Feb. 20, 2026) (regarding meeting with Commissioner Trusty's office); *Ex Parte* Letter of Cincinnati Bell Extended Territories LLC dba altafiber and Hawaiian Telecom Services Company, Inc., MB Docket Nos. 17-

(continued….)

## III.    STANDARD OF REVIEW AND PUBLIC INTEREST FRAMEWORK

17.    Pursuant to section 310(d) of the Communications Act of 1934, as amended (the Act),[53] we must determine whether the proposed transfer of control to Nexstar of licenses and authorizations held and controlled by TEGNA will serve the public interest, convenience, and necessity. In making this determination, we first assess whether the proposed transaction complies with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[54]

18.    If the proposed transaction does not violate a statute or rule, we then consider whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[55] Our competitive analysis, which forms an important part of the public interest evaluation, is informed by, but not limited to, traditional antitrust principles.[56] The United States Department of Justice has independent authority to examine the competitive impacts of proposed mergers and transactions involving transfers of Commission licenses, but the Commission's competitive analysis under the public interest standard is somewhat broader, and often takes a more extensive view of potential and future competition and its impact on the relevant markets.[57] Notably, the

(Continued from previous page)

318, 25-322, and 25-331 (filed Feb. 20, 2026) (regarding meeting with Commissioner Gomez's office); *Ex Parte* Letter of DIRECTV (filed Feb. 24, 2026) (DIRECTV Feb. 24 *Ex Parte*); Optimum *Ex Parte* Letter; DIRECTV Mar. 2 *Ex Parte*; *Ex Parte* Letter of Nexstar Media Group, Inc. (filed Mar. 3, 2026); *Ex Parte* Letter of DIRECTV (filed Mar. 6, 2026) (DIRECTV Mar. 6 *Ex Parte*); *Ex Parte* Letter of DIRECTV (filed Mar. 9, 2026) (DIRECTV Mar. 9 *Ex Parte*); State Cable Petitioners Mar. 9 *Ex Parte* Letter; *Ex Parte* Letter of National Hispanic Media Coalition (filed Mar. 16, 2026); *Ex Parte* Letter of DIRECTV (filed Mar. 16, 2026) (DIRECTV Mar. 16, 2026 *Ex Parte*). *See also* Reply to Opposition to Application for Review of Cincinnati Bell Extended Territories (dba altafiber), MB Docket No. 25-331 (filed Feb. 9, 2026) (altafiber Feb. 9 Reply). We note that the altafiber Feb. 9 Reply is a reply in a pending good-faith retransmission consent proceeding and therefore we decline to address it herein.

[53] 47 U.S.C. § 310(d). Section 310(d) of the Act requires that we consider applications for transfer of Title III licenses under the same standard as if the proposed transferee were applying for licenses directly under section 308 of the Act, 47 U.S.C. § 308. *See, e.g.*, *Applications of Level 3 Communications, Inc. and CenturyLink, Inc. for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 32 FCC Rcd 9581, 9585, para. 8 (2017) (*CenturyLink-Level 3 Order*); *Application of Verizon Communications Inc. and Straight Path Communications, Inc. for Consent to Transfer Control of Local Multipoint Distribution Service, 39 GHz, Common Carrier Point-to-Point Microwave, and 3650-3700 MHz Service Licenses*, Memorandum Opinion and Order, 33 FCC Rcd 188, 189, para. 5 & n.11 (WTB 2018) (*Verizon-Straight Path Order*); *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10442, para. 23 & n.71 (2013) (*Alaska Wireless-GCI Order*).

[54] 47 U.S.C. § 310(d); *Applications for Consent to the Transfer of Control of Paramount Global,* Memorandum Opinion and Order, 40 FCC Rcd 5689, 5701, para. 25 (2025); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 8; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 5; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[55] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 5; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[56] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para. 9; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 6; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 25; *see also Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 947 (1st Cir. 1993) (public interest standard does not require agencies "to analyze proposed mergers under the same standards that the Department of Justice . . . must apply").

[57] *See, e.g.*, *Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio Holdings Inc., Transferor to Sirius Satellite Radio Inc., Transferee*, MB Docket No. 07-57, Memorandum Opinion and Order and Report and Order, 23 FCC Rcd 12348, 12365-66, para. 32 (2008); *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5674, para. 21 (2007) (*AT&T-BellSouth Order*); *Applications of Nextel Communications, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations, File Nos. 0002031766, et al.*, WT Docket No. 05-63, Memorandum Opinion and Order, 20 FCC Rcd 13967, 13978, para. 22 (2005) (*Sprint-Nextel*

(continued….)

Commission has determined it may impose and enforce transaction-related conditions to ensure that the public interest is served by the transaction.[58]

19.     If we determine that a transaction raises no public interest harms or that any such harms have been ameliorated by the Commission-imposed conditions or by voluntary commitments, we next consider a transaction's public interest benefits.  Applicants bear the burden of proving those benefits by a preponderance of the evidence.[59]  As part of our public interest authority, we may impose conditions to ensure for the public the transaction-related benefits claimed by the Applicants.[60]

20.     Finally, if we are able to find that transaction-related conditions are able to ameliorate any public interest harms and the transaction is in the public interest, we may approve the transaction as so conditioned or agreed.[61]  In contrast, if we are unable to find that a proposed transaction even with such conditions serves the public interest or if the record presents a substantial and material question of fact, then we must designate the application for hearing.[62]

## IV.     QUALIFICATIONS OF APPLICANTS AND COMPLIANCE WITH COMMUNICATIONS ACT AND FCC RULES AND POLICIES

21.     Section 310(d) of the Act requires that the Commission make a determination as to

---

(Continued from previous page) ───────────────────

*Order*); *Applications of AT&T Wireless Services, Inc. and Cingular Wireless Corporation for Consent to Transfer Control of Licenses and Authorizations, File Nos. 0001656065, et al.; Applications of Subsidiaries of T-Mobile USA, Inc. and Subsidiaries of Cingular Wireless Corporation for Consent to Assignment and Long-Term De Facto Lease of Licenses, File Nos. 0001771442, 0001757186, and 0001757204; Applications of Triton PCS License Company, LLC, AT&T Wireless PCS, LLC, and Lafayette Communications Company, LLC for Consent to Assignment of Licenses, File Nos. 0001808915, 0001810164, 0001810683, and 50013CWAA04*, WT Docket Nos. 04-70, 04-254, and 04-323, Memorandum Opinion and Order, 19 FCC Rcd 21522, 21545, para. 42 (2004) (*Cingular-AT&T Wireless Order*).

[58] *See, e.g.*, *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9141, para. 22 (2015) (*AT&T-DIRECTV Order*); *Comcast-NBC Universal Order*, 26 FCC Rcd at 4249, para. 25; *Application of EchoStar Communications Corp., (A Nevada Corp.), General Motors Corp., and Hughes Electronics Corp (Delaware Corps.) (Transferors) and EchoStar Communications Corp. (A Delaware Corp.) (Transferee)*, Hearing Designation Order, 17 FCC Rcd 20559, 20575, para. 27 (2002) (*EchoStar-DIRECTV HDO*); *see also Application of WorldCom, Inc. and MCI Commc'ns Corp. for Transfer of Control of MCI Communications Corporation to WorldCom, Inc.*, Memorandum Opinion and Order, 13 FCC Rcd 18025, 18032, para. 10 (1998) (stating that the Commission may attach conditions to the transfers); *Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578, 10596, para. 42 (2019) (*T-Mobile-Sprint Order*).

[59] 47 U.S.C. § 309(e); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 10; *Verizon-Straight Path Order*, 33 FCC Rcd at 190-91, para. 7; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[60] *See, e.g.*, *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 26; *Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements*, Memorandum Opinion and Order, 24 FCC Rcd 13915, 13929, para. 30 (2009).

[61] *See, e.g.*, *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 11; *Verizon-Straight Path Order*, 33 FCC Rcd at 191, para. 8.

[62] 47 U.S.C. § 309(e); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586-87, para. 11; *Verizon-Straight Path Order*, 33 FCC Rcd at 191, para. 8; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10444, para. 27.  Section 309(e)'s requirement applies only to those applications to which Title III of the Act applies. *ITT World Communications, Inc. v. FCC*, 595 F.2d 897, 901 (2d Cir. 1979); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586-87, para. 11 & n.37.

whether the Applicants have the requisite qualifications to hold Commission licenses.[63]  Among the factors the Commission considers in its public interest review is whether the applicant for a license has the requisite "citizenship, character, financial, technical, and other qualifications."[64]  Therefore, as a threshold matter, the Commission must determine whether the applicants to a proposed transaction meet the requisite qualification requirements to hold and transfer licenses under section 310(d) of the Act and the Commission's rules.[65]

### A. Applicants' Qualifications

22.  No party has raised an issue with respect to the basic qualifications of the Applicants.  Accordingly, pursuant to Commission precedent,[66] we find that there is no reason to reevaluate the requisite citizenship, character, financial, technical, or other basic qualifications of Nexstar or TEGNA under the Act or our rules, regulations, and policies.[67]

23.  *Current Renewals.*  It is Commission policy, in multi-station, multi-market transactions, to grant transfer of control applications while renewal applications are pending as long as there are no basic qualification issues pending against the transferor or transferee that could not be resolved in the context of the transfer proceeding, and the transferee explicitly assents to standing in the stead of the transferor in the pending renewal proceeding.[68]  To the extent any TEGNA licensees have pending license renewals, none of these renewals present a basic character qualification issue.  Nexstar has submitted a statement explicitly agreeing to stand in the stead of the transferor in any renewal application that is pending at the time of the consummation of the transfer.[69]  Therefore, we will apply the policy set out in *Shareholders of CBS* to those applications.

### B. Compliance with the Communications Act and FCC Rules and Policies

24.  As discussed below, we grant the Applicants' request for a waiver of the Commission's National Television Ownership Rule.[70]  In the seventeen DMAs where Nexstar proposes to form or acquire a combination of two full power television stations, we find that these combinations will permit

---

[63] 47 U.S.C. § 310(d).

[64] 47 U.S.C. §§ 308, 310(d); *see also T-Mobile-Sprint Order*, 34 FCC Rcd at 10596, para. 43; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 24; *Applications Filed by Qwest Communications International, Inc. and CenturyTel, Inc. d/b/a CenturyLink for Consent to Transfer Control*, WC Docket No. 10-110, Memorandum Opinion and Order, 26 FCC Rcd 4194, 4201, para. 11 (2011) (*CenturyLink-Qwest Order*); *AT&T-BellSouth Order*, 22 FCC Rcd at 5756, paras. 190-91.

[65] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10596, para. 43; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 24; *CenturyLink-Qwest Order*, 26 FCC Rcd at 4201, para. 11; *AT&T-BellSouth Order*, 22 FCC Rcd at 5756, para. 191.  The Commission generally does not reevaluate the qualifications of transferors unless issues related to basic qualifications have been sufficiently raised in petitions to warrant designation for hearing.  *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 45; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 25.

[66] *See supra* note 65.  With respect to the *WPIX NAL* proceeding discussed *infra* note 100, State Cable Petitioners assert that "Nexstar failed to disclose to the Commission in the WPIX matter that it exercised total retransmission consent negotiation authority over the station" and that the Applicants "make no mention of this prior lack of candor" in the instant Transaction.  State Cable Petition at n.131.  We dismiss this allegation as the *WPIX NAL*, as discussed *infra* note 100, raised no character issues.  Therefore, the Applicants had no duty of candor to raise this issue in the instant Transaction.

[67] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10597, para. 44; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9142, para. 25.

[68] *Shareholders of CBS Corporation*, Memorandum Opinion and Order, l6 FCC Rcd 16072, 16072-73 (2001).

[69] *Nexstar Localism Commitment Letter* at 3.

[70] 47 CFR § 73.3555(e) (National Television Ownership Rule).

Nexstar to better serve its local viewers while at the same time complying with the Commission's Local Television Ownership Rule and grant them herein. Regarding Nexstar's proposed ownership of more than two full power television stations in twenty-three DMAs,[71] we grant the Applicants' requests for waiver of the Commission's Local Television Ownership Rule, subject to the divestitures Nexstar has committed to make.[72]

### 1.    National Television Ownership Rule

25.      While the Communications Act itself does not set any limit on broadcast ownership, the FCC has long had rules in place restricting the ownership of broadcast stations to promote its core public interest goals of competition, localism, and diversity. The Commission created the National Television Ownership Rule in 1941 as a rule under the statute's public interest standard. Since it was promulgated originally, the limit on national television ownership has become less restrictive as television licensees have required greater flexibility to respond to the marketplace changes confronting the broadcast industry. During the earliest days of television, the Commission's first, and most restrictive, ownership limits prohibited an entity from owning, operating, or controlling more than three television stations nationwide.[73]

26.      As technology and the media landscape changed, the restriction on national ownership was relaxed accordingly. The Commission's current National Television Ownership Rule—adopted twenty years ago[74]—prohibits a commercial television licensee from having a cognizable interest in television stations that have an aggregate national audience reach above 39%, or up to a maximum of 78% using the UHF discount, which attributes to a UHF television station only 50% of the households in the station's Nielsen Designated Market Area (DMA).[75] While the Commission long ago rejected competition and diversity concerns as a justification for the rule, the rule was last retained in order to promote localism.[76]

27.      Over the last two decades, the media landscape has shifted dramatically, as a plethora of video distribution technologies have come to market at a pace that eclipsed all changes that came before.

---

[71] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio of Mid-Missouri, Inc. v. FCC et al.*, 145 F.4th 828 (8th Cir. 2025) (*Zimmer Radio*)) (Local Television Ownership Rule). These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline. The divestitures Nexstar has committed to making in Indianapolis and Norfolk-Portsmouth-Newport News would result in it owning two full power television stations in those DMAs.

[72] *Nexstar Localism Commitment Letter* at 2.

[73] *Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2284-85 (May 6, 1941).

[74] *Implementation of Section 629 of the Consolidated Appropriations Act, 2004 (National Broadcast Television Ownership)*, Order, 22 FCC Rcd 4245, 4245-46, paras. 1-3 (2006) (*Order Implementing the CAA*).

[75] 47 CFR § 73.3555(e). Section 73.3555(e)(1) states that "[n]o license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent." Section 73.3555(e)(2) defines national audience reach as "the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license" and provides that "[f]or purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA."

[76] *2002 Biennial Review Order*, 18 FCC Rcd at 13828-45, para. 538-84 (retaining a national cap but raising it from 35% to 45%).

Viewers can now access video content online through streaming platforms, podcasts, video sharing sites, and virtual MVPDs. Indeed the current media marketplace is thriving. Recent data show that there are 15,686 radio stations; 1,777 television stations;[77] 35.3 million cable subscribers; 13.7 million DBS subscribers; 5.1 million telephone company video subscribers;[78] at least 193 nationally-distributed non-broadcast networks;[79] and roughly 2.3 million U.S. podcast shows.[80] Approximately 121 million U.S. households subscribe to an Internet access provider,[81] and the Internet offers approximately 200 million active websites, with 252,000 new websites created daily.[82] Although traditional MVPD subscribership has been in decline since 2012, when it reached 101.6 million subscribers,[83] 83% of U.S. adults now access video programming through streaming services.[84] Subscribership is robust for online video distributors (OVDs), which distribute video programming to consumers over the Internet and include services such as Netflix, Amazon Prime Video, Disney+, and Paramount+, among many others.[85] In addition, one recent report found that there are 1,189 free, ad-supported streaming television (FAST) channels are available over the Internet.[86]

28. In that same timeframe, we have seen significant changes in the relative market position between national networks (particularly the Big Four networks (i.e., ABC, CBS, FOX, and NBC)) and their local affiliates. To maximize their national audience, these Big Four networks traditionally have acquired their own local broadcast stations (typically in the largest television markets) and entered into affiliation agreements with station owners throughout the rest of the country.[87] Through this affiliation model, the Big Four networks benefit by obtaining wide-scale delivery of their programming, and affiliates benefit by obtaining access to network programming.[88] By contrast, many local affiliates historically have aired local programming, including local news, in time slots not occupied by national network programming. Television viewers benefit from localism to the extent that their affiliated stations have the latitude and resources to produce and air local programming, as well as the incentive and ability to preempt national network programming in favor of local news or other programming that is potentially

---

[77] *Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[78] *2024 Communications Marketplace Report*, GN Docket No. 24-119, Report, 39 FCC Rcd 14116, 14256, para. 204, Fig. II.E.1 (2024) (*2024 CMR*).

[79] *See* S&P Global, *Economics of Basic Cable Networks, Ownership, 2025* (Dec. 9, 2025) (listing 193 cable networks).

[80] Beamly, *Podcast Statistics & Trends in 2026* (Jan. 1, 2026), https://beamly.com/podcast-statistics/.

[81] *See 2024 CMR*, 39 FCC Rcd at 14132-33, para. 25, Fig. II.A.11.

[82] As of October 2025, the total number of websites, including inactive sites, was over 1.2 billion. Katherine Haan, *Top Website Statistics for 2025*, Forbes (Feb. 2, 2026), https://www.forbes.com/advisor/business/software/website-statistics/.

[83] *2024 CMR*, 39 FCC Rcd at 14256, para. 204.

[84] Eugenie Park and Colleen McClain, *83% of U.S. Adults Use Streaming Services, Far Fewer Subscribe to Cable or Satellite TV*, Pew Research Center (July 1, 2025), https://www.pewresearch.org/short-reads/2025/07/01/83-of-us-adults-use-streaming-services-far-fewer-subscribe-to-cable-or-satellite-tv/.

[85] *2024 CMR*, 39 FCC Rcd at 14266-68, paras. 225-28.

[86] Gracenote, *Beyond nostalgia: Tracking FAST channel evolution and the opportunities for platforms and advertisers*, at 2 (Mar. 2025).

[87] *See, e.g.*, *2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459, Notice of Proposed Rulemaking, FCC 25-64, para. 41 (Sept. 30, 2025).

[88] *Id.*

of greater value or importance to their local audiences and better serves local needs and interests.[89] This network/affiliate model has long sought to balance two competing interests: that of broadcast networks, which are economically motivated to ensure that their programming appeals to a nationwide audience and is carried broadly by affiliates; and that of local affiliates, which are economically motivated to attract viewers and advertising dollars by tailoring their programming to the tastes of their local audiences and by inducing networks to air programming that is responsive to their communities' needs and interests.[90]

29. But times have changed. Networks do not depend on affiliates for programming distribution to the same extent as they did in the past. Now networks can reach viewers directly by placing their programming on their associated streaming platforms, such as Peacock, Disney+, Paramount+, and FOX One. The streaming services owned by the parent companies of the Big Four networks reach tens of millions of viewers.[91] As a result, the networks no longer rely solely on broadcast television stations to distribute their programming, which has resulted in reduced influence and bargaining power for local affiliates. The station licensee is ultimately responsible for all programming aired on its station, including the absolute right to preempt network programming under section 73.658(g) of the Commission's rules.[92] Any imbalance between the networks and affiliates that could jeopardize licensee control over programming is a matter of significant concern.

30. Accordingly, in light of these broader trends and based on the specific factors presented in this transaction, we find that strict application of the rule is not warranted. Instead, as discussed in greater detail below, we find both that we have the authority to waiver the National Television Ownership Rule and that a transaction-specific waiver is the best way to effectuate the FCC's traditional policy goals. Indeed, as opposed to restricting the national audience reach of station owners through an *ex ante* 39% cap, we believe that a case-by-case waiver review of such transaction in this case gives us the opportunity to analyze whether a particular transaction would benefit the public, such as through increased investment in local news coverage and other programming of local interest.

31. We now consider the record in this transaction. Several Petitioners and Opposing Commenters[93] assert that the 39% limit (National Cap) set forth in the National Television Ownership Rule became fixed by statute when Congress instructed the Commission to "modify its rules" in the Telecommunications Act of 1996[94] and, again, in the Consolidated Appropriations Act of 2004.[95] Moreover, several Petitioners argue that that the CAA's removal of the National Television Ownership Rule from the Commission's periodic review process under Section 202(h) of the 1996 Act foreclosed further changes by the Commission, because that process had "displaced the Commission's general rulemaking authority" over the broadcast ownership rules.[96] In addition, some Petitioners assert that the

---

[89] *Id.*

[90] *Id.*

[91] *See 2024 CMR*, 39 FCC Rcd at 14277-78, para. 249, Fig. II.E.11. For instance, by the third quarter of 2023, Peacock Premium had 28.4 million U.S. subscribers; Disney+ had 41.7 million; and Paramount+ had 30.7 million. *Id.* FOX One launched in August 2025 and currently has more than two million subscribers. Antenna, *State of Subscriptions Preview: Sports Officially Enters Its Streaming Era*, https://www.antenna.live/insights/state-of-subscriptions-preview-sports-officially-enters-its-streaming-era (last visited Feb. 11, 2026).

[92] 47 CFR § 73.658(g).

[93] *See, e.g.*, DIRECTV Petition at 55-59; EchoStar Petition at 7-9; ATVA and NCTC Objection at 15-16; NTCA Reply at 5-6.

[94] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(c)(1), 110 Stat. 56, 111 (1996) (1996 Act).

[95] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

[96] *See, e.g.*, State Cable Petition at 12-14; DIRECTV Petition at 58-59.

forbearance provision in section 629 of the CAA[97] prohibits the Commission from waiving the National Television Ownership Rule.[98]  Moreover, some Petitioners assert that the divestiture provision in Section 629 of the CAA establishes "divestiture" as the "exclusive remedy for violations of the Cap."[99]  Finally, some Petitioners and Opposing Commenters maintain that waiver of the National Television Ownership Rule will fail to deliver concrete benefits to viewers that are specific to the Transaction and ask the Commission to deny the request for waiver of the National Television Ownership Rule.[100]  For the reasons discussed below, we disagree with Petitioners and Opposing Commenters in all respects and find both that the Commission has the authority to waive the National Television Ownership Rule and that waiver is warranted in this Transaction.[101]

32.     *Legal Authority*.  As a preliminary matter, we find that the Commission has the authority to waive the National Television Ownership Rule.  The Commission first established a 25% National Cap on television audience reach in 1985,[102] exercising its "broad statutory authority to regulate broadcast media 'as the public convenience, interest, or necessity requires.'"[103]  In section 202(c)(1)(B) of the 1996 Act, Congress instructed the Commission to "modify its rules . . . by increasing the national audience reach limitation for television stations to 35 percent."[104]  In section 202(h), Congress also directed the Commission to review its media ownership rules every two years to determine whether they remain "necessary in the public interest as the result of competition."[105]

---

[97] *See* CAA § 629(2), 118 Stat. at 100 (amending the 1996 Act to add Section 202(c)(4) to state that "Section 10 of the Communications Act of 1934 (47 U.S.C. § 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations").

[98] *See, e.g.*, DIRECTV Petition at 55-56; State Cable Petition at 14.

[99] *See* State Cable Petition at 24-25.

[100] *See, e.g.*, State Cable Petition at 22-23; ATVA and NCTC Objection at 17-18.  We acknowledge State Cable Petitioners' claim that there is a pending proceeding in which the Commission found that Nexstar apparently violated the Commission's rules, including the National Television Ownership Rule, when Nexstar assumed *de facto* control over WPIX, one of the stations it was required to divest to come into compliance with the rule in the *Nexstar*/*Tribune* transaction.  *See Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd 3676 (2024) (*WPIX NAL*); *see Applications of Tribune Media Co. (Transferor) & Nexstar Media Group, Inc. (Transferee), et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8441-42, para. 8 (2019) (*Nexstar/Tribune Order*).  State Cable Petitioners assert that the finding in the *WPIX NAL* proceeding has direct implications on Nexstar's compliance with the National Television Ownership Rule in the instant Transaction and raises substantial and material questions of fact as to whether Nexstar has been violating other ownership rules via its relationships with side car entities.  State Cable Petition at 33-35.  In light of the decision we reach here today, we determine that this argument is moot.  The *WPIX NAL* proceeding remains open, and our action today does not pre-judge or in any way prejudice any actions we may take in that proceeding.

[101] *See* CAR Reply at 1 ("The Center continues to argue the best reading of the law is that the Commission retains the power to modify its own rules, which include the national ownership cap . . . . Objectors are again looking to stitch together 'signals' of 'Congress's intent' from various bits of text and scraps of legislative history, like Roman priests judging the auguries of bird entrails."); Sinclair Reply at 3 ("There is no statutory bar to the Commission raising or eliminating the national cap through rulemaking or waiving the cap to permit specific transactions based on its conclusion that such a waiver would serve the public interest.").

[102] *Amend. of Section 73.3555(e),* MB Docket No. 13-236, Order on Reconsideration, 32 FCC Rcd 3390, 3391, paras. 3-4 (2017).

[103] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303(r)).

[104] Pub. L. No. 104-104, § 202(c)(1)(B), 110 Stat. 111 (1996).

[105] 110 Stat. 111-12.

33. After the Commission subsequently voted to raise the National Cap to 45%,[106] Congress in 2004 "amended" section 202(c)(1)(B) "by striking '35 percent' and inserting '39 percent.'"[107] Congress also modified the Commission's obligation to periodically review its media ownership rules to every four years, and removed the National Cap from that obligation.[108]

*34.* We determine that as amended, section 202(c)(1)(B) "did not directly establish [a specific percentage] limitation by statute," but "directed the Commission to revise its rules."[109] By directing the Commission to "modify its rules" to set the National Cap at 35 and then 39%, Congress left the National Cap embedded in the Commission's rules and accordingly left undisturbed the Commission's general authority to waive any of its rules for "good cause" shown.[110]

*35.* This straightforward reading of section 202(c)(1)(B) is reinforced by additional indications of statutory meaning. First, two years before the CAA was enacted, the United States Court of Appeals for the D.C. Circuit had ruled that Congress's choice of 35% in the 1996 Act did not insulate the National Cap from further changes under the biennial review process.[111] And, well before the 1996 Act, it had been settled generally that "changes in factual and legal circumstances may impose upon the [FCC] an obligation to reconsider a settled policy or explain its failure to do so."[112] Courts "normally assume that Congress is aware of relevant judicial precedent when it enacts a new statute."[113] Congress's choice to direct the Commission to "modify its rules" again in 2004 shows that it "intended the phras[ing]" to preserve the FCC's authority.[114] Second, Congress "knew exactly" how to remove the Commission's authority to waive or modify the National Cap if it so intended,[115] but chose not to do so.[116]

---

[106] *See 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 02-277 et al., Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13842-45, paras. 578-84 (2003) (*2002 Biennial Review Order*).

[107] CAA, § 629(1), 118 Stat. at 99.

[108] *Id.* § 629(3).

[109] *Amend. of Section 73.3555(e)*, MB Docket No. 13-236, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14329, para. 13 (2013); *Amend. of Section 73.3555(e),* MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213, 10220-10224, paras. 16-24 (2016) (same).

[110] 47 CFR § 1.3 ("The FCC may waive its rules 'where particular facts would make strict compliance with a rule inconsistent with the public interest.'"); *Levine/Schwab Partnership v. FCC*, 61 F.4th 183, 186 (D.C. Cir. 2023) (cleaned up).

[111] *Fox Tel. St. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002) ("First, the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change").

[112] *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992). *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 603 (1981) ("[T]he Commission should be alert to the consequences of its policies and should stand ready to alter its rule if necessary to serve the public interest more fully.").

[113] *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233-34 (2020).

[114] *Id.*

[115] *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).

[116] *See, e.g., Ex Parte* Letter of Thomas M. Johnson, Jr., MB Docket No. 17-318, at 5 (Dec. 15, 2025) (Johnson Letter) (discussing the Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, § 632(a)(1), 114 Stat. 2762, 2762A-111 (2000)). There, the Johnson Letter states, "Congress showed that it knows how to remove the FCC's discretion expressly," because Congress similarly directed the Commission to "modify [its] rules" about low-power FM radio stations, but, "in tandem with that direction," Congress told the Commission that it "may not . . . eliminate or reduce" its "minimum distance separations," except "as expressly authorized by an Act of Congress enacted after the date of the enactment of this Act." *Id.* (internal citations omitted). By comparison, as the Johnson Letter asserts, "the 1996 Act contained no such recission of the agency's discretion over the national cap,

(continued….)

Third, Congress considered and rejected language that would have codified the National Cap into statutory law, thereby eliminating the Commission's authority to waive or modify it.[117] Finally, given the dynamic nature of the broadcast market, it would have been odd for Congress to have permanently embedded an ownership limit into statute and thereby immunized a media ownership limitation from regulatory reconsideration regardless of subsequent market conditions.

36.    As discussed above, Petitioners' and Opposing Commenters' arguments to the contrary are unpersuasive.  The National Cap's removal from the quadrennial review process did not serve to codify the 39% limitation.  Section 202(h), as amended, "merely provides that the Commission is not *required* to review the national audience reach cap quadrennially, it says nothing about whether the Commission is *allowed* to review that rule at any point in time."[118]  Nor does the divestiture provision of the 2004 CAA limit the Commission's authority to waive the National Cap.  That provision requires a broadcaster "that exceeds the 39 percent" cap to divest in certain circumstances "to come into compliance with such limitation."[119]  In doing so, the provision simply sets a specific time period for compliance with the rule; it does not purport to limit the FCC's authority to waive the rule.  The rule being waived, "the divestiture provision simply does not apply," because, as to the waiver recipient, the cap itself does not apply.[120]

37.    The forbearance provision,[121] likewise, does not limit Commission authority to waive the National Cap.  That provision cross-references section 10 of the Act, which authorizes the Commission to "forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service" when the agency finds that certain criteria are met.[122]  By its terms, however, section 10 applies to "telecommunications carriers," and "telecommunications services," not broadcasters.  In any event, the Commission's forbearance and waiver authority are distinct.[123]

38.    Finally, the fact that section 629 of the 2004 CAA refers to "the 39 percent national audience reach limitation" several times is of no moment.  The language in question references the National Cap "in paragraph (1)(B)," which amends "section 202(c)(1)(B)" of the 1996 Act.  Section 202(c)(1)(B) directs the FCC to set the National Cap through its rulemaking authority, which necessarily leaves the agency with the discretion to modify or waive its rules.  The statutory references to "the 39

(Continued from previous page) ───────────────

demonstrating that Congress intended the FCC to continue to modify these rules as circumstances changed." *Id*. *See also* Comments of Nexstar Media Inc. in MB Docket No. 17-318 at n.88 & accompanying text (Aug. 4, 2025) (discussing examples of prohibitory language in the Communications Act).

[117] Johnson Letter at n.34 & accompanying text (discussing drafting history).  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).

[118] Joint Broadcasters' Reply Comments in MB Docket No. 17-318 at 12 (Aug. 22, 2025) (emphasis in original). *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 397 (3rd Cir. 2004) (recognizing that section 202(h) did not speak to the FCC's authority over the National Cap "outside the context of" that mandatory review) (subsequent history omitted).

[119] 2004 CAA § 629(2).

[120] Applicants Opposition at 64.

[121] 2004 CAA § 629(2).

[122] 47 U.S.C. § 160.

[123] *See* Applicants Opposition at 61 ("the Commission is statutorily required to make certain specific findings to support exercise of its forbearance authority that differ from the general good cause standard that applies to waiver requests."), and "where Congress has intended to address the FCC's waiver authority, it has used the term waiver, not the term forbearance." *Id.* (citing 47 U.S.C. §§ 621(b)(3)). *See* 1996 Act, § 202(d) (specifically addressing Commission's "waiver policy" for "one-to-a-market" ownership rules).

percent national audience reach limitation in paragraph (1)(B)" simply reflect that, at the time Congress enacted the 2004 CAA, it had directed the Commission to revise its rules to reset the National Cap to that level.

39.     The Commission's conclusion that the 39% rule is in fact a rule—rather than a statutory limit—is reinforced by a Court of Appeals decision. The U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded that decision in 2002, finding that the Commission had failed to demonstrate that the 35% cap advanced localism, diversity, or competition.[124] The court stated that Congress' decision to set the cap at 35% did not require deference because "the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change."[125]

40.     *Waiver Request*. In support of their request for waiver of the National Television Ownership Rule, the Applicants assert that depriving Nexstar of the ability to "maintain and grow its local news and other programming" undermines "localism by increasing the likelihood that local broadcast stations will be replaced by automated and filtered non-local content provided by Big Tech."[126] They argue that the Transaction will enhance localism by allowing Nexstar to build on the current model of Nexstar and TEGNA of developing "strong local stations that are responsive to the needs of their communities and supporting them with the regional and national programming and journalistic resources that can only come with enhanced scale."[127]

41.     Further, the Applicants provide that "Nexstar has a proven history of improving service to the public when adding stations to its portfolio."[128] In addition, the Transaction will "deliver specific benefits in each of the new DMAs where Nexstar will operate by shoring up the long term viability of those stations, fueling Nexstar's ability to continue investing in fact-based, independent journalism."[129] The Applicants also note that the acquired TEGNA stations will gain access to Nexstar's Washington, DC bureau, and state capitol bureaus, both the Nexstar and TEGNA stations will benefit from their ability to share coverage across stations and markets, and Nexstar will gain access to TEGNA's Premion platform.[130]

---

[124] *See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1040-49 (*Fox I*), *modified on reh'g*, 293 F.3d 537 (*Fox II*) (D.C. Cir. 2002).

[125] *Fox I*, 280 F.3d at 1042-43.

[126] Comp. Exh. at 116.

[127] *Id*.

[128] *Id*. at 115. For example, the Applicants provide that in connection with Nexstar's acquisition of Tribune in 2019, Nexstar "identified several specific ways in which its ownership of the Tribune stations would benefit the public," such as providing localized coverage of national affairs; improving coverage of state government affairs; and enhancing news, public affairs, and emergency programming from reinvestment in local stations. *Id*. at 10-11. The Applicants assert that Nexstar delivered on each of the benefits, meeting or exceeding those described in Nexstar's applications filed in connection with the *Nexstar/Tribune* transaction. *Id*. at 11. In contrast to claims in the record that "[c]onsiderable evidence shows that Applicants' past mergers have led to a reduction in output and quality in local news," *see* DIRECTV Reply at 21, Nexstar states that in the "five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence. During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%)." *Nexstar Localism Commitment Letter* at 1-2.

[129] *Id*. at 115.

[130] *Id*.; Applicants Opposition at 69.

42.     The Commission's rules may be waived for good cause shown.[131]  When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[132]  Waiver is appropriate "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[133]  In making this determination, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[134]

43.     We find that the waiver standard is met and special circumstances warrant grant of the waiver of the National Television Ownership Rule in this Transaction.[135]  First, we find that by enabling Nexstar to achieve the scale needed to sustain its operations, the Transaction will deliver concrete public interest benefits with respect to localism.[136]  For example, we find that Nexstar will be better positioned to "acquire and retain the rights to popular content, such as live sports and entertainment programming," which "it will make available to viewers over-the-air for free."[137]  We also agree with the Applicants that the Transaction will produce specific benefits to viewers, including increased access by the acquired TEGNA stations to Nexstar's Washington, DC, news bureau and state capital news bureaus, access by TEGNA's stations to Nexstar's ACT, and Nexstar's access to TEGNA's Premion platform.[138]  Importantly, the Applicants provide that these shared resources will allow local reporters and crews to provide "wider and/or more in-depth coverage of stories occurring within the stations' local communities."[139]

44.     Second, the Applicants provide that combining Nexstar with TEGNA "provides the only hope to achieve the scale needed to sustain operations."[140]  In further support, before the Transaction was negotiated, the Applicants point to TEGNA's plans to reduce costs and consolidate certain operations, as "part of its extensive cost-containment efforts."[141]  The Applicants state that when the "possibility of a

---

[131] 47 CFR § 1.3.

[132] *WAIT Radio v. FCC*, 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969).

[133] *See Northeast Cellular*, 897 F.2d at 1166 (citing *WAIT Radio*, 418 F.2d at 1159)); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008).

[134] *Northeast Cellular*, 897 F.2d at 1166.

[135] *CCB Order* at  n.27 ("The Commission previously has granted a permanent waiver of its multiple ownership rules," citing *Fox Television Stations Inc*., Declaratory Ruling, 8 FCC Rcd 5341 (1993) (permanent waiver of the newspaper/broadcast cross-ownership rule)).  *See also* CAR Feb. 11 *Ex Parte* Letter at 1 (disputing the assertion of the State Cable Petitioners that it was a novel legal question whether the Commission has authority to modify the National Cap and pointing out that the Commission has taken the position in the past that it does have that authority.).

[136] In the Commission's 2003 decision to retain the National Cap, the Commission reasoned that it was "necessary to promote localism on broadcast television" and found that a "cap is necessary to protect localism by preserving a balance of power between networks and affiliates . . . ." *See 2002 Biennial Regulatory Review*, 18 FCC Rcd at 13828, para. 539.  *See also* Sinclair Reply at 7 ("Broadcasters' ability to preserve and expand local news turns *entirely* on the economics of the broadcast industry and individual broadcasters within the industry.") (emphasis in the original).

[137] *See* Applicants Opposition at 68-69.  *See also FCC's Media Bureau Seeks Comment on Sports Broadcasting Practices and Marketplace Developments*, MB Docket No. 26-45, Public Notice, DA 26-188 (MB Feb. 25, 2026) (acknowledging that "sports remain inherently local" as well as the "frustration among many consumers and sports fans" over the shift in availability of sporting events from free broadcast and traditional pay-TV packages to stand-alone subscription streaming services).

[138] Applicants Opposition at 69.

[139] *Id*.

[140] *Id*. at 68.

transformative merger or acquisition such as the Transaction came about, TEGNA paused its implementation of these plans."[142]  By providing TEGNA stations with the full panoply of resources available to Nexstar's stations, we find that the combined company will better serve its local communities.  In addition, to further serve its local communities, Nexstar commits to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and "increase[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[143]  Nexstar also plans to expand the local news it provides in nine markets.[144]

45.     Finally, we find that the combination provided by the Transaction will help preserve Nexstar's ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community.  Therefore, we find that strict compliance with the National Television Ownership Rule would be inconsistent with the purpose of the National Television Ownership Rule—enhancing localism—and, therefore, inconsistent with the public interest.[145]  The FCC is taking many actions to empower local broadcast television stations to serve the public interest, and this grant of the Applicants' request for waiver of the National Television Ownership Rule will help do just that.

## 2.     Local Television Ownership Rule

46.     The Local Television Ownership Rule provides that an entity may own two television stations licensed in the same DMA if:  "(i) the digital noise limited service contours of the stations . . . do not overlap; or (ii) at the time the application to acquire . . . the station(s) is filed, at least one of the stations is not ranked among the top-four stations in the DMA, based on the Sunday to Saturday, 7 a.m. to 1 a.m. daypart audience share ratings averaged over a 12-month period immediately preceding the date of the application, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service."[146]  Following *Zimmer Radio*'s vacatur of the latter provision—the Top-Four Prohibition—we have determined that ownership of any two stations in a single DMA is rule compliant.[147]  Ownership of more than two stations, however, is impermissible, unless the Commission finds good cause to waive application of the Local Television Ownership Rule.[148]

47.     In this section, we consider whether the Applicants' proposals to form or acquire Duopolies in seventeen DMAs, as well as their requests for waiver of the Local Television Ownership Rule to permit Nexstar to own more than two full power television stations in twenty-three DMAs, serve the public interest.[149]  Regarding the proposed Duopolies, several Petitioners and Opposing Commenters

---

(Continued from previous page) ————————————

[141] *Id*. at 20, 70.

[142] *Id*. at 20.

[143] Nexstar Localism Commitment Letter at 2.

[144] *Id*.  These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo. *Id*. at n.1.

[145] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13815, 13842, paras. 501, 578 (finding that while a National Cap was no longer needed to protect diversity or competition, a cap remained necessary to promote localism).

[146] 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio*).  We will refer to the numerical ownership limit of the Local Television Ownership Rule as the "Two-Station Limit."

[147] *Sinclair-Cunningham-Roberts Letter Order; Letter from Chief, Video Division to Sinclair, Inc., et al.*, Letter Order, DA 26-177 (MB Feb. 20, 2026) (*application for review pending*).

[148] *See CCB Order* at paras. 9-11.

[149] *See supra* note 4.

assert that nothing in *Zimmer Radio* alters the Applicants' affirmative obligation to demonstrate that ownership of two top-four stations in a DMA serves the public interest.[150]  Moreover, with respect to the twenty-three DMAs where the Applicants seek waivers for Nexstar to own more than two full power television stations, several Petitioners and Opposing Commenters assert that Applicants have failed to provide actual evidence of the public interest benefits in each of the twenty-three DMAs,[151] and others assert that the Transaction will harm local news in those DMAs.[152]

48.       *Duopolies*.  We find that the proposed Duopolies[153] fully comply with the Commission's rules, including the post-*Zimmer Radio* Local Television Ownership Rule.[154]  Further, as discussed below, we find that there are no cognizable public interest harms identified in the record that would require further consideration of these station combinations.[155]  Accordingly, we conclude that grant of the Duopolies will serve the public interest, convenience, and necessity.

49.       *More than Two Full Power Television Stations*.  In addition, the Applicants propose that Nexstar would own more than two full power television stations in twenty-three DMAs and, therefore, seek waivers of the Local Television Ownership Rule.[156]  In their waiver requests, the Applicants argue that, as a general matter, application of the Local Television Ownership Rule would "contravene the purpose of the rule and hinder the competition" that the rule was "intended to promote."[157]  They assert that, post-Transaction, competition in these DMAs will continue to be "fierce," with at least four,[158] and as many as fifteen,[159] full power television stations competing "for viewer attention and the advertising

---

[150] *See* DIRECTV Petition at 4; ATVA and NCTC Objection at 4.

[151] *See, e.g.*, Public Interest Petition at 68-132; State Cable Petitioners Reply at 17; DIRECTV Reply at 36-37. Moreover, regarding Public Interest Petitioners' claim that Applicants should have submitted requests for waiver of the Local Television Ownership Rule to allow for ownership of more than two stations in the Austin and Waco-Temple-Bryan DMAs, we dismiss this claim.  *See* Public Interest Petition at 132-34.  The Commission's rules exempt from the Local Television Ownership Rule full power television stations that have Commission authorization to operate as a satellite.  *See* 47 CFR § 73.3555, Note 5.

[152] *See, e.g.*, Public Interest Petition at 68-132; Newsmax Objection at 15-16.

[153] Comp. Exh. at 18, nn. 74-75. These DMAs are:  Atlanta; Seattle-Tacoma; Jacksonville; Tucson (Sierra Vista); Spokane; Waco-Temple-Bryan; San Angelo; Sacramento-Stockton-Modesto; Austin; Columbus; Harrisburg-Lancaster-Lebanon-York; Greensboro-High Point-Winston Salem; Wilkes-Barre-Scranton-Hazelton; Knoxville; Tyler-Longview (Lufkin & Nacogdoches); Odessa-Midland; and Abilene-Sweetwater.  *Id*. at nn. 74-75.

[154] *See Sinclair-Cunningham-Roberts Letter Order* at 8 ("Where the Commission has adopted a specific, numerical ownership limit, as it has with the Two-Station Limit, an applicant satisfies its initial burden of showing that the transaction is in compliance with the Act and the Commission's rules and policies related to competition and diversity by correctly certifying compliance with that limit.").

[155] *Id*. at 8-9 ("A more detailed showing is necessary only if the applicant is seeking a waiver, if a petitioner raises cognizable potential public interest harms, or if the Commission, on its own review, determines that additional information is required to process the application.") (internal citations omitted).  We note that some Opposing Commenters raise concerns with Nexstar's ownership of the proposed top-four duopolies, which we dismiss herein. *See, e.g.*, Newsmax Objection at 12 ("Nexstar should not be permitted to further capture the local advertising market even where its proposed transaction would not violate the Commission's rules, such as markets where Nexstar proposes to hold two of the top-4 stations in a local market.").  For a discussion of the potential harms associated with the Transaction, see *infra* Section VI.A.

[156] These DMAs are:  Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; Indianapolis; San Diego; Grand Rapids-Kalamazoo-Battle Creek; Norfolk-Portsmouth-Newport News; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Davenport-Rock Island-Moline; Fort Smith-Fayetteville-Springdale-Rogers; Denver; Hartford & New Haven; and New Orleans.
[157] Comp. Exh. at 19.

[158] *Id.* at 102 (Huntsville-Decatur (Florence) DMA)).

dollars that fuel local news and information programs"[160] and that grant of their waiver requests will "strengthen the competitive position of the stations currently owned and operated by Nexstar and TEGNA, particularly against the companies that are working feverishly to disrupt the way local media is consumed."[161] The Applicants state that in "each DMA where [they] are seeking a waiver of the [Local Television Ownership Rule], core revenue is stagnant or falling" and contend that "[s]eparately, neither Nexstar nor TEGNA will be able to sustain their commitment to the localized, independent, fact-based journalism that these markets currently enjoy."[162] The Applicants further maintain that "[i]nsisting on continued separate ownership eventually will be the death of at least one news organization in these markets."[163] Finally, they state that "at least two independent local broadcast news operations will remain" in each of the DMAs post-Transaction.[164]

50.     Absent grant of the waiver request, the Applicants assert that Nexstar would be required to divest a weak station, one that shows "signs that a station is failing."[165] While acknowledging that the "failing" station waiver standard "does not extend to markets where the applicant will own more than two stations," the Applicants nevertheless assert that the Commission's underlying policy—allowing a "failing" station to join with a stronger station in the market to improve its ability to provide local programming—supports grant of their waiver request.[166] For example, in the Dallas DMA, Nexstar states that it would be forced to divest either KDAF(TV), Dallas, Texas (CW/Antenna TV), the tenth-ranked station in the DMA, or KFAA-TV, Decatur, Texas (Independent/EstrellaTV), the twelfth-ranked station in the DMA, and that it is only through common ownership that the stations are able to offer the quality programming that they provide today.[167] If, however, it is permitted to leverage the strength of the newsroom of TEGNA's WFAA(TV), Dallas, Texas (ABC), the second-ranked station in the DMA, Nexstar states that it will be able to "begin broadcasting local news on KDAF."[168] The Applicants assert that similar public interest benefits from common ownership will be realized across other DMAs, including, for example, Houston;[169] Phoenix (Prescott);[170] Grand Rapids-Kalamazoo-Battle Creek;[171] Washington, DC (Hagerstown);[172] San Diego;[173] and Huntsville-Decatur (Florence).[174]

(Continued from previous page) ——————————

[159] *See, e.g.*, *id*. at 39 (Phoenix (Prescott) DMA)); *id*. at 31 (Washington, DC (Hagerstown) DMA).

[160] *Id*. at 20.

[161] *Id*. at 21.

[162] *Id*. at 20.

[163] *Id*. at 21.

[164] *Id*.

[165] *See, e.g., id.* at 25 (citing 47 CFR § 73.3555, note 7; *Review of the Commission's Regulations Governing Television Broadcasting*, Report and Order, 14 FCC Rcd 12903, 12939, para. 81 (1999) (*Local Ownership Order*)) (establishing the presumptive "failing" station waiver standard). We note that in granting the requests for waiver herein, we are not explicitly applying the "failing" station waiver standard.

[166] Comp. Exh. at 26 (citing *Local Ownership Order*, 14 FCC Rcd at 12939, para. 79).

[167] *Id*.

[168] *Id*. at 21.

[169] *Id*. at 28 ("Nexstar plans to expand the local news operations at KIAH, which broadcasts a locally produced four-hour morning news show and a late local news program, utilizing TEGNA's award-winning KHOU newsroom.").

[170] *Id*. at 40 ("Nexstar plans to expand the amount of news on KAZT-TV, leveraging KPNX's strong local newsroom which has served its communities for more than 70 years.").

[171] *Id*. at 76 ("Nexstar plans to expand the amount of news on WZZM by leveraging WOOD-TV's award-winning newsroom.").

51.     The Commission's rules may be waived for good cause shown.[175]  When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[176]  Waiver is appropriate "if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest."[177]  In making this determination, the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.[178]

52.     We find that special circumstances warrant grant of the waiver requests to permit Nexstar to own three full power television stations in twenty-one of the twenty-three requested DMAs.[179]  In particular, we find that such degree of common ownership better serves the public interest than strict application of the Local Television Ownership Rule in those DMAs where at least one of the stations in the proposed combination is weak relative to the stronger stations in the market.  Even in those DMAs here where the weak, third station is the fifth-ranked station in the market, it is a distant fifth in terms of revenue and audience share, or other special circumstances exist to offset any competition concerns.[180]  Requiring divestiture of these weak stations to an independent buyer is not likely to enhance competition or preserve and promote increased local programming.  Any prospective buyer would have to invest significant capital to build the facilities and hire the staff necessary to operate the stations independently, without any guarantee that the stations would generate enough revenue to survive.  Moreover, as the Applicants state, the "production or acquisition of video content is an expensive endeavor," with local news operations being "particularly costly," amounting to "one third or more of a station's annual budget."[181]  Indeed, even TEGNA observes that it has already considered significant cost reduction initiatives and strategies for consolidating certain operations for its television stations that it was able to

(Continued from previous page) ————————————

[172] *Id.* at 32-33 (stating that Nexstar plans to "expand both the amount of news" on WDCW(TV), Washington, DC (Hagerstown) (CW/AntennaTV), the ninth-ranked station in the DMA, and "the station's newsgathering resources").

[173] *Id.* at 67 (observing that, if Nexstar were required to divest Nexstar station KUSI-TV, San Diego, California (Independent), the fifth-ranked station in the DMA, the 62.5 hours of local news that it broadcasts each week, as well as its extensive local high school sports coverage, could be lost).

[174] *Id.* at 103 (detailing that Nexstar plans to "expand the amount of news on WZDX, leveraging WHNT's strong news operation, which produces more than 37 hours of local news weekly and earned six ABBY Awards from the Alabama Broadcasters Association in 2025.") (internal citations omitted).

[175] 47 CFR § 1.3.

[176] *WAIT Radio v. FCC*, 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969).

[177] *See Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990 (citing *WAIT Radio*, 418 F.2d at 1159)); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008).

[178] *Northeast Cellular*, 897 F.2d at 1166.

[179] These DMAs are: Dallas-Fort Worth; Houston; Washington, DC (Hagerstown); Tampa-St. Petersburg (Sarasota); Phoenix (Prescott); Denver; Cleveland-Akron (Canton); Charlotte; Portland, OR; St. Louis; San Diego; Hartford-New Haven; Grand Rapids-Kalamazoo-Battle Creek; New Orleans; Memphis; Buffalo; Little Rock-Pine Bluff; Des Moines-Ames; Huntsville-Decatur (Florence); Ft. Smith-Fayetteville-Springdale-Rogers; and Davenport-Rock Island-Moline.  *See supra* note 6.

[180] For example, in the Grand Rapids-Kalamazoo-Battle Creek DMA, while Nexstar's WOTV(TV), Battle Creek, Michigan, is an ABC affiliate, it is a "distant fifth" in terms of both revenue and audience share.  *Id.* at 75.  Applicants note that this is largely because "WOTV primarily serves Battle Creek and the southeast corner of the DMA, while the DMA's top four stations cover the larger population center of Grand Rapids (which has its own ABC affiliate in WZZM[(TV), Grand Rapids, Michigan])."  *Id*. at 74-75.  Similarly, in the Huntsville-Decatur (Florence) DMA, Nexstar's WHDF(TV), Florence, Alabama, which is a CW affiliate, is a "very distant . . . fifth" and the "lowest-ranked reported station in the DMA in terms of revenue."  *Id*. at 102.

[181] Comp. Exh. at 9.

23

pause in light of the Transaction.[182]  The public interest would not be served by further diminishing these already weak stations or, in the event a buyer could not be found, letting them go dark; rather, we agree with the Applicants that Nexstar, through its acquisition of a third television in these markets, will "shor[e] up the long term viability" of the stations it will operate.[183]

53.     We further find that common ownership of the stations would not harm competition in these particular DMAs.  We agree with the Applicants that one station in each of these markets is weak and would otherwise fail, which does not serve competition.  In addition, Nexstar commits to "expand its investment in local news and programming after its acquisition of TEGNA is complete" and "increase[e] the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[184]  Nexstar also plans to expand the local news it provides in nine markets.[185]  Thus, strict compliance with the Local Television Ownership Rule would be inconsistent with the purpose of that rule—promoting competition among broadcast television stations—and, therefore, inconsistent with the public interest.[186]  Moreover, we find that grant of the Application will result in more effective implementation of Commission policy by preserving and promoting increased local programming in these particular DMAs.

54.     Finally, based on our own review of the Application and the record in this matter, we conclude that the potential public interest benefits of Nexstar owning the stations in these DMAs outweigh the potential harms.  Indeed, any potential competitive harm would be minimal in light of the weakness of one or more stations in the markets, the breadth of the number of full-power broadcast stations in the DMAs, and the degree of independent ownership of those stations.  We have not identified any other issues or potential public interest harms that would require further consideration, and we conclude that Nexstar's acquisitions in these particular markets would serve the public interest.

### 3.     Divestitures

55.     Nexstar commits to divest the following stations:   KTVD(TV), Denver, Colorado; WTHR(TV), Indianapolis, Indiana;[187] WCTX(TV), New Haven, Connecticut; WAVY-TV, Portsmouth, Virginia; WUPL(TV), Slidell, Louisiana; and KNWA-TV, Rogers, Arkansas.[188]  Moreover, Nexstar commits to divesting these stations "no later than two years following the TEGNA Closing Date, provided that a waiver of the Local TVO Rule remains necessary under the Commission's rules at such time."[189]  We find that competition will not be unduly harmed during the period of common ownership.

---

[182] Applicants Opposition at 20.  As the Applicants themselves admit, they are both "susceptible to intense market forces conspiring against their ability to sustain operations at their current level, and these challenges are amplified by the specific circumstances in the markets in which waiver of the Commission's rules may be necessary to allow the proposed combinations."  *See* Comp. Exh. at 1.

[183] *See* Comp. Exh. at 115.

[184] Nexstar Localism Commitment Letter at 2.

[185] *Id*.  These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo.  *Id*. at n.1.

[186] *See 2014 Quadrennial Regulatory Review*, MB Docket Nos. 14-50 et al., Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, 9833, para. 71 (2017); *2018 Quadrennial Review*, MB Docket No. 18-349, Report and Order, 38 FCC Rcd 12782, 12827, para. 81 (Local Television Ownership Rule "remains first and foremost competition-focused").

[187] Given that Nexstar has committed to divest WTHR, we find that we need not address the arguments raised in the CCB Petition.

[188] *Nexstar Localism Commitment Letter* at 2.

[189] *Id.* at 2.

## V.  STANDING

56.  Under the Act, only a "party in interest" has standing to file a petition to deny.[190]  In addition to containing the necessary factual allegations to support a *prima facie* case that grant of the application would be inconsistent with the public interest, convenience, and necessity, a petition to deny must contain specific allegations of fact demonstrating that the petitioner is a party in interest.[191]  The allegations of fact, except for those of which official notice may be taken, must be supported by an affidavit or declaration under penalty of perjury of someone with personal knowledge of the facts alleged.[192]  In the broadcast regulatory context, standing is generally shown in one of three ways: (1) as a competitor in the market subject to signal interference; (2) as a competitor in the market subject to economic harm; or (3) as a resident of the station's service area or regular listener or viewer of the station.[193]  An organization can establish standing on behalf of its members if it provides an affidavit or declaration "of one or more individuals entitled to standing indicating that the group represents local residents and that the petition is filed on their behalf."[194]  In general, a petitioner in a transfer proceeding also must allege and prove that: (1) it has suffered or will suffer an injury in fact; (2) there is a causal link between the proposed transfer and the injury in fact; and (3) not granting the transfer would remedy or prevent the injury in fact.[195]  Consistent with Commission practice, to the extent that we find standing has not been established, we will treat such pleading as an informal objection and address the arguments raised.[196]

57.  *CCB*.  We find that CCB has standing in the Indianapolis DMA.  Consistent with

[190] 47 U.S.C. § 309(d); 47 CFR § 73.3584.

[191] 47 U.S.C. § 309(d).

[192] *Id*.

[193] *See, e.g.*, *Nexstar/Tribune Order*; *Entercom License, LLC*, MB Docket No. 16-357, Hearing Designation Order, 31 FCC Rcd 12196, 12205, para. 22 (2016); *Connoisseur Media Licenses, LLC*, Letter Order, 30 FCC Rcd 6045, 6048, 6049 (MB 2015).

[194] *Liberman Television of Dallas License LLC, Debtor-in-Possession et al.*, Order, 34 FCC Rcd 8543, 8547, para. 7 (MB 2019); *Cox Radio, Inc. & Summit Media, LLC*, Letter Order, 28 FCC Rcd 5674, 5676, para. 2, n.12 (MB 2013).

[195] *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *MCI Communications Corp.*, Memorandum Opinion and Order, 12 FCC Rcd 7790 (1997); *Saga Communications of North Carolina, LLC and Library Productions, a Limited Partnership, re: WOXL-FM*, Letter Order, 20 FCC Rcd 11987 (MB 2005).  The Public Interest Petitioners request that the Commission expand its concept of "organizational standing," which limits an organization's standing to those markets in which a member submits an affidavit certifying residency or regular viewership of a station, and, instead, find standing based on harm that "could be derived from the impact on an organization, regardless of where it is located, or on the local or national impact on members who may not necessarily reside in the geographic market where stations are changing hands but still experience harm."  Applicants Opposition at 10; *see Nexstar/Tribune Order*, 34 FCC Rcd at 8448, para. 23.  The Public Interest Petitioners and the State Cable Petitioners also assert organizational standing on the basis of the standard set forth by the United States Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) (*Hunt v. Washington*), despite the fact that the Commission has squarely rejected this theory.  Public Interest Petition at 19-25; State Cable Petitioners Reply at 6-7; see *Friends of the Earth, Inc. and Forest Conservation Council, Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 23622, 23622, para. 4 (2003) (stating that, for purposes of standing under section 309(d), *Hunt v. Washington* does not eliminate the requirement that "associations submit affidavits from *local* residents or competitors to meet the party in interest threshold to establish standing" (emphasis added).  Finally, the Applicants request that the Commission require organizational members to submit an affidavit certifying to both residency *and* regular viewership of a station in order to demonstrate standing.  Applicants Opposition at 6, n.12.  The Bureau is bound by Commission precedent, and, accordingly, we deny the requested changes to the Commission's analysis.

[196] *See* 73 CFR § 73.3587.

Commission precedent, any broadcast licensee has standing to challenge a competitor seeking to transfer a license in the same market.[197]

58. *DIRECTV and EchoStar*. DIRECTV claims standing, arguing that the consolidation created by the Transaction will increase retransmission consent rates to MVPDs, thus making consumer price increases inevitable and causing direct economic injury in the form of higher churn, lower subscribership, and lower revenue.[198] EchoStar also asserts that it is a party in interest because, as the parent company of DISH, an MVPD that retransmits local broadcast stations in all 210 DMAs and currently has retransmission consent agreements with both Applicants, it expects to negotiate with them in the future for continued retransmission of all of their stations.[199] The Applicants respond that the alleged harms are too remote and speculative to support standing and that concerns about prospective increases in retransmission consent fees should instead be addressed under the Commission's good-faith negotiation framework.[200] In reply, DIRECTV states that the Applicants literally repeat arguments previously rejected by the Commission,[201] while EchoStar maintains that the threatened harm flows directly from the Transaction.[202]

59. Consistent with Commission precedent, we determine that the claims of DIRECTV and EchoStar—that the Transaction will have specific, negative effects on them, specifically related to retransmission consent fee negotiations, and that those harms can be cured by dismissal or denial of the Applications—are sufficient to establish standing.[203] Accordingly, we find that DIRECTV and EchoStar qualify as parties-in-interest with respect to the Transaction.

60. *Public Interest Petitioners*.[204] The Public Interest Petitioners claim representational standing and submit affidavits from members of NABET-CWA, TNG-CWA, Free Press, and UCC Media Justice certifying residency or regular viewership in several Transaction DMAs.[205] We reject the Applicants' argument that the affidavits suffer from fatal "factual and other defects"[206] and, consistent with Commission precedent, find that all four organizations have standing as a party in interest only in certain DMAs.[207] In all other markets, we will treat them as informal objectors. NABET-CWA has standing in Cleveland; Denver; Hartford & New Haven; Portland, OR; and Washington, DC (Hagerstown). TNG-CWA has standing in St. Louis; Phoenix (Prescott); and Washington, DC (Hagerstown). Free Press has standing in Denver; Grand Rapids-Kalamazoo-Battle Creek; Indianapolis;

---

[197] *See*, *e.g.*, *Existing Shareholders of Clear Channel Communications Inc. (Assignors) and Aloha Station Trust, LLC, as Trustee (Assignee)*, Memorandum Opinion and Order, 23 FCC Rcd 1421, 1431, para. 22 (finding standing based on petitioner's claim that its licensed stations compete with the transferors' in the same market).

[198] DIRECTV Petition at 61-63.

[199] EchoStar Petition at 1, n.1.

[200] Applicants Opposition at 12.

[201] DIRECTV Reply at 41.

[202] EchoStar Reply at 11-13.

[203] *See Nexstar/Tribune*, 34 FCC Rcd at 8448, para. 24.

[204] Although Public Knowledge is a signatory to the Public Interest Petition, it failed to submit the required affidavits. We will, therefore, treat Public Knowledge as an informal objector with respect to the Transaction.

[205] *See, e.g.*, Public Interest Petition at Declaration of Kenneth Koscick.

[206] Applicants Opposition at 11 & nn. 34-35.

[207] Since the requirement for viewer standing is either residency *or* regular viewership, *see supra* note 195, we reject the Applicants' arguments that certain affidavits certifying to regularly watching news produced by local television stations, without further specifying which stations, necessarily disqualifies party-in-interest status. *See* Applicants Opposition at 11, nn.34 & 35.

New Orleans; Sacramento; and San Diego. UCC Media Justice has standing in Cleveland-Akron (Canton); Dallas; Des Moines-Ames; Hartford & New Haven; St. Louis; San Diego; and Washington, DC (Hagerstown).

61. *State Cable Petitioners*.[208] The State Cable Petitioners claim standing as representatives of more than 20 MVPD "market competitors" operating across more than 100 DMAs served by Nexstar and TEGNA[209] and submit declarations from executives of member companies of BCAP and VCTA[210] asserting harms with a direct causal link to the Applicants' retransmission consent practices, including the use of "after-acquired station" clauses.[211] The Applicants contend that, to the extent we find that MVPDs establish standing on the basis of potential changes in retransmission consent fees, standing for BCAP and VCTA should be limited to those DMAs in which the supporting declarations indicate their members carry Nexstar or TEGNA stations.[212] In reply, the State Cable Petitioners assert that their representational standing should not be limited in geographic scope, because Nexstar negotiates retransmission consent on a nationwide basis, across its station footprint, and most State Cable Petitioners' members will be adversely impacted across numerous markets in multiple states."[213]

62. Consistent with Commission precedent, we find that, based on the declarations submitted, BCAP and VCTA have standing in certain DMAs. In all other markets we will treat them as informal objectors. Both associations have standing in Portland-Auburn; Washington, DC (Hagerstown); Cleveland-Akron (Canton); Hartford & New Haven; Norfolk-Portsmouth-Newport News; Buffalo; Columbus; Harrisburg-Lancaster-Lebanon-York; and Wilkes Barre-Scranton-Hazleton.[214] We also find that BCAP has standing in the Buffalo DMA.[215]

63. *Newsmax*. Newsmax argues that, as the independent video programmer of a linear television channel carried by major MVPDs, it will be harmed by the Transaction, because the resulting concentrated distribution will "further opportunities for other content creators like Nexstar . . . to use their market dominance to anti-competitively freeze out strong competitors from the marketplace."[216] Specifically, Newsmax alleges that Nexstar has its own nonbroadcast station, NewsNation, and that "Nexstar appears to have used its broadcast stations as leverage to coerce pay-TV distributors to pay a

---

[208] Although BCAW, ICBA, MCTA, and TCBA are signatories to the State Cable Petition, they failed to submit the required affidavits. We will, therefore, treat them as informal objectors with respect to the Transaction.

[209] State Cable Petition at 2-3.

[210] *See, e.g., id.* at Declaration of Joe Lorah.

[211] State Cable Reply at 4-5.

[212] Applicants Opposition at 13.

[213] State Cable Reply at 7. To the extent that the State Cable Petitioners suggest that they, rather than their members, have "standing . . . as competitors alleging economic harm," *id.*, we reject the argument. *See supra* note 195; *see also Standards for Determining the Standing of a Party*, 82 F.C.C.2d at 96 ("Even in the absence of injury to itself . . . an association may establish standing as the representative of its members, as long as it alleges that one or more of its members has standing, and the nature of the claim and the relief sought does not make the individual participation of each injured party indispensable to the resolution of the lawsuit.").

[214] *See* State Cable Petition, Declaration of Paul Beaudry, Cogeco US Finance LLC d/b/a Breezeline, para. 4 (Beaudry Decl.) (identifying service to all nine markets as a member of both BCAP and VCTA); Declaration of Joe Lorah, Blue Ridge Communications, para. 4 (Lorah Decl.) (identifying service to Harrisburg-Lancaster-Lebanon-York, PA; and Wilkes Barre-Scranton-Hazleton, PA as a member of BCAP); Declaration of Jack Capparell, Service Electric Cable TV & Communications, para. 4 (Capparell Decl.) (identifying service to Harrisburg-Lancaster-Lebanon-York, PA; and Wilkes Barre-Scranton-Hazleton, PA as a member of BCAP).

[215] *See* Lorah Decl. at para. 4 (identifying service to Buffalo, NY).

[216] Newsmax Objection at 3.

higher license fee for NewsNation than they do for Newsmax and other networks with higher ratings."[217] The Applicants respond that Newsmax fails to identify a single direct, non-speculative injury, observing that Newsmax does not own any television broadcast licenses; does not appear to have any commercial agreements with Nexstar or TEGNA; and that Newsmax's offices are not located in any of the DMAs at issue in the Transaction.[218] The Applicants further argue that Newsmax's claim of harm from possible anti-competitive behavior is based on conjecture and rests on a speculative chain of possibilities that courts have rejected.[219] In reply, Newsmax denies that its claim of harm is speculative, maintaining that Nexstar's increased market power will better enable it to strong-arm MVPDs to favor Nexstar's news service over Newsmax.[220]

64. We find that Newsmax does not qualify as a party in interest. The courts have made clear that "standing is accorded to persons not for the protection of their private interests but only to vindicate the public interest,"[221] and the Commission has repeatedly applied this ruling.[222]

## VI. POTENTIAL PUBLIC INTEREST HARMS AND BENEFITS

65. In this section, we consider the potential harms and benefits arising from the Transaction. As discussed below, in light of Nexstar's commitments, we find that the Transaction will not raise any material public interest harms. We further find that the Transaction is likely to result in some tangible benefits by allowing Nexstar to achieve the scale necessary to provide expanded news coverage, enhanced service, and continued innovation to the local communities it serves. We conclude that, on balance, the benefits outweigh any potential public interest harms.

66. Petitioners and Opposing Commenters of the Transaction argue that there are several distinct markets where this Transaction will result in consumer or other harms. As discussed below, the FCC's analysis and the record shows that they have failed to establish any relevant harms in the markets they define—or at least no harms that are not more than offset by the consumer benefits that will flow from this Transaction. Indeed, in many cases, they focus on claiming harm to competitors, rather than articulating harms to competition or to consumers. Throughout their advocacy, the Petitioners and Opposing Commenters also take a backwards-looking approach to competition. In at least some cases, they appear to assume that the market for news and information and other programming is a narrow one that looks nearly indistinguishable to decades past when broadcast TV dominated rather than the decade we live in today when broadcast TV competes in a broader market against streaming services, cable operators, virtual cable operators, and many other digital and traditional distributors of news, content, and information.

67. First, Petitioners and Opposing Commenters argue that this Transaction will produce harms in what they define as a market for local news. They appear to claim that this Transaction will result in a reduction in local news and therefore harm to consumers. The record does not support their position.

---

[217] *Id*. at 9; Newsmax Reply at 3. Newsmax included an affidavit from Christopher Ruddy, its chief executive officer, attesting to the truth of its submission. Newsmax Objection at 17.

[218] Applicants Opposition at 6.

[219] *Id*. at n.15 (citations omitted).

[220] *Id*. at 4.

[221] *Office of Communication of the United Church of Christ v. FCC,* 123 U.S. App. D.C. 328, 335, 359 F. 2d 994, 1001 (1966).

[222] *See*, *e.g.*, *CBS Radio Stations Assignor, Memorandum Opinion and Order*, 22 FCC Rcd 20058, 20061, para. 4 (MB 2007); *Arizona Mobile Telephone Company*, Memorandum Opinion and Order, 80 FCC 2d 87 (1980) (creditors are not generally permitted to participate in an application proceeding solely on the ground that they have a financial stake in the matter).

68.    The record shows that Nexstar has a track record of maintaining and expanding local news following its acquisition of other stations.  For instance, in the five years following Nexstar's 2019 acquisition of Tribune, Nexstar's stations (including many of its newly acquired stations) increased local news coverage by more than 28,000 hours per year (more than 12.5%) and garnered hundreds of awards annually recognizing their journalistic excellence, as Nexstar states in the record here.[223] During the same period, local lifestyle programming on Nexstar's stations rose by more than 9,000 hours per year (more than 75%) and local political programming increased by almost 800 hours per year (more than 40%).[224] More concretely, Nexstar has committed in this Transaction to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years from the date the TEGNA Acquisition is consummated.[225]  We accept these commitments as enforceable commitments.

69.    We therefore conclude that the Petitioners and Opposing Commenters have failed to establish that there will be any relevant harm in a market they define as the local news market.  Indeed, we find that both Nexstar's commitments and our analysis of the record show that consumers will realize benefits in the local news market.  The new combined station group will continue to invest in local news and reporting, which is a significant public interest benefit.

70.    Second, Petitioners and Opposing Commenters of the Transaction argue that there will be harms in what they define as a local spot advertising market.  Here, too, they fail to show relevant harms in any such market.  More fundamentally, they ground their arguments in an outdated and unduly narrow view of the competitive environment.  For one, advertising dollars have been shifting in large numbers from local TV broadcasters to digital platforms, including Facebook.  This supports the argument both advertisers and consumers view digital advertising as a substitute for traditional local TV ads.  We agree and find that this substitutability rebuts the claimed harms articulated by many Petitioners and Opposing Commenters.  Moreover, their arguments ignore relevant and revolutionary technology and other changes.  Today, both streamers and cable providers offer targeted and DMA-wide advertising options.[226] These offerings are real and competitive substitutes in any market for local spot advertising.  Advertisers can use those other competitors and distribution channels to reach the same demographic as the tradition local TV spot ad market.

71.    Third, Petitioners and Opposing Commenters argue that there will be harms that relate to retransmission consent.  In other words, they argue that this Transaction will allow Nexstar to charge MVPDs more for carrying their program and in turn this will result in harms—either harms in the form of higher prices or increased blackouts of programming based on their argument that MVPDs and Nexstar TV stations will fail to reach carriage agreements in a higher percentage of cases.  As above, they have failed to establish this case.  In many cases, certain Petitioners and Opposing Commenters do not even appear to be making an argument about harm to competition or to consumers.  Rather, they appear to be making an argument about harms to MVPDs themselves in the main while indicating additional pass through harms.  But even so, they have not established a cognizable case.

72.    As an initial matter, the Petitioners and Opposing Commenters effectively ignore a basic and fundamentally important fact.  The Nexstar programming that consumers get through an MVPD has a readily available and free substitute.  The Nexstar programming is broadcast free over the air.  Assuming

---

[223] *Nexstar Localism Commitment Letter* at 1-2.

[224] *Id.* at 2.

[225] *Id.*

[226] *See, e.g.*, *Streaming TV Advertising is Taking Over – Here's How to Get Ahead of the Curve* (Nov. 5, 2025), https://nationalmediaspots.com/streaming-tv-advertising-is-taking-over-heres-how-to-get-ahead-of-the-curve/; *Addressable TV: How Advertising is Evolving With Television* (Mar. 14, 2019), https://www.paramount.com/news/addressable-tv-how-advertising-is-evolving-with-television.

arguendo that Nexstar attempted to raise prices on MVPDs in a way that could produce cognizable harms or reach a point of program blackouts on MVPDs, consumers could switch to viewing Nexstar for free over the air. This dynamic disciplines both Nexstar and MVPDs. We find that this ameliorates any concerns raised in our record.

73.     Likewise, we conclude that the Petitioners and Opposing Commenters appear to base all or at least a substantial portion of their argument on a theory that consumers are locked into a traditional MVPD with no real competitive options if prices rises or blackouts increase. The record here does not support that view. We have entered a new streaming age where consumers have many more options today for the type of programming that, in many cases, they could previously get only through a single MVPD or cable company. Consumers now view those and use those as competitive substitutes to traditional MVPDs. This substitutability provides consumers with protection against the theoretical harms put forth by this deal's opponents. Indeed, the record here shows that the pricing charged for the equivalent type of network programming that consumers view on these streaming or virtual MVPDs is not set by Nexstar or any traditional MVPD. Rather, the evidence indicates that the relevant pricing for that programming is set, in the vMVPD context, by the national programmers negotiating directly with the vMVPD.

74.     Moreover, the Petitioners and Opposing Commenters have failed to establish that, assuming arguendo Nexstar increases the fees it charges to MVPDs, that any such increases would reach consumers. Nexstar does not set the rates that MVPDs charge to their customers. Nor have MVPDs provided transparency in our record regarding the current and potential future inputs that go into their consumer pricing for us to conclude that the relevant MVPDs would have to raise prices in response to this Transaction.

75.     We also note that Nexstar has made specific commitments that are relevant to this point. Specifically, Nexstar states that it "joins the Commission in its efforts to promote consumer affordability," and notes that MVPD bills are "wholly in the control of the MVPDS and include costs well beyond Nexstar's control, including for hundreds of other programming channels – particularly regional sports networks, equipment fees, DVR fees, regulatory fees, administrative fees, and HD fees, among the numerous charges before taxes."[227] While Nexstar notes its stations are always available free, over-the-air, to help consumers with MVPD affordability, "Nexstar commits to offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RTCA') that expires after the TEGNA Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026."[228] We accept these commitments as enforceable commitments.

76.     As indicated above, we also conclude that Petitioners and Opposing Commenters have largely ignored the features relevant to today's media environment. Their arguments would be more relevant and meaningful if the media environment looked more like the one that existed decades ago. But today, broadcasters are competing in a much larger, broader, and competitive environment. They are competing against digital advertisers and they are competing for viewers and listeners against various technology platforms—from streamers to podcasts. Broadcasters are no longer competing against other broadcasters, but against competitors that deliver their offerings over the Internet, from satellites in orbit, over 5G networks, over fiber, and over cable plus other technologies or modes of distribution. When placed in its proper market context, the harms and arguments pressed by this Transaction's opponents melt away and are otherwise offset by the substantial, competitive benefits as well as the benefits for the FCC's core media policy goals of competition, localism, and diversity.

A.     **Potential Public Interest Harms**

77.     *Anticompetitive Effects*. Several of the Petitioners and Opposing Commenters allege that

---

[227] *Nexstar Localism Commitment Letter* at 2-3.

[228] *Id.*

the Transaction would have anticompetitive effects, such as enhancing Nexstar's leverage to extract higher retransmission consent fees, which will negatively impact MVPDs and consumers,[229] and to use blackouts to extract higher retransmission consent fees.[230] We find, however, that the Petitioners' and Opposing Commenters' allegations regarding retransmission consent do not raise a substantial and material question of fact as to whether grant of the Applications would serve the public interest.[231]

78. With respect to alleged non-local effects, as the Commission stated in *Nexstar/Tribune*, the Commission has not previously identified a national market for the negotiation of retransmission consent.[232] Neither has the Commission found previously that increasing a station's national reach leads to a public interest harm in retransmission consent negotiations.[233] Moreover, consistent with the Commission's precedent, we do not believe that an increase in retransmission consent rates, by itself, is necessarily a public interest harm.[234] Rather, as the Commission has found, such harm exists only where an increase is not the product of "competitive marketplace considerations."[235] Over the years, the Commission has consistently affirmed Congress's intent, in creating the retransmission consent regime, to "establish a marketplace for the disposition of the rights to retransmit broadcast signals" but not to "dictate the outcome of the ensuing marketplace negotiations."[236]

79. Nexstar states that it "joins the Commission in its efforts to promote consumer affordability," and notes that MVPD bills are "wholly in the control of the MVPDS and include costs well beyond Nexstar's control, including for hundreds of other programming channels – particularly regional sports networks, equipment fees, DVR fees, regulatory fees, administrative fees, and HD fees, among the numerous charges before taxes."[237] While Nexstar notes its stations are always available free, over-the-air, to help with consumers with MVPD affordability, "Nexstar commits to offer those MVPDs with which Nexstar has an existing retransmission consent agreement ('RTCA') that expires after the TEGNA

---

[229] *See, e.g.*, Newsmax Objection at 11-12; DIRECTV Petition at 16-37; State Cable Petition at 36-48; ATVA and NCTC Objection at 4-9; EchoStar Petition at 2; AANHPI Coalition Objection at 3; National Civil Rights Organizations Objection at 3-4; Public Interest Petition at 42; Business Forward Objection at 1.

[230] *See, e.g.*, State Cable Petition at 47-48; EchoStar Petition at 15-16.

[231] *See supra* para. 12.

[232] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 28; *Transfer of Control of Raycom Media, Inc. to Gray Television, Inc.*, MB Docket 18-230, Memorandum Opinion and Order, 33 FCC Rcd 12349, 12357, para. 16 (*Gray-Raycom Order*); *Applications to Transfer Control of License Subsidiaries of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd 183, 196, para. 35 (MB/WTB 2017) (*Nexstar/Media General Order*).

[233] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8451, para. 28; *Gray-Raycom Order*, 33 FCC Rcd at 12357, para. 16; *Nexstar-Media General Order*, 32 FCC Rcd at 196, para. 35.

[234] *Nexstar/Tribune Order*, 34 FCC Rcd at 8451, para. 29.

[235] *Implementation of the Satellite Home Viewer Improvement Act of 1999 Retransmission Consent Issues: Good Faith Negotiation and Exclusivity*, MB Docket No. 99-363, First Report and Order, 15 FCC Rcd 5445, 5469-70, paras. 56-58 (2000) (*2000 Good Faith Negotiation Order*) (finding that "[c]onsiderations that are designed to frustrate the functioning of a competitive market" and "[c]onduct that is violative of national policies favoring competition" are not "competitive marketplace considerations").

[236] *See, e.g., Implementation of Section 103 of the STELA Reauthorization Act of 2014 Totality of the Circumstances Test*, MB Docket No. 15-216, Notice of Proposed Rulemaking, 30 FCC Rcd 10327, 10328, para. 2 (2015) (*Totality of the Circumstances Test NPRM*), citing S. Rep. No. 92, 102nd Cong., 1st Sess. (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1169. Under this regime, broadcast television stations and MVPDs are required to "negotiate in good faith," and it is not a violation of the duty to negotiate in good faith where a party enters into agreements "containing different terms and conditions, including price terms" with different entities, provided "such different terms and conditions are based on competitive marketplace considerations." *See* 47 U.S.C. § 325(b)(3)(C).

[237] *Nexstar Localism Commitment Letter* at 2-3.

Closing Date and before November 30, 2026, an extension of such RTCA at the existing rates through November 30, 2026."[238]

80.       We also find that Petitioners' and Opposing Commenters' allegations regarding Nexstar's incentive and ability, post Transaction, to black out (or threaten to black out) its stations go to the functioning of the retransmission consent marketplace, and the Commission has not previously entertained general concerns about the retransmission consent marketplace in the context of individual transactions.[239] Instead, the Commission has, in the past, considered issues related to retransmission consent—including leverage in retransmission consent negotiations—in rulemaking proceedings,[240] and we believe that it is appropriate to continue that practice here.

81.       *Localism, Viewpoint Diversity, and Jobs*.  Several Petitioners and Opposing Commenters raise concerns regarding localism, viewpoint diversity, and the labor market, arguing that increased access to Nexstar's various news bureaus will not enhance localism and that consolidated news functions will result in duplication of content.[241] We find that Petitioners' and Opposing Commenters' arguments regarding the Transaction's impact on localism do not raise a substantial and material question of fact as to whether grant of the Applications would serve the public interest.[242] In particular, we find that the arguments that increased access to national and state news bureaus will not enhance localism to be without merit.  As discussed *infra*, the Commission has previously found that expanded access to Washington, DC, and state news bureaus can produce transaction-specific public interest benefits to viewers and give stations access to new resources, even when it is a shared resource.[243] To the contrary, we agree with the Digital First Project that the Transaction "enhances the ability of local stations to invest in journalism, weather coverage, and public-interest programming by enabling scale and operational efficiency.  The record contains no evidence that the [T]ransaction will reduce local news output, eliminate independent editorial judgment, or diminish viewpoint diversity."[244]

82.       Regarding the arguments that Nexstar may cut news staff and consolidate news functions, which they contend will result in duplication of content across stations and harm to localism,[245] we conclude that Nexstar's commitments, as discussed below, will offset any potential harms.  Specifically, as discussed above, Nexstar commits to "expand[ing] its investment in local news and programming"

---

[238] *Id*.

[239] *See, e.g., Nexstar/Tribune Order*, 34 FCC Rcd at 8452, para. 31; *Gray-Raycom Order*, 33 FCC Rcd at 12356-58, paras. 15-17; *Nexstar-Media General Order*, 32 FCC Rcd at 196-97, paras. 34-36.

[240] *See, e.g., Reporting Requirements for Commercial Television Broadcast Station Blackouts,* MB Docket No. 23-427, 40 FCC Rcd 659 (2024)*; Totality of the Circumstances Test NPRM*, 30 FCC Rcd at 10336-38, para. 13 (seeking comment on certain practices employed by broadcasters to "gain leverage in retransmission consent discussions"); *Implementation of Section 207 of the Satellite Home Viewer Extension and Reauthorization Act of 2004 Reciprocal Bargaining Obligation*, MB Docket No. 05-89, Report and Order, 20 FCC Rcd 10339, 10345-46, para. 15 (2005) (concluding that the Commission would "take into account the relative bargaining positions of the parties when examining the totality of the circumstances for a failure to negotiate in good faith"); *2000 Good Faith Negotiation Order*, 15 FCC Rcd at 5469-70, paras. 56-58 (providing examples of retransmission consent negotiation proposals that would be presumptively consistent or inconsistent with "competitive marketplace considerations" under the good faith standard).

[241] *See, e.g*., ATVA and NCTC Objection at 11-12; CCB Petition at 9-10; DIRECTV Petition at 46-53; Newsmax Objection at 13-16; State Cable Petition at 51-54; Public Interest Petition at 46-47.

[242] *See supra* para. 13.

[243] *See infra* notes 261-62.

[244] DFP Reply at 1.

[245] *See supra* paras. 13-14.

following consummation of the Transaction.[246] Nexstar "commits to increasing the amount and availability of local programming in the aggregate in the acquisition markets, and to maintain that increase in local programming hours for a minimum of two years" from consummation.[247] In addition, Nexstar plans to "expand the local news it provides" in nine DMAs.[248] Nexstar also notes that it has launched local station apps on a variety of platforms in 108 of its markets, which provide a "wide array of truly local programming to serve viewers."[249] Nexstar also submits that to preserve the independence of its local newsrooms, Nexstar has "already ended our news cooperation relationship with one of the national broadcast networks," and it intends to allow its "remaining agreements with the national broadcast networks to terminate as they expire."[250] We accept these commitments as firm and definite, and expect that they will help ensure that the post-Transaction company will continue to serve its communities by maintaining, and even increasing, locally focused programming.

### B.  Potential Public Interest Benefits

83.    We next review the potential public interest benefits.  The Commission finds a claimed benefit to be cognizable only if it is:  (1) transaction-related; (2) verifiable; and (3) likely to flow through to consumers and not inure solely to the benefit of the company.[251]  Here, we find that the record indicates that the Transaction will produce some public interest benefits to viewers of Nexstar's and TEGNA's stations, including by "creat[ing] a broadcaster positioned to navigate the 'headwinds and competition' facing the broadcast industry," which, in turn, will provide Nexstar with the ability to invest in local news production and increase local coverage in the communities the combined company will serve.[252]  We also recognize Nexstar's commitments to increase the amount and availability of local programming in the aggregate in the acquisition markets, as discussed above, as well as Nexstar's commitments with respect to its hiring practices.[253]

84.    The Applicants observe "existential changes to the market in which they compete," in which "national and global technology and media behemoths" increasingly "siphon revenue away from broadcast stations for the benefit of their national and global digital platforms and affiliated streaming services, rendering Nexstar and TEGNA unable to compete and maintain the same level of investment in the essential local content upon which their communities rely."[254]  They assert that consumers viewing habits have also changed, stating that in the last year, "video streaming reached 100 percent market penetration, streaming emerged as the primary way that viewers consume video content, and broadcast

---

[246] *Nexstar Localism Commitment Letter* at 2.

[247] *Id*.

[248] *Id*. & n. 1 ("These include Dallas-Fort Worth, Houston, Washington-Hagerstown, Phoenix-Prescott, Grand Rapids-Kalamazoo-Battle Creek, Huntsville-Decatur-Florence, Waco-Temple-Bryan, Abilene-Sweetwater, and San Angelo.")

[249] *Id*. at 2.

[250] *Id*.

[251] *See Applications Filed for the Transfer of Control of Authorizations Held by Frontier Communications Corporation, Debtor-in-Possession and Its Wholly Owned Subsidiaries et al.,* WC Docket No. 20-197 et al., Memorandum Opinion and Order and Declaratory Ruling, 36 FCC Rcd 291, 301, para. 25 (WCB/IB/WTB/OEA 2021) (*Frontier 2021 Order*); *T-Mobile-Sprint Order*, 34 FCC Rcd at 10671, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50 (citing *AT&T-BellSouth Order*, 22 FCC Rcd at 5761, para. 202); *AT&T-DIRECTV Order*, 30 FCC Rcd at 9237, paras. 273-74.

[252] *See* Applicants Opposition at 16 & 21 (internal citations omitted).

[253] *Nexstar Localism Commitment Letter; see* Letter from Perry Sook, Chairman and Chief Executive Officer, Nexstar Media Group, Inc., to Hon. Brendan Carr, Chairman, FCC, MB Docket No. 25-331 (filed Mar. 19, 2026) (*Nexstar Workforce Commitment Letter*).
[254] Comp. Exh. at 2.

television viewing plummeted to a new low of just 18.5 percent of total monthly television viewing."[255] The Applicants note that forecasts predicting decreases in local television advertising revenue are further compounded by rising operating costs for producing or acquiring video content.[256] The Applicants thus provide that "[w]ith this handwriting on the wall," the proposed Transaction represents the best course for the future and will "enable the combined company to reduce costs and innovate, thus continuing to serve local communities with freely available and critical news, sports, weather and emergency information."[257]

85. Further, they assert that "[e]fficiencies created by the Transaction likewise will fuel enhancements to the quantity and quality of broadcast service that neither company alone can continue to provide."[258] For example, the Applicants state that, once the Transaction is consummated, the TEGNA stations will gain access to Nexstar's Washington, DC, news bureau, a resource TEGNA stations will not otherwise have, "which provides in-depth coverage and analysis of federal policies tailored to the needs and interests of viewers in the individual DMAs where Nexstar's stations operate."[259] Moreover, viewers of stations, including in a number of states that TEGNA stations serve, will also benefit from Nexstar's operation of "24 state capital news bureaus that provide local viewers with increased access to state lawmakers and their opinions on critical issues, state agency activities, and state supreme court proceedings, as well as special programming on state issues."[260] We have previously found that expanded access to Washington, DC, and state news bureaus that results from a transaction "provide[s] transaction-specific, public interest benefits" to viewers[261] and that even shared news sources provide public interest benefits when stations did not have prior access to those sources.[262]

86. To better serve their local audiences, the Applicants point out that the Transaction will also allow "Nexstar to accelerate the shift to ATSC 3.0 for those TEGNA stations that are not already equipped for the next generation broadcast television standard."[263] They also provide that the "Transaction will go beyond merely upgrading broadcast infrastructure and provide all TEGNA stations with access to EdgeBeam Wireless, a joint venture among four leading broadcast station groups (including Nexstar) that provides a national footprint for ATSC 3.0 Broadcast Internet services. Participation in EdgeBeam will provide the TEGNA stations with new revenue opportunities, allowing them to monetize their spectrum to support their continued investment in reliable and trustworthy local journalism."[264] As we have previously found, investments in ATSC 3.0 for the acquired stations constitutes a public interest benefit and we therefore disagree with Petitioners[265] and find that accelerating

---

[255] Applicants Opposition at 17, citing Comp. Exh. at 7.

[256] *See* Comp. Exh. at 8-9.

[257] *Id*. at 9. *See also* CAR Comments at 9 ("And Nexstar's applications demonstrate a consistent commitment to increasing local sports where possible, such as pre-season games or secondary sports and leagues. Approving the transaction will give Nexstar necessary leverage to negotiate broadcast rights that keep marquee sports free for everyone.").

[258] Applicants Opposition at 26.

[259] *Id*. at 21-22.

[260] *Id*. at 22-23 (internal citations omitted).

[261] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8449-8450, para. 26; *see also Gray-Raycom Order*, 33 FCC Rcd at 12356, 12361-62, paras. 14, 31; *Nexstar/Media General Order*, 32 FCC Rcd at 194-196, paras. 26-29.

[262] *Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 26; *Gray-Raycom Order*, 33 FCC Rcd at 12361-62, para. 31.

[263] Applicants Opposition at 24-25.

[264] *Id*. (internal citations omitted).

[265] *See* Public Interest Petition at 48; State Cable Petition at 55-57.

the transition to ATSC 3.0 is in the public interest.[266]

87.     We recognize Nexstar's commitment to equal opportunity employment and nondiscrimination as strengthening its service in the public interest.[267]  Nexstar states that it does not have DEI programs in place today and will not establish such initiatives.  Nexstar further summarizes the changes Nexstar has made to its practices to promote equal employment and nondiscrimination and additional commitments it will make upon closing the Transaction, including to its hiring and promoting practices, training, compensation, supplier and vendor selection, leadership structure and job functions, employee groups, and public and internal messaging.[268]  We accept Nexstar's commitment as firm and definite, and expect that these changes will prevent DEI discrimination in the post-transaction company, as consistent with the law and public interest.[269]

88.     The Commission has acknowledged that a transaction enabling a combined company to emerge as a stronger competitor in the marketplace is a transaction-specific benefit to consumers.[270]  Overall, based on the record before us, we find that the Transaction is likely to result in public interest benefits and therefore we find the Transaction serves the public interest, convenience, and necessity.

## VII.    CONCLUSION

89.     We have conducted a detailed review of the Applications and related filings in this proceeding, as well as a thorough analysis of the potential harms and benefits of the Transaction, including the firm and definite commitments of the Applicants to take certain actions, as set forth above.  Based on our extensive consideration of the record, and subject to the commitments contained herein, we find that the Applicants are fully qualified and conclude that grant of the Applications will result in public interest benefits and serve the public interest, convenience, and necessity.

## VIII.   ORDERING CLAUSES

90.     Accordingly, having reviewed the Applications and the record in this matter, **IT IS ORDERED**, pursuant to sections 4(i) and (j), and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. § 154(i), 154(j), 310(d), that, subject to Nexstar's commitments, the Applications proposing to transfer control of TEGNA Inc. to Nexstar Media Inc. **ARE GRANTED**.

91.     Accordingly, **IT IS ORDERED** that, pursuant to section 1.3 of the Commission's rules, 47 CFR § 1.3, the requests of Nexstar Media Inc. and TEGNA Inc., for waiver of sections 73.3555(b) and (e) of the Commission's rules, 47 CFR § 73.3555(b) (vacated in part by *Zimmer Radio*) and (e), **ARE GRANTED**.

92.     **IT IS FURTHER ORDERED**, pursuant to Sections 4(i) and (j), 309, and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 309, 310(d), that the petitions to deny and other requests for Commission action, addressed herein, filed by Newsmax Media, Inc.; DIRECTV, LLC; CCB License, LLC; Broadband Communications Association of Pennsylvania et al.; United Church of Christ Media Justice Ministry et al.; EchoStar Corporation; One Ministries, Inc.;

---

[266] *See Nexstar/Tribune Order*, 34 FCC Rcd at 8450, para. 26.

[267] *Nexstar Workforce Commitment Letter*.

[268] *Id.* at 1-3.

[269] *Id.*

[270] *See, e.g., CenturyLink-Qwest Order*, 26 FCC Rcd at 4202, para. 15, 4212, para. 39; *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10472-73, paras. 100-101 (2013) (*Alaska Wireless-GCI Order*); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9605, paras. 52-53; *Applications of XO Holdings and Verizon Communications Inc. For Consent to Transfer Control of Licenses and Authorizations,* Memorandum Opinion and Order, 31 FCC Rcd 12501, 12534, para. 61 (WCB, IB, WTB 2016).

AANHPI Coalition Objection; National Civil Rights Organizations Objection; Sean Patrick Patterson; Mafia Monthly; Business Forward; American Television Alliance and National Content & Technology Cooperative; NTCA—The Rural Broadband Association; Cincinnati Bell Extended Territories LLC (dba altafiber); National Association of Black Owned Broadcasters and the Multicultural Media, Telecom and Internet Council, **ARE DENIED**.

93. **IT IS FURTHER ORDERED** that this Memorandum Opinion and Order **SHALL BE EFFECTIVE** upon adoption, in accordance with section 1.102 of the Commission's rules, 47 CFR § 1.102. Petitions for reconsideration under section 1.106 of the Commission's Rules, 47 CFR § 1.106, may be filed within thirty days of the release date of this Memorandum Opinion and Order.

94. These actions are taken pursuant to Sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, and Sections 4(i) and (j), and 310(d) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 310(d).

95. **IT IS FURTHER ORDERED**, that, should no petitions for reconsideration, applications for review, or petitions for judicial review be timely filed, MB Docket No. 25-331 **SHALL BE TERMINATED** and the docket closed.

FEDERAL COMMUNICATIONS COMMISSION

Erin Boone
Chief, Media Bureau

**APPENDIX**
**TEGNA Transfer of Control Applications**

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WUPL(TV) | 13938 | Belo TV, Inc. | 0000280940 | Slidell, LA |
| WBXN-CD | 70419 | Belo TV, Inc. | 0000280941 | New Orleans, LA |
| KFSM-TV | 66469 | Cape Publications, Inc. | 0000280719 | Fort Smith, AR |
| KTHV(TV) | 2787 | Cape Publications, Inc. | 0000280720 | Little Rock, AR |
| WZZM(TV) | 49713 | Combined Communications of Oklahoma, LLC | 0000280972 | Grand Rapids, MI |
| KENS(TV) | 26304 | KENS-TV, Inc. | 0000280703 | San Antonio, TX |
| KFMB-TV | 42122 | KFMB-TV, LLC | 0000280712 | San Diego, CA |
| KHOU(TV) | 34529 | KHOU-TV, Inc. | 0000280755 | Houston, TX |
| KTBU(TV) | 28324 | KHOU-TV, Inc. | 0000280756 | Conroe, TX |
| KING-TV | 34847 | KING Broadcasting Company | 0000280789 | Seattle, WA |
| KREM(TV) | 34868 | KING Broadcasting Company | 0000280799 | Spokane, WA |
| KTVB(TV) | 34858 | KING Broadcasting Company | 0000280798 | Boise, ID |
| K15IO-D | 34869 | KING Broadcasting Company | 0000280792 | McCall & New Meadows, ID |
| K16JE-D | 188132 | KING Broadcasting Company | 0000280790 | Glenns Ferry, ID |
| K17KF-D | 188131 | KING Broadcasting Company | 0000280797 | Cambridge, ID |
| K21CC-D | 50532 | KING Broadcasting Company | 0000280796 | Lewiston, ID |
| K23KY-D | 11446 | KING Broadcasting Company | 0000280791 | Council, ID |
| K29NB-D | 34884 | KING Broadcasting Company | 0000280793 | Cascade, ID |
| K30QA-D | 34861 | KING Broadcasting Company | 0000280794 | Coeur d'Alene, ID |
| KTFT-LD | 167056 | KING Broadcasting Company | 0000280795 | Twin Falls, ID |
| KONG(TV) | 35396 | KONG-TV, Inc. | 0000280832 | Everett, WA |
| KSKN(TV) | 35606 | KSKN Television, Inc. | 0000280842 | Spokane, WA |
| KTTU-TV | 11908 | KTTU-TV, Inc. | 0000280848 | Tucson, AZ |
| KVUE(TV) | 35867 | KVUE Television, Inc. | 0000280853 | Austin, TX |
| KWES-TV | 42007 | KWES Television, LLC | 0000280858 | Odessa, TX |
| KXTV(TV) | 25048 | KXTV, LLC | 0000280868 | Sacramento, CA |
| KBMT(TV) | 10150 | LSB Broadcasting, Inc. | 0000280646 | Beaumont, TX |
| KCEN-TV | 10245 | LSB Broadcasting, Inc. | 0000280649 | Temple, TX |
| KIDY(TV) | 58560 | LSB Broadcasting, Inc. | 0000280656 | San Angelo, TX |
| KIII(TV) | 10188 | LSB Broadcasting, Inc. | 0000280647 | Corpus Christi, TX |
| KXVA(TV) | 62293 | LSB Broadcasting, Inc. | 0000280652 | Abilene, TX |
| KYTX(TV) | 55644 | LSB Broadcasting, Inc. | 0000280651 | Nacogdoches, TX |
| KUIL-LD | 168234 | LSB Broadcasting, Inc. | 0000280655 | Beaumont, TX |
| KAGS-LD | 10246 | LSB Broadcasting, Inc. | 0000280648 | Bryan, TX |

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|-----------|-----------------|----------|--------------|----------------------|
| KIDU-LD | 58559 | LSB Broadcasting, Inc. | 0000280650 | Brownwood, TX |
| KIDV-LD | 58571 | LSB Broadcasting, Inc. | 0000280654 | Albany, TX |
| KVHP-LD | 168235 | LSB Broadcasting, Inc. | 0000280653 | Jasper, TX |
| WGRZ(TV) | 64547 | Multimedia Entertainment, LLC | 0000280922 | Buffalo, NY |
| KARE(TV) | 23079 | Multimedia Holdings Corporation | 0000280666 | Minneapolis, MN |
| KNAZ-TV | 24749 | Multimedia Holdings Corporation | 0000280670 | Flagstaff, AZ |
| KPNX(TV) | 35486 | Multimedia Holdings Corporation | 0000280667 | Mesa, AZ |
| K06AE-D | 35274 | Multimedia Holdings Corporation | 0000280668 | Prescott, AZ |
| K26OD-D | 35487 | Multimedia Holdings Corporation | 0000280669 | Globe, AZ |
| KPSN-LD | 63396 | Multimedia Holdings Corporation | 0000280672 | Payson, AZ |
| KTVD(TV) | 68581 | Multimedia Holdings Corporation | 0000280671 | Denver, CO |
| KUSA(TV) | 23074 | Multimedia Holdings Corporation | 0000280674 | Denver, CO |
| WJXX(TV) | 11893 | Multimedia Holdings Corporation | 0000280675 | Orange Park, FL |
| WTLV(TV) | 65046 | Multimedia Holdings Corporation | 0000280673 | Jacksonville, FL |
| KSDK(TV) | 46981 | Multimedia KSDK, LLC | 0000280839 | St. Louis, MO |
| WATL(TV) | 22819 | Pacific and Southern, LLC | 0000280898 | Atlanta, GA |
| WLTX(TV) | 37176 | Pacific and Southern, LLC | 0000280901 | Columbia, SC |
| WMAZ-TV | 46991 | Pacific and Southern, LLC | 0000280900 | Macon, GA |
| WXIA-TV | 51163 | Pacific and Southern, LLC | 0000280899 | Atlanta, GA |
| WBNS(AM) | 54901 | RadiOhio, Incorporated | 0000280910 | Columbus, OH |
| WBNS-FM | 54701 | RadiOhio, Incorporated | 0000280909 | Columbus, OH |
| WHAS-TV | 32327 | Sander Operating Co. I LLC D/B/A WHAS Television | 0000280924 | Louisville, KY |
| KGW(TV) | 34874 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280730 | Portland, OR |
| K16ML-D | 34851 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280736 | Corvallis, OR |
| K17HA-D | 130923 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280738 | Astoria, OR |
| K19LT-D | 34864 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280732 | Prineville, etc., OR |
| K25KS-D | 34844 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280735 | The Dalles, OR |
| K28MJ-D | 189303 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280737 | Tillamook, OR |
| K29AZ-D | 34865 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280734 | Newport, OR |
| K35HU-D | 34870 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280733 | Grays River, OR |
| KGWZ-LD | 30810 | Sander Operating Co. III LLC D/B/A KGW Television | 0000280731 | Portland, OR |

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|-----------|-----------------|----------|--------------|----------------------|
| KMSB(TV) | 44052 | Sander Operating Co. V LLC D/B/A KMSB Television | 0000280816 | Tucson, AZ |
| KCWI-TV | 51502 | TEGNA Broadcast Holdings, LLC | 0000280681 | Ames, IA |
| WCCT-TV | 14050 | TEGNA Broadcast Holdings, LLC | 0000280688 | Waterbury, CT |
| WNEP-TV | 73318 | TEGNA Broadcast Holdings, LLC | 0000280689 | Scranton, PA |
| WOI-DT | 8661 | TEGNA Broadcast Holdings, LLC | 0000280692 | Ames, IA |
| WPMT | 10213 | TEGNA Broadcast Holdings, LLC | 0000280687 | York, PA |
| WQAD-TV | 73319 | TEGNA Broadcast Holdings, LLC | 0000280693 | Moline, IL |
| WTIC-TV | 147 | TEGNA Broadcast Holdings, LLC | 0000280683 | Hartford, CT |
| WZDX(TV) | 28119 | TEGNA Broadcast Holdings, LLC | 0000280684 | Huntsville, AL |
| W07DC-D | 73325 | TEGNA Broadcast Holdings, LLC | 0000280686 | Allentown/ Bethlehem, PA |
| W10CP-D | 73320 | TEGNA Broadcast Holdings, LLC | 0000280682 | Towanda, PA |
| W14CO-D | 73326 | TEGNA Broadcast Holdings, LLC | 0000280685 | Clarks Summit, etc., PA |
| W15CO-D | 73324 | TEGNA Broadcast Holdings, LLC | 0000280691 | Towanda, PA |
| W20AD-D | 73321 | TEGNA Broadcast Holdings, LLC | 0000280694 | Williamsport, PA |
| W26CV-D | 129499 | TEGNA Broadcast Holdings, LLC | 0000280695 | Mansfield, PA |
| W29FQ-D | 73327 | TEGNA Broadcast Holdings, LLC | 0000280690 | Pottsville, PA |
| WTSP(TV) | 11290 | Tegna East Coast Broadcasting, LLC | 0000280915 | St. Petersburg, FL |
| WLBZ(TV) | 39644 | Tegna East Coast Broadcasting, LLC | 0000280918 | Bangor, ME |
| WCSH(TV) | 39664 | Tegna East Coast Broadcasting, LLC | 0000280916 | Portland, ME |
| WATN-TV | 11907 | TEGNA Memphis Broadcasting, Inc. | 0000280904 | Memphis, TN |
| WLMT(TV) | 68518 | TEGNA Memphis Broadcasting, Inc. | 0000280905 | Memphis, TN |
| WTHR(TV) | 70162 | VideoIndiana, Inc. | 0000280937 | Indianapolis, IN |
| WALV-CD | 70161 | VideOhio, Inc. | 0000280876 | Indianapolis, IN |
| WBIR-TV | 46984 | WBIR-TV, LLC | 0000280906 | Knoxville, TN |
| WBNS-TV | 71217 | WBNS-TV, Inc. | 0000280907 | Columbus, OH |
| WCNC-TV | 32326 | WCNC-TV, Inc. | 0000280911 | Charlotte, NC |
| W17EE-D | 32316 | WCNC-TV, Inc. | 0000280913 | Lilesville/ Wadesboro, NC |
| W36FB-D | 32317 | WCNC-TV, Inc. | 0000280912 | Briscoe, NC |
| KFAA-TV | 73701 | WFAA-TV, Inc. | 0000280990 | Decatur, TX |
| WFAA(TV) | 72054 | WFAA-TV, Inc. | 0000280989 | Dallas, TX |
| WFMY-TV | 72064 | WFMY Television, LLC | 0000280921 | Greensboro, NC |
| WKYC(TV) | 73195 | WKYC-TV, LLC | 0000280936 | Cleveland, OH |
| WTOL(TV) | 13992 | WTOL Television, LLC | 0000280938 | Toledo, OH |

| Call Sign | Facility ID No. | Licensee | LMS File No. | Community of License |
|---|---|---|---|---|
| WUSA(TV) | 65593 | WUSA-TV, Inc. | 0000280943 | Washington, DC |
| WVEC(TV) | 74167 | WVEC Television, LLC | 0000280949 | Hampton, VA |
| WJHJ-LD | 35137 | WVEC Television, LLC | 0000280950 | Newport News, etc., VA |
| WWL-TV | 74192 | WWL-TV, Inc. | 0000280967 | New Orleans, LA |